```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
IN RE: EPHEDRA PRODUCTS LIABILITY  :     04 M.D. 1598 (JRS)
LITIGATION                         :
                                   :     Honorable Jed S. Rakoff
----------------------------------X
Pertains to:                       :     Pertains to Docket No.
                                   :     06-CV-00014
HARBIR SINGH and DOINA CARAGATA,   :     (United States District
                                   :     Court for the
                                   :     Southern District of New
                                   :     York)
                  Plaintiffs,      :
                                   :
       -against-                   :
                                   :
HERBALIFE INTERNATIONAL            :
COMMUNICATION, INC., HERBALIFE     :
INTERNATIONAL OF AMERICA, INC.,    :
and STEVE PETERSON,                :
                                   :
                  Defendant.       :
----------------------------------X
```

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO PRECLUDE OR LIMIT THE TESTIMONY OF DEFENDANTS' CASE-SPECIFIC EXPERTS

### I.   INTRODUCTION

Defendant Herbalife in its statement of disclosure of case-specific expert witnesses dated Feb. 27, 2007 (attached as exhibit 1), lists two case-specific experts:

1.  John F. Dashe, M.D.

2.  Bruce C. Zablow, M.D.

Testimony by these experts should be either precluded at a trial of this case or the testimony reformed and limited in order to comply with the rulings of this Court and the Federal Rules of

1

Civil Procedure.

## II. FACTS

The facts of this case in brief are that our client, Harbir Singh, suffered a stroke on May 10, 2003, after consuming an Herbalife product, "Original Green," which contained ephedra and caffeine.  His stroke was of the subarachnoid hemorrhage type. The hemorrhage was due to the rupture of an aneurysm in his brain. Plaintiffs' case-specific neurologist expert has opined that the ephedra was a contributing factor in producing the rupture of a weak place in a cerebral vessel.  This occurred through the mechanism of elevated blood pressure.

## III. LAW AND ANALYSIS

A.  Dr. John F. Dashe, M.D.

Defendant expert Dr. Dashe is a Boston neurologist.  In his report (attached as exhibit 2 and also part of exhibit 1), at page 5 he makes a number of overly broad statements which belong in the province of the generic expert, if at all.

> To summarize, there is no basis on which to claim that Mr. Singh's stroke was caused by the Herbalife product, as the available scientific evidence does not support a hypertensive effect of ephedra alkaloids.

> There is no convincing scientific evidence that ephedra use increases the risk of the conditions suffered by Mr. Singh, that is aneurysm formation, aneurysm rupture, or hemorrhagic stroke including subarachnoid hemorrhage and intracerebral hemorrhage.

> And on page 7 it is stated:

> It is therefore my opinion, based on the best available

2

scientific evidence, that Mr. Singh's use of Herbalife played no causative role in these events and was unrelated to his aneurysm rupture and subarachnoid hemorrhage.

This Court has ruled that discussion of the inherent properties of ephedra is the province of the generic experts, not the case-specific experts.  And this rule was applied to defense experts as well as plaintiffs' experts.  See Parks v. Herbalife International, opinion filed 12/13/06, at p. 4. (Attached as exhibit 3.)

Plaintiffs submit that the banned topic of "inherent properties," which from the defense point of view relates to "non-causation," encompasses the ultimate and conclusory statements in Dr. Dashe's report set forth above, such as "no convincing scientific evidence."

One of the defendants' experts in the Parks decision was the same Dr. Dashe offered here.  His report in Parks was similar to the one presented in this case.  This Court struck general language from his report.

(This is not the situation posited in Parks, where the plaintiff has introduced a new type of injury or injury mechanism for which the defendant has no generic expert and therefore the defendant's expert may cover the generic field as well.  Here the injury, a stroke due a bleed in the brain, is one covered by Dr. Steven R. Levine in the generic report.)

In the deposition which plaintiff took of Dr. Dashe on April

3

12, 2007, he reiterated these conclusory statements.  For
example, at p. 99 (attached as exhibit 4) he stated:

> p. 99, lines 20-14
> Yes, my opinion is that it's never been convincingly
> demonstrated that ephedra alkaloids alone have any
> clinically important association with increased blood
> pressure...

And he also stated:

> p. 102, lines 13-16
> I don't know of any evidence that any dose of ephedra
> has been established to cause an important increase in
> blood pressure.

Therefore, it is asked that the Court order the defendants
to reform the report of Dr. Dashe to adhere to applicable rules,
and that testimony at trial or any case-specific hearing be
similarly banned.

B.  <u>Bruce C. Zablow, M.D.</u>

Dr. Zablow is a neurosurgeon who operated on plaintiff.  He
was deposed by defendants. Dr. Zablow was asked in his deposition
about the cause of the hemorrhage which our client sustained, but
he was not asked about what role if any the taking of ephedra
might have played as a contributing factor.

For Dr. Zablow, defendants did not provide a written report
and the other disclosures which are called for under Rule
26(a)(2)(B) of the Federal Rules of Civil Procedure, evidently
because they take the position that, since he is only a treating
doctor, those provisions do not apply.  This is so even though

4

they have listed him in their disclosure statement (exhibit 1) as an expert witness.

Defendants do describe what Dr. Zablow's testimony at trial "may include," at p. 2 of the declaration.  This includes "impressions" which he may have.  Plaintiffs have no objection to his impressions as far as his opinion as to plaintiff's condition, even including opinions regarding what he sees as the direct mechanical cause of the hemorrhage.  However, if it is intended or should come to pass at the trial of this case that Dr. Zablow has an opinion on the possible role of consumption of ephedra in the production of the bleed, it is our position that he would run afoul of two rules which apply to such testimony. And this would be true even if Dr. Zablow in performing a differential diagnosis ruled out a role for ephedra.  The rules are:

(a) this Court's ban on case-specific experts opining broadly on the inherent qualities of ephedra (that being left to the defendants' generic experts);

(b) the requirement for a written report pursuant to Rule 26 if Dr. Zablow is deemed to be a "retained expert."

In Stafford v. Weight Watchers, Inc., 2007 U.S. Dist. LEXIS 20857 (S.D.N.Y. 2007), this Court had occasion to pass on a similar issue.  While finding that Dr. Dennis, a treating doctor, was one for whom a written report was not required, the opinion continues:

With respect to all other opinions of Dr. Dennis on
causation, however, defendant's motion to exclude is
granted. In particular, Dr. Dennis may not offer any
opinions of his own about the inherent properties of
ephedra; instead, he must use as the generic foundation
for his above-quoted opinion whatever general-causation
testimony has been admitted at trial before he actually
disclosed in his deposition or likely would have then
disclosed in answer to an appropriate question(at *12-
13)

Judge Kaplan has similarly held in Byrne v. Gracious Living

Industries, Inc., 2003 U.S. Dist. LEXIS 2552,(S.D.N.Y. 2003)that

a treating doctor is not a retained expert from whom a written

report is needed "so long as the physician's testimony was

acquired directly through treatment..." (*6).

Since it is now untimely for defendants to provide a written

report and its various disclosures, and for plaintiffs to depose

this doctor specifically on causation issues, we would ask that

this Court by order limit the testimony at trial (and in any

case-specific proceedings) to his statements in his deposition.

Respectfully submitted,
RHEINGOLD, VALET, RHEINGOLD
SHKOLNIK & McCARTNEY, LLP

PAUL D. RHEINGOLD (9394)
DAVID B. RHEINGOLD (4676)
Attorneys for Plaintiffs
113 East 37th Street,
New York, NY 10016
Ph. (212) 684-1880
Fx. (212) 689-8156

To:  Frederick R. McGowen
     Goodwin Procter, LLP
     599 Lexington Avenue
     New York, NY 10022

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IN RE: EPHEDRA PRODUCTS LIABILITY          :
LITIGATION                                 :    04 MD 1598 (JSR)
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Pertains to:                               :
                                           :    1:06-CV-00014
Harbir Singh v. Herbalife International    :
Communications, Inc., et al.               :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## HERBALIFE INTERNATIONAL COMMUNICATIONS, INC.S, HERBALIFE INTERNATIONAL OF AMERICA, INC'S. AND STEVE PETERSON'S DISCLOSURE OF EXPERT WITNESSES

TO:   David B. Rheingold, Esq.
      Rheingold, Valet, Rheingold, Shkolnick & McCarthy, LLP
      113 E. 37th Street
      New York, New York 10016

Defendants Herbalife International Communications, Inc., Herbalife International of America, Inc. and Steve Peterson, through their attorneys Goodwin Procter LLP, in accordance with Rule 26 of the Federal Rules of Civil Procedure and all applicable Case Management Orders of The Honorable Jed S. Rakoff, United States District Judge in the above-captioned multidistrict litigation, disclose the following expert witnesses:

1.   John F. Dashe, M.D.

2.   Bruce C. Zablow, M.D.

The report of Dr. Dashe, and the exhibits thereto, including his curriculum vitae, are being served simultaneously herewith.

The transcript of Dr. Zablow's January 10, 2007 deposition in this case, and the exhibits thereto, including his curriculum vitae, the record of the treatment that he rendered to Mr. Singh at St. Vincent's Catholic Medical Center of New York, and the radiological scans marked as exhibits at Dr. Zablow's deposition, are being served simultaneously herewith.  The scope of Dr. Zablow's testimony may include all aspects of the treatment that he rendered to Mr. Singh, including all of Dr. Zablow's observations and impressions regarding the treatment that he rendered to Mr. Singh, all medical records and radiological scans that Dr. Zablow may have generated or consulted, and all issues covered in Dr. Zablow's deposition.

Dated:  February 27, 2007

Joanne M. Gray (JG7287)
Frederick R. McGowen (FM1072)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
212.813.8800
212.355.3333 (Fax)

Richard A. Oetheimer
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
617.570.1000
617.523.1231 (Fax)

Attorneys for Defendants
HERBALIFE INTERNATIONAL COMMUNICATIONS,
INC., HERBALIFE INTERNATIONAL OF AMERICA, INC.
AND STEVE PETERSON

LIBNY/4582456.1

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2007, I caused a true and correct copy of the

foregoing HERBALIFE INTERNATIONAL COMMUNICATIONS, INC.S, HERBALIFE

INTERNATIONAL OF AMERICA, INC'S. AND STEVE PETERSON'S DISCLOSURE OF

EXPERT WITNESSES, EXPERT REPORT OF JOHN F. DASHE, M.D., Ph.D. and exhibits

thereto, and TRANSCRIPT OF DEPOSITION OF BRUCE C. ZABLOW and exhibits thereto, to

be served by Hand upon:

David B. Rheingold, Esq.
Rheingold, Valet, Rheingold, Shkolnick & McCarthy, LLP
113 E. 37th Street
New York, New York 10016

Frederick R. McGowen

LIBNY/4582456.1

EXHIBIT 2

**Expert report of John F. Dashe, M.D., Ph.D.**

**Re: Harbir Singh**

**Qualifications**

My name is John F. Dashe. I am a medical doctor and board-certified neurologist. I am currently the Deputy Editor of Neurology for UpToDate, Inc, an electronic medical reference for physicians and medical practitioners, with offices at 95 Sawyer Road, Waltham, Massachusetts. I am on staff at the New England Medical Center, Department of Neurology, 750 Washington Street #314, Boston, Massachusetts, 02111. I was Co-Director of the Comprehensive Stroke Center at New England Medical Center from 1999 until 2004. I hold a position as Assistant Professor of Neurology at Tufts University School of Medicine in Boston, Massachusetts since 1999. From 1994 to 1998, I was an Instructor in Neurology at Harvard Medical School, and Stroke Neurologist at Beth Israel Deaconess Medical Center Boston, Massachusetts from 1994 to 1999.

In 1989, I received an M.D. from the University of Pennsylvania School of Medicine and a Ph.D. in Neuroanatomy from the University of Pennsylvania Graduate School of Arts and Sciences. I was an Intern in Medicine at Pennsylvania Hospital in Philadelphia, Pennsylvania from 1989 to 1990, and a Resident in Neurology at the Harvard-Longwood Neurology Training Program in Boston, Massachusetts from 1990 to 1993. I completed a Fellowship in Stroke and Cerebrovascular Disease at New England Medical Center in Boston, Massachusetts in 1994. I am licensed to practice medicine by the Commonwealth of Massachusetts (1993), and am certified as a Diplomate of the American Board of Psychiatry and Neurology since 1994, with recertification in 2004.

I have written extensively on stroke and have published articles in The New England Journal of Medicine, Stroke, Neurology, Annals of Neurology, and Cerebrovascular Disease. My curriculum vitae is attached hereto.

**Basis for Opinion**

I have been asked to offer an opinion with regard to the cause of the hemorrhagic stroke suffered by Mr. Harbir Singh on or about May 10, 2003. For the reasons described below, I conclude Mr. Singh suffered a subarachnoid hemorrhage from aneurysmal rupture due to his known major risk factor, specifically his long history of cigarette smoking. In addition to cigarette smoking, Mr. Singh may have had fibromuscular dysplasia as another risk factor for aneurysm development and rupture.

I disagree with the opinions set forth by plaintiff's experts that ephedrine contained in the Herbalife supplement was the cause of Mr. Singh's stroke and resultant injury.

My opinion is based on a review of the following materials: deposition transcripts of Mr. Harbir Singh, Ms. Diona Caragata, and Dr. Bruce Zablow, M.D.; Plaintiff's Fact Sheet; report of Dr. Lawrence Shields, M.D.; Mr. Harbor Singh's medical records from St. Vincent's Hospital and Medical Center of New York, and from Alan Hirschfeld, M.D.

**Case History**

The medical records and deposition testimony in this case reveal the following history:

Mr. Harbir Singh was a 41-year-old man in May 2003, with a history of tobacco abuse, with a one pack a day cigarette smoking habit since at least age 20 or 21, and alcohol use. On the morning of May 10, 2003, Mr. Singh fell in the bathroom around 9:00 am and was brought by ambulance to St. Vincent's Hospital where he was described as arousable and following commands, but tending to drift back off to sleep when not being stimulated. Although one of the admission notes states that Mr. Singh had mild left sided weakness, the same note indicates that he followed simple commands (was able to move self to CT table) and moved all 4 extremities without focal motor deficit. He was arousable to tactile stimulation, could verbalize, and knew his name. His blood pressure was 175/118 on admission, and was 159 systolic at the time of the exam (approximately 2:15 pm on 5/10). It should be noted that blood pressure is frequently elevated at the time of emergent evaluation, even in patients who have no history of hypertension, and the blood pressure increase is likely due to the effects of acute stroke and the stress of the emergency.

The initial impression was subarachnoid hemorrhage, Hunt and Hess grade III, possibly from a ruptured left posterior communicating artery aneurysm, with mild hydrocephalus, and probably with elevated intracranial pressure.

He was intubated for airway protection, and a ventriculostomy was placed by 4:15 pm that afternoon.

Four-vessel cerebral arteriography showed a left internal carotid intracranial bifurcation aneurysm measuring 7.0 x 5.4 mm with a neck diameter of 4 mm. There was also dysplasia of the cervical left internal carotid artery, with an appearance suggesting the probability of fibromuscular dysplasia as noted by Dr. Zablow, the treating neuroradiologist. He then had successful intracranial endovascular treatment of the left internal carotid bifurcation aneurysm with Guglielmi detachable coils.

His hospital course was complicated by prolonged ventilator dependence, due to respiratory failure and failure to wean, and probable ventriculitis and/or meningitis. He also had episodes of junctional cardiac arrhythmias and transient glucose intolerance. He had a tracheostomy on 5/20/03, and underwent decannulation on 6/23/03. He was transferred to the rehabilitation floor on 6/25/03, and was discharged from the hospital on 7/9/2003.

In a follow-up outpatient visit on 7/30/2003, Dr. Alan Hirschfeld's office note reported that Mr. Singh noticed some slight unsteadiness of gait, but that his cognitive abilities had "pretty much returned" and that he was back at work. On examination, his speech was described as clear, and he was able to follow commands well; he did not have any noticeable unsteadiness of gait, and he had no focal neurological deficits.

**Mr. Singh's stroke**

Stroke is an injury to the brain caused by a disturbance in the cerebral blood supply or vascular system. It frequently results in transient or permanent neurological deficits and is the most common cause of adult disability in the United States. It is the third leading cause of death in the United States, after heart disease and cancer, accounting for one of every 15 deaths. While advancing age is a risk factor for stroke of all types, stroke affects all ages from neonates to the elderly, and between 19 and 26 percent of all strokes occur in people who are under 60 years old (1-3). There are two major types of stroke: ischemic and hemorrhagic. Mr. Singh had a hemorrhagic stroke. Hemorrhagic stroke occurs from the rupture of a cerebral blood vessel. The rupture allows bleeding into or around the brain, which may cause brain tissue irritation or destruction, pressure on adjacent brain tissue, and sometimes causes ischemic tissue injury by compressing or irritating blood vessels.

Data from the American Heart Association through the year 2004 reveal that 87 percent of strokes are ischemic and 13 percent are hemorrhagic (4). Of the hemorrhagic strokes, about three-quarters (or about 9 percent of all strokes) were intracerebral and one-quarter (or about 3 percent of all strokes) were subarachnoid. Mr. Singh had a subarachnoid hemorrhage from an aneurysmal rupture. Saccular aneurysms are thin-walled outpouchings that arise from the intracranial arteries and are characterized by defects in the wall of the vessel, with a very thin or absent tunica media, and a severely fragmented or absent internal elastic lamina (5, 6). Such aneurysms typically arise at branching points of the major arterial vessels at the base of the brain (7, 8).

Subarachnoid hemorrhage is bleeding into the area under the meninges, the outer membrane surrounding the brain, and into the subarachnoid space, usually from the rupture of an aneurysm located on a major cerebral blood vessel. Pressure created by the presence of blood within this confined space causes brain dysfunction and injury, and may result in increased intracranial pressure, hydrocephalus, blood vessel spasm and areas of brain ischemia. While the incidence of subarachnoid hemorrhage increases with age, the median age of onset is 55 years (9, 10); thus half of all cases of subarachnoid hemorrhages occur in people like Mr. Singh who are younger than 55 years old.

The major established risk factors for aneurysm rupture with subarachnoid hemorrhage are cigarette smoking, hypertension, alcohol abuse, and a family history of aneurysmal subarachnoid hemorrhage (11, 12). Mr. Singh was a smoker. Among the environmental factors that have been linked to an increased risk of aneurysmal subarachnoid hemorrhage,

cigarette smoking is the only risk factor that has been established in all studied populations (6).

Similar risk factors are linked to subarachnoid hemorrhage in patients like Mr. Singh who are younger than age 50. One of the largest well designed case-control studies examining the risk factors in younger (ages 18 to 49) people with subarachnoid hemorrhage concluded that cigarette smoking, hypertension, and primary family history of hemorrhagic stroke, are major risk factors for aneurysmal subarachnoid hemorrhage (13).

The precise cause of intracranial aneurysms and the factors leading to aneurysmal growth and rupture are poorly understood. However, structural defects of the arterial wall, most commonly a decrease of the middle muscular layer of the vessel wall known as the tunica media, have been noted histologically (6, 14). In addition, hypertension and vascular changes induced by smoking are thought to play a major role (6, 14). In a longitudinal study of patients with an unruptured aneurysm who developed new aneurysms, only cigarette smoking was associated with aneurysm growth of 3 mm or greater (OR 3.48, 95% CI 1.14 to 10.64) (15). The investigators concluded that cigarette smoking hastens aneurysm growth, and that cessation of smoking is important for patients who have unruptured aneurysms. The mechanism by which cigarette smoking would predispose someone like Mr. Singh to aneurysm growth and rupture is not well-understood, but one widely entertained hypothesis is that smoking may disrupt the normal relationship of plasma and artery wall elastase and alpha 1-antitrypsin activity, by increasing elastase activity and/or by decreasing alpha1-antitrypsin activity (6, 15-20).

Other conditions that have been associated with aneurysm formation include brain arteriovenous malformations, Ehlers–Danlos syndrome type IV, fibromuscular dysplasia, Marfan syndrome, and polycystic kidney disease (6, 14). Mr. Singh may have had fibromuscular dysplasia as another risk factor for aneurysm development and rupture. In support of the association of fibromuscular dysplasia with aneurysms, a meta-analysis found that the prevalence of cerebral aneurysms in patients with fibromuscular dysplasia was 7.3 percent (21). In contrast, it is estimated that cerebral aneurysms are found in only two percent of adults without known risk factors for subarachnoid hemorrhage (22).

While not established, some authors have postulated that a sudden transient increase in arterial pressure may trigger aneurysmal rupture in a proportion of patients (8, 23). Physical exercise, sexual intercourse, or straining preceding subarachnoid hemorrhage have been reported in up to 20 percent of patients with subarachnoid hemorrhage (24, 25), but others have noted that these are not necessary factors (8). The naturally occurring circadian variation of blood pressure, which is generally highest in the morning with the onset of awakening and activity, is a potentially important trigger in precipitating aneurysmal rupture. A number of studies have found that the time of subarachnoid hemorrhage onset exhibits a circadian variation with peak incidence significantly more likely to occur during waking hours than at night in some studies (26), or in the morning in other studies (27, 28). Mr. Singh was reported to have stroke onset at or about 9 AM, when

he fell in his bathroom.

There is no convincing scientific evidence that ephedra use increases the risk of the conditions suffered by Mr. Singh, that is, aneurysm formation, aneurysm rupture, or hemorrhagic stroke including subarachnoid hemorrhage and intracerebral hemorrhage. Rather, the best scientific evidence suggests that ephedra is not associated with an increased risk of hemorrhagic stroke. This observation is supported by a large case-control study that investigated the association between ephedra alkaloids and adverse vascular effects (29). The results showed that the use of ephedra at any dose during the three days before the stroke was not associated with a statistically significant increased risk of hemorrhagic stroke (adjusted odds ratio (OR) 1.00; 95% CI 0.32 to 3.11). The hypothesis that ephedra alkaloids may increase the risk of hemorrhagic stroke has arisen from a number of case reports of patients with hemorrhagic stroke who have also ingested ephedra in herbs or over-the-counter products. However, case reports do not constitute convincing scientific evidence of a cause and effect relationship between ephedra use and hemorrhagic stroke, and cannot provide a basis on which to determine the cause of Mr. Singh's stroke.

Various mechanisms have been proposed to explain how ephedra use might lead to hemorrhagic stroke like the one suffered by Mr. Singh, including transient hypertension, vasospasm and/or vasoconstriction. However, these proposed mechanisms are not established or proven. There is no evidence that the ephedra alkaloids in the Herbalife product Mr. Singh took cause clinically important hypertension, or vasospasm, or vasoconstriction, nor is there any evidence that Mr. Singh had any of these conditions prior to his stroke on May 10, 2003. The highest level of scientific evidence comes from randomized controlled trials, and the trials that address this issue do not show a significant association between ephedra use and increased blood pressure. In support of this observation, a randomized placebo controlled trial involving 16 healthy adults found that 25 mg of ephedrine alone did not affect blood pressure (30). Furthermore, a meta-analysis of randomized controlled trials of at least eight weeks duration that studied ephedra use for weight loss and athletic performance found that ephedra use was not associated with a statistically significant increase in hypertension (31).

To summarize, there is no basis on which to claim that Mr. Singh's stroke was caused by the Herbalife product, as the available scientific evidence does not support a hypertensive effect of ephedra alkaloids. Furthermore, there is no good scientific evidence to support the speculative hypothesis that ephedra alkaloids cause clinically important intracranial arterial vasospasm or vasoconstriction, or that ephedra alkaloids played any role in the growth or rupture of his saccular aneurysm.

In his deposition, Mr. Singh has testified that he did not take Herbalife on the morning of May 10, 2003, the day of his subarachnoid hemorrhage. Therefore, given the relatively short elimination half-life of ephedra, approximately six hours (32), there is no possibility that ephedra contained in the Herbalife product could have caused a blood pressure

increase or any blood vessel alteration that acted as the precipitant of the aneurysmal rupture and subarachnoid hemorrhage that he suffered that morning.

I have personally reviewed Mr. Singh's cerebral angiogram of May 10, 2003, and I agree with the opinion of the treating interventional neuroradiologist, Dr. Bruce Zablow, that this study shows no evidence of vasospasm or vasoconstriction in Mr. Singh's intracranial arteries. The angiogram findings therefore argue against the major postulated mechanism of ephedra – that of possible arterial vasospasm or vasoconstriction - in the etiology of the aneurysm growth and rupture in this case.

**Summary of Opinions**

To a reasonable degree of medical certainty, I offer the following opinions regarding the hemorrhagic stroke suffered by Harbir Singh on May 10, 2003:

1. On May 10, 2003, Mr. Harbir Singh suffered a subarachnoid hemorrhage due to rupture of an intracranial left internal carotid artery bifurcation aneurysm.

2. It is my opinion that the formation of the left internal carotid intracranial bifurcation aneurysm as well as rupture of the aneurysm with subarachnoid hemorrhage is directly attributable to Mr. Singh's history of cigarette smoking, which is above all the most important risk factor for aneurysm formation and rupture. It is also possible that a condition known as fibromuscular dysplasia may have played a role in causing the aneurysm to develop and eventually rupture.

3. The available scientific evidence does not support the notion that the amount of ephedra alkaloids in the Herbalife product cause clinically important hypertension, or vasospasm or vasoconstriction of intracranial arterial vessels. Nor is there evidence that the ephedra alkaloids played any role in the growth or rupture of Mr. Singh's saccular aneurysm.

4. The records in this case, specifically the cerebral angiogram of May 10, 2003, reveal that there was no evidence of vasospasm or vasoconstriction in Mr. Singh's intracranial arteries. This too argues against any hypothesized role of ephedra in the etiology of the aneurysm growth and rupture.

5. Mr. Singh has testified in his deposition that he did not take Herbalife on May 10, 2003, the day of his stroke. Therefore, given the relatively short half-life of ephedra, there is no possibility that any hypothesized blood pressure increase potentially due to the Herbalife product was the precipitant of the aneurysmal rupture and subarachnoid hemorrhage that he suffered that morning.

6. It is therefore my opinion, based on the best available scientific evidence, that Mr. Singh's use of Herbalife played no causative role in these events and was unrelated to his aneurysm rupture and subarachnoid hemorrhage.

My consultation rate is $375 per hour for this report and $500 an hour for deposition and trial testimony, with a $2000 minimum for court appearances requiring travel out of state, plus travel, food and lodging expenses.

Within the past four years, I have given deposition testimony on August 22, 2006 in the matter of Parks v Herbalife (MDL 1598, No 04-9358). I have also testified on March 12, 2004, in Suffolk Probate and Family Court, Massachusetts, as a treating physician and expert in the matter of Peter Tang estate.

Signature: *John F. Dashe*

John F. Dashe, M.D., Ph.D.

Date: *2/26/2007*

February 26, 2007

# REFERENCES

1. Williams GR, Jiang JG, Matchar DB, Samsa GP. Incidence and occurrence of total (first-ever and recurrent) stroke. Stroke 1999;30(12):2523-8.
2. Williams GR. Incidence and Characteristics of Total Stroke in the United States. BMC Neurol 2001;1(1):2.
3. Thom T, Haase N, Rosamond W, et al. Heart Disease and Stroke Statistics--2006 Update. A Report From the American Heart Association Statistics Committee and Stroke Statistics Subcommittee. Circulation 2006.
4. Rosamond W, Flegal K, Friday G, et al. Heart disease and stroke statistics--2007 update: a report from the American Heart Association Statistics Committee and Stroke Statistics Subcommittee. Circulation 2007;115(5):e69-171.
5. Austin G, Fisher S, Dickson D, Anderson D, Richardson S. The significance of the extracellular matrix in intracranial aneurysms. Ann Clin Lab Sci 1993;23(2):97-105.
6. Schievink WI. Intracranial aneurysms. N Engl J Med 1997;336(1):28-40.
7. Wiebers DO, Piepgras DG, Meyer FB, et al. Pathogenesis, natural history, and treatment of unruptured intracranial aneurysms. Mayo Clin Proc 2004;79(12):1572-83.

8.      van Gijn J, Kerr RS, Rinkel GJ. Subarachnoid haemorrhage. Lancet 2007;369(9558):306-18.

9.      Mayberg MR, Batjer HH, Dacey R, et al. Guidelines for the management of aneurysmal subarachnoid hemorrhage. A statement for healthcare professionals from a special writing group of the Stroke Council, American Heart Association. Stroke 1994;25(11):2315-28.

10.     Epidemiology of aneurysmal subarachnoid hemorrhage in Australia and New Zealand: incidence and case fatality from the Australasian Cooperative Research on Subarachnoid Hemorrhage Study (ACROSS). Stroke 2000;31(8):1843-50.

11.     Teunissen LL, Rinkel GJ, Algra A, van Gijn J. Risk factors for subarachnoid hemorrhage: a systematic review. Stroke 1996;27(3):544-9.

12.     Qureshi AI, Suri MF, Yahia AM, et al. Risk factors for subarachnoid hemorrhage. Neurosurgery 2001;49(3):607-12; discussion 12-3.

13.     Broderick JP, Viscoli CM, Brott T, et al. Major risk factors for aneurysmal subarachnoid hemorrhage in the young are modifiable. Stroke 2003;34(6):1375-81.

14.     Brisman JL, Song JK, Newell DW. Cerebral aneurysms. The New England journal of medicine 2006;355(9):928-39.

15.     Juvela S, Poussa K, Porras M. Factors affecting formation and growth of intracranial aneurysms: a long-term follow-up study. Stroke; a journal of cerebral circulation 2001;32(2):485-91.

16.     Cohen JR, Sarfati I, Wise L. The effect of cigarette smoking on rabbit aortic elastase activity. J Vasc Surg 1989;9(4):580-2.

17.     Baker CJ, Fiore A, Connolly ES, Jr., Baker KZ, Solomon RA. Serum elastase and alpha-1-antitrypsin levels in patients with ruptured and unruptured cerebral aneurysms. Neurosurgery 1995;37(1):56-61; discussion -2.

18.     Gaetani P, Tartara F, Tancioni F, Klersy C, Forlino A, Baena RR. Activity of alpha 1-antitrypsin and cigarette smoking in subarachnoid haemorrhage from ruptured aneurysm. Journal of the neurological sciences 1996;141(1-2):33-8.

19.     Miskolczi L, Guterman LR, Flaherty JD, Hopkins LN. Saccular aneurysm induction by elastase digestion of the arterial wall: a new animal model. Neurosurgery 1998;43(3):595-600; discussion -1.

20.     Gaetani P, Rodriguez y Baena R, Tartara F, et al. Metalloproteases and intracranial vascular lesions. Neurol Res 1999;21(4):385-90.

21.     Cloft HJ, Kallmes DF, Kallmes MH, Goldstein JH, Jensen ME, Dion JE. Prevalence of cerebral aneurysms in patients with fibromuscular dysplasia: a reassessment. Journal of neurosurgery 1998;88(3):436-40.

22.     Rinkel GJ, Djibuti M, Algra A, van Gijn J. Prevalence and risk of rupture of intracranial aneurysms: a systematic review. Stroke 1998;29(1):251-6.

23.     Ostergaard JR. Risk factors in intracranial saccular aneurysms. Aspects on the formation and rupture of aneurysms, and development of cerebral vasospasm. Acta Neurol Scand 1989;80(2):81-98.

24.     Fann JR, Kukull WA, Katon WJ, Longstreth WT, Jr. Physical activity and subarachnoid haemorrhage: a population based case-control study. J Neurol Neurosurg Psychiatry 2000;69(6):768-72.

25.    Anderson C, Ni Mhurchu C, Scott D, Bennett D, Jamrozik K, Hankey G. Triggers of subarachnoid hemorrhage: role of physical exertion, smoking, and alcohol in the Australasian Cooperative Research on Subarachnoid Hemorrhage Study (ACROSS). Stroke 2003;34(7):1771-6.

26.    Vermeer SE, Rinkel GJ, Algra A. Circadian fluctuations in onset of subarachnoid hemorrhage. New data on aneurysmal and perimesencephalic hemorrhage and a systematic review. Stroke 1997;28(4):805-8.

27.    Tsementzis SA, Gill JS, Hitchcock ER, Gill SK, Beevers DG. Diurnal variation of and activity during the onset of stroke. Neurosurgery 1985;17(6):901-4.

28.    Kleinpeter G, Schatzer R, Bock F. Is blood pressure really a trigger for the circadian rhythm of subarachnoid hemorrhage? Stroke 1995;26(10):1805-10.

29.    Morgenstern LB, Viscoli CM, Kernan WN, et al. Use of Ephedra-containing products and risk for hemorrhagic stroke. Neurology 2003;60(1):132-5.

30.    Haller CA, Jacob P, 3rd, Benowitz NL. Enhanced stimulant and metabolic effects of combined ephedrine and caffeine. Clin Pharmacol Ther 2004;75(4):259-73.

31.    Shekelle PG, Hardy ML, Morton SC, et al. Efficacy and safety of ephedra and ephedrine for weight loss and athletic performance: a meta-analysis. Jama 2003;289(12):1537-45.

32.    Berlin I, Warot D, Aymard G, et al. Pharmacodynamics and pharmacokinetics of single nasal (5 mg and 10 mg) and oral (50 mg) doses of ephedrine in healthy subjects. Eur J Clin Pharmacol 2001;57(6-7):447-55.

# CURRICULUM VITAE

| | |
|---|---|
| **Name:** | John Francis Dashe, M.D., Ph.D. |
| **Current Position:** | Deputy Editor, Neurology<br>UpToDate, Inc. |
| **Office Address:** | 95 Sawyer Road<br>Waltham, MA 02453<br>(781) 392-2065 |
| **Date of Birth:** | April 16, 1956 |
| **Place of Birth:** | Easton, Pennsylvania |
| **Citizenship:** | U.S.A. |

**Education:**

| | |
|---|---|
| 1978 B.A. | University of Pennsylvania College of Arts and Sciences |
| 1989 M.D. | University of Pennsylvania School of Medicine |
| 1989 Ph.D. | University of Pennsylvania Graduate School of Arts and Sciences, Philadelphia |

**Post Doctoral Training:**

| | |
|---|---|
| 1989 - 1990 | Intern in Medicine, Pennsylvania Hospital, Philadelphia |
| 1990 - 1993 | Resident in Neurology, Harvard-Longwood Neurology Training Program, Boston |
| 1993 - 1994 | Fellow in Stroke and Cerebrovascular Disease, New England Medical Center, Boston |

**Licensure and Certification:**

| | |
|---|---|
| 1989 - 1990 | Graduate Medical Trainee, Commonwealth of Pennsylvania |
| 1990 | Diplomate, National Board of Medical Examiners |
| 1990 - 1993 | Limited License, Commonwealth of Massachusetts |
| 1993 - | Unlimited License, Commonwealth of Massachusetts |
| 1994 | Diplomate, American Board of Psychiatry and Neurology |

**Academic Appointments:**

| | |
|---|---|
| 1994 - 1998 | Associate in Neurology, Beth Israel Hospital, Boston |
| 1994 - 1998 | Instructor in Neurology, Harvard Medical School, Boston |
| 1999 - 2004 | Co-Director, Tufts Comprehensive Stroke Center |
| 1999 - | Assistant Professor, Tufts University School of Medicine, Boston |

Dashe - 2

**Awards:**

1984 - 1989          Measey Foundation Scholar, University of Pennsylvania

**Professional Societies:**

1991 -               American Academy of Neurology
1994 -               Boston Stroke Society
1999 -               American Stroke Association

**Research Interests:**

Clinical manifestations and pathophysiology of acute ischemic stroke

**Past Research Funding:**

1995 - 1998   NIH/NINDS
Co-investigator, families in recovery from stroke trial (FIRST).

1996 - 1997   Abbott Laboratories
Local principal investigator, intra-arterial thrombolysis in acute middle cerebral artery distribution
thromboembolic stroke.

1996 - 1997   Interneuron Pharmaceuticals
Local principal investigator, the effect of 500 mg citicoline on lesion volume in human stroke using
diffusion-weighted magnetic resonance imaging.

1996 - 1997   Boehringer Ingelheim
Local principal investigator, efficacy, safety, tolerability, and pharmacokinetics of aptiganel
hydrochloride in patients with an acute ischemic stroke.

1998          Astra, USA
Local principal investigator; the clomethiazole acute stroke study in ischemic stroke; the
clomethiazole acute stroke study in acute intracerebral hemorrhage; the clomethiazole acute stroke
study in t-PA treated ischemic stroke.

1998          Bristol Myers Squibb
Local principal investigator; safety, efficacy, and dose response trial of BMS 204352 in patients with
acute stroke.

1998          Centocor
Local principal investigator; phase II study of abciximab in acute ischemic stroke.

1998          Glaxo-Welcome

Local principal investigator; safety, efficacy and pharmacokinetics of GV 150526 in the treatment of patients with a clinical diagnosis of acute stroke.

1998          Interneuron Pharmaceuticals
Local principal investigator; the effects of citicoline on clinical outcome and the evolution of lesion volume in human stroke.

1998          NPS Pharmaceuticals
Local principal investigator; pharmacokinetic study of NPS 1506 in subjects with acute stroke.

2003 - 2004    NIH Grant 1R01AG21790-01
Micronutrients, Stroke and Cognition in Aging. Ten percent salary support.


**Invited Presentations:**

1996          Deaconess Hospital Neurology Conference
              Advances in Acute Stroke: Neuroprotection and Thrombolytic Therapy

1997          Discussant, Case records of the Massachusetts General Hospital. Weekly
              clinicopathological exercises. A 13-year-old girl with a relapsing-
              remitting neurologic disorder.

**Continuing Medical Education:**

Scientific Meetings:

1993 - 1997   American Academy of Neurology Annual Meeting

1994 - 2007   American Stroke Association
              International joint conference on stroke and cerebral circulation

1996          Massachusetts Medical Society
              Current status of thrombolysis in cerebrovascular disease

Courses:

1993          American Academy of Neurology
              Neuro-ophthalmology.
              Emergency room management of acute visual, ocular motor, and vestibular
              disturbances.

1994          American Academy of Neurology
              Motor control.
1994          Critical care and emergency neurology: Management of increased intracranial
              pressure.

1995        Symposium and Tutorial on Cerebral Hemodynamics.
            Transcranial doppler, cerebral blood flow and other modalities.

1996        American Academy of Neurology
            Peripheral neuropathy.
            Symptomatic hydrocephalus in the elderly.
            Clinical research methods.

1997        American Academy of Neurology
            Clinical Neuroimmunology.

**Bibliography:**

1.  **Dashe JF**. Predictors of hemorrhage in patients with untreated brain arteriovenous malformation. Neurology. 2007;68(7):535; author reply 535

2.  Scott TM, Peter I, Tucker KL, Arsenault L, Bergethon P, Bhadelia R, Buell J, Collins L, **Dashe JF**, Griffith J, Hibberd P, Leins D, Liu T, Ordovas JM, Patz S, Price LL, Qiu WQ, Sarnak M, Selhub J, Smaldone L, Wagner C, Wang L, Weiner D, Yee J, Rosenberg I, Folstein M. The Nutrition, Aging, and Memory in Elders (NAME) study: design and methods for a study of micronutrients and cognitive function in a homebound elderly population. Int J Geriatr Psychiatry. 2006;21(6):519-28

3.  Caplan LR, Wityk RJ, Glass TA, Tapia J, Pazdera L, Chang HM, Teal P, **Dashe JF**, Chaves CJ, Breen JC, Vemmos K, Amarenco P, Tettenborn B, Leary M, Estol C, Dewitt LD, Pessin MS. New England Medical Center Posterior Circulation Registry. Ann Neurol. 2004;56:389-398

4.  Sanchez-Moreno C, **Dashe JF**, Scott T, Thaler D, Folstein MF, Martin A. Decreased levels of plasma vitamin C and increased concentrations of inflammatory and oxidative stress markers after stroke. Stroke. 2004;35:163-168

5.  Doron SI, **Dashe JF**, Adelman LS, Brown WF, Werner BG, Hadley S. Histopathologically proven poliomyelitis with quadriplegia and loss of brainstem function due to West Nile virus infection. Clin Infect Dis. 2003;37:e74-77

6.  **Dashe JF**. Hyperviscosity and stroke. In: Bogousslavsky J, Caplan L, eds. Uncommon Causes of Stroke. New York: Cambridge University Press, 2001:100-109

7.  Baird AE, **Dashe J**, Connor A, Burzynski C, Schlaug G, Warach S. Comparison of retrospective and prospective measurements of the national institutes of health stroke scale. Cerebrovasc Dis. 2000;10:80-81

8. Baird AE, Lovblad KO, **Dashe JF,** Connor A, Burzynski C, Schlaug G, Straroselskaya I, Edelman RR, Warach S. Clinical correlations of diffusion and perfusion lesion volumes in acute ischemic stroke. Cerebrovasc Dis. 2000;10:441-448

9. Chaves CJ, Silver B, Schlaug G, **Dashe J**, Caplan LR, Warach S. Diffusion- and perfusion-weighted MRI patterns in borderzone infarcts. Stroke. 2000;31:1090-1096

10. Saposnik G, Caplan LR, Gonzalez LA, Baird A, **Dashe J**, Luraschi A, Llinas R, Lepera S, Linfante I, Chaves C, Kanis K, Sica RE, Rey RC. Differences in stroke subtypes among natives and caucasians in Boston and Buenos Aires. Stroke. 2000;31:2385-2389

11. Warach S, Pettigrew LC, **Dashe JF,** Pullicino P, Lefkowitz DM, Sabounjian L, Harnett K, Schwiderski U, Gammans R. Effect of citicoline on ischemic lesions as measured by diffusion-weighted magnetic resonance imaging. Citicoline 010 Investigators. Ann Neurol. 2000;48:713-722

12. Case records of the Massachusetts General Hospital. Weekly clinicopathological exercises. Case 39-1998. A 13-year-old girl with a relapsing-remitting neurologic disorder. N Engl J Med. 1998;339:1914-1923

13. **Dashe JF**, Pessin MS, Murphy RE, Payne DD. Carotid occlusive disease and stroke risk in coronary artery bypass graft surgery. Neurology. 1997;49:678-686

14. Warach S, **Dashe JF**, Edelman RR. Clinical outcome in ischemic stroke predicted by early diffusion-weighted and perfusion magnetic resonance imaging: a preliminary analysis. J Cereb Blood Flow Metab. 1996;16:53-59

15. **Dashe JF**, Davis TL. Electron-lucent degenerating geniculate terminals in cat striate cortex. Brain Res. 1989;505:203-208

EXHIBIT 3

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-13-06
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
In re: EPHEDRA PRODUCTS LIABILITY       :       04 M.D. 1598 (JSR)
LITIGATION                              :
                                        :       MEMORANDUM ORDER
                                        :
----------------------------------------X

PERTAINS TO *Parks v. Herbalife International
of America, Inc.*, No. 04 Civ. 9358

JED S. RAKOFF, U.S.D.J.

    The pending motion of defendant Herbalife International of

America, Inc. ("Herbalife") to exclude the opinion testimony of

plaintiff's case-specific experts is granted in part and denied

in part with respect to plaintiff's cardiology expert, Ralph

Lazzara, M.D., and is granted in its entirety with respect to

plaintiff's internist-pharmacology expert, Thomas Whitsett, M.D.

Plaintiff's cross-motion to exclude the opinions of three

Herbalife experts is granted in part and denied in part.

    Dr. Lazzara's report must be revised to omit the last

paragraph on (unnumbered) page 2 and the first two paragraphs on

(unnumbered) page 3.  In place of these paragraphs, Dr. Lazzara

may substitute new text explaining that atrial fibrillation is

one kind of arrhythmia within the range of those arrhythmias that

— according to the court-approved reports of the "generic

experts" designated by Plaintiffs' Coordinating Counsel ("PCC") —

ephedra may cause in some people.  Dr. Lazzara's report must also

omit the last full paragraph (ending with "(10)") on (unnumbered)

1

page 4 and the words "and later embolization to the brain with stroke" on (unnumbered) page 5.

The required deletions exclude testimony about the inherent properties of ephedra because the Court has assigned that subject matter exclusively to the PCC's "generic experts."  Also excluded is Dr. Lazzara's opinion that plaintiff's stroke was indirectly caused by ephedra because Dr. Lazzara's testimony alone is insufficient to reach that conclusion.  Plaintiff's theory is that Ms. Parks' stroke was caused by a shower to the brain of small clots formed in her heart by atrial fibrillation, and that the atrial fibrillation was in turn caused by ephedra.  Dr. Lazzara may give the opinion that more likely than not, ephedra caused Ms. Parks' atrial fibrillation.[1]  The next question, however, is whether the atrial fibrillation caused Ms. Parks' stroke, and here Dr. Lazzara is not the appropriate expert.  CT and MRI brain images were taken at the time of Ms. Parks' stroke, and defendants' neurologist, John F. Dashe, M.D., Ph.D., in an opinion whose reliability under Rule 702 is not challenged, proposes to testify that the clotting shown on the MRI is of a kind unlikely to be caused by atrial fibrillation and likely to be caused by other factors.  Although the Court would have

---

[1]The Court also finds admissible Dr. Lazzara's opinion that, through a process of "atrial remodeling," Ms. Parks' atrial fibrillation in January 2003 increased the risk of subsequent episodes of atrial fibrillation at least through May 2003.

2

granted a timely application by plaintiff to identify a rebuttal neurologist, no such application was made, and Dr. Lazzara readily acknowledged that he is not qualified to interpret brain images.  In the absence of neurological testimony from plaintiff, Dr. Dashe's opinion is uncontroverted, and a crucial link in plaintiff's theory of indirect causation of stroke is missing.[2] Because of this gap, Dr. Lazzara's testimony that atrial fibrillation *in general* can cause stroke will not "assist the trier of fact to ... determine a fact in issue" as required by Rule 702.

Dr. Whitsett's report consists almost entirely of opinions about the inherent properties of ephedra.  After attempting to demonstrate that ephedra has the inherent capacity to cause atrial fibrillation, his report notes that two of Mrs. Parks' treating physicians attributed her condition to ephedra.  It then concludes: "All of these [*i.e.*, the inherent properties of ephedra and the views of the treating physicians] provide information that is persuasive and allows me to conclude that more probably than not the Herbalife Green Ms. Parks was taking caused or significantly contributed to her atrial fibrillation." Whitsett Report at 4.  The views of the treating physicians will be admissible or inadmissible for reasons of their own.  Dr.

---

[2]Whether this means that Herbalife is entitled to summary judgment is not an issue presently before the Court.

3

Whitsett cannot make them admissible and add his own weight to
them by opining at length on the inherent properties of ephedra.

Plaintiff's motion to exclude the opinions of three of
Herbalife's experts is made primarily on the ground that their
opinions are generic and therefore within the exclusive domain of
the "generic experts" designated by the Defendants' Coordinating
Counsel ("DCC") pursuant to Case Management Order No. 1
("CMO#1").  Since the Court's prior rulings excluding generic
opinions of case-specific experts were addressed to *plaintiffs'*
experts, Herbalife argues that the rule of exclusion does not
apply to defendants.  This is too broad.  The purpose of the rule
was to mandate common proceedings and determinations for all
expert testimony that is generically applicable to multiple
cases.  This purpose applies equally to defendants' generic
testimony as to plaintiffs'.  As a result, much of what
Herbalife's case-specific experts now opine about generic issues
must be excluded.

There is, however, one distinction between plaintiffs and
defendants that is relevant here, to wit, the fact that
plaintiffs bear the burden of proof.  As a result, defendants'
generic experts were only required to respond to those generic
assertions raised by plaintiffs' generic experts.  Here, the
PCC's generic experts did not expressly opine about ephedra's
alleged capacity to cause atrial fibrillation.  Consequently, the

4

fact that the PCC's generic experts opined about ephedra's alleged capacity to cause cardiac arrhythmias in general does not preclude Herbalife's case-specific witnesses from expressing generic opinions about the alleged effect of ephedra on atrial fibrillation to the extent that they opine that there is a scientifically recognized and here-relevant distinction between this and other forms of cardiac arrhythmia.

Applying these principles to the revised[3] report of Herbalife's epidemiologist, Steven Lamm, M.D., the Court finds that paragraph 18 is admissible, but that the remaining substantive paragraphs must be excluded because they discuss epidemiology in general.

Dr. Lamm also proposes to testify that there is no epidemiological evidence that ephedra can cause atrial fibrillation because no epidemiological studies of ephedra have been done for *any* injury (including, therefore, atrial fibrillation).  This is material that should have been covered by the DCC's generic witnesses and was in fact covered by the one DCC expert challenged in a *Daubert* hearing, Dr. Kristie L. Ebi,

---

[3] See Exhibit E to Herbalife's declaration in opposition to plaintiff's motion.  Herbalife conditionally submitted three revised reports omitting the defense experts' response to the challenged opinions of the reports Dr. Lazzara and Dr. Whitsett. Since the Court has substantially sustained Herbalife's challenges, the Court assumes that Herbalife's revised reports are now submitted and rules on plaintiff's objections with respect to the revised reports rather than the original reports.

an epidemiologist. It must therefore by stricken from Dr. Lamm's report. For similar reasons, in Dr. Dashe's revised report[4] — which is deemed substituted for his original report — the sections entitled "Stroke," "Risk Factors for Ischemic Stroke," and "Ephedra and Stroke" on pages 3 and 4 must be stricken; the remainder is found reliable under Rule 702, Fed. R. Ev., and will be admissible if relevant.

Finally, plaintiff moves for exclusion of the report of Morton P. Printz, Ph.D., Herbalife's pharmacologist, on the grounds that it is generic and also that Dr. Printz, who is not a physician, is not qualified to testify about plaintiff's medical history and condition. Upon review of Dr. Printz's revised report (Exh. F to Herbalife's declaration in opposition), the Court agrees that paragraphs 7 through 22 must be excluded because they cover generic subject matter assigned to the DCC's experts. Paragraphs 23 and 24 must also be excluded because the Court agrees with plaintiff that Dr. Printz is not qualified to contradict the diagnostic opinions of Dr. Lazzara on the basis of Ms. Parks' medical records or individual and family medical history. Paragraph 25 is reliable under Rule 702 and relevant in response to Dr. Lazzara's testimony. Paragraphs 26 through 28 need not be considered because they are Dr. Printz's response to

_____

[4]See Exhibit G to Herbalife's declaration in opposition to plaintiff's cross-motion.

6

Dr. Whitsett's report, which the Court has excluded.

Within twenty days after the entry of this order, the parties shall serve amended reports complying with the rulings set forth above.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       December 12, 2006

7

EXHIBIT 4

1                     UNITED STATES DISTRICT COURT

2                     SOUTHERN DISTRICT OF NEW YORK

3

4   * * * * * * * * * * * * * * * * * * * * * * * * *

5   IN RE: EPHEDRA PRODUCTS LIABILITY LITIGATION     *

6   ------------------------------------------------   *

7   Pertains to:                                    *

8   Harbir Singh v. Herbalife International        *

9   Communications, Inc. et al.                *

10   * * * * * * * * * * * * * * * * * * * * * * * * *

11

12          DEPOSITION OF: JOHN FRANCIS DASHE, M.D.

13

14                  GOODWIN PROCTOR LLP

15                  One Exchange Place

16             Boston, Massachusetts 02109

17

18      April 12, 2007         9:48 a.m. - 1:02 p.m.

19

20

21

22

23               KATHRYN K. GIANNO

24                COURT REPORTER

1   APPEARANCES:

2   Representing the Plaintiff:

3           DAVID B. RHEINGOLD, ESQ.

4           RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK &

5           MCCARNEY

6           113 East 37th Street

7           New York, NY 10016

8           Tel.: 212.684.1880  Fax: 212.689.8156

9           Email: drheingold@rheingoldlaw.com

10

11  Representing the Defendant:

12          RICHARD A. OETHEIMER, ESQ.

13          MELISSA A. CELL, ESQ. CO-COUNSEL

14          One Exchange Place

15          Boston, MA 02109

16          Tel.: 617.570.1000 Fax: 617.523.1231

17

18

19

20

21

22

23

24

1    hemorrhagic can stroke?

2       A.    Well, it depends what you mean by acute I

3    think people who have a sudden, severe increases in

4    blood pressure are probably predisposed to

5    hemorrhagic stroke.

6       Q.    How would you define severe?  Is there a

7    certain level to the blood pressure, or is it some

8    other --

9       A.    Really depends on the individual.  If

10   someone has a relatively normal pressure to begin

11   with, once you get into the range of blood pressure

12   over -- and by normal I mean a systolic of 120 or

13   less, and you get to the range of blood pressure

14   that are over 200, 220, 240, that's certainly severe

15   as an acute event.

16      Q.    Do you have an opinion as to whether

17   ephedra alkaloids can raise someone's blood

18   pressure?

19            MR. OETHEIMER:   Objection.

20      A.    Yes, my opinion is that it's never been

21   convincingly demonstrated that ephedra alkaloids

22   alone have any clinically important association with

23   increased blood pressure, whether it's acute or

24   chronic.

1     Q.    When you write the sentence, does this

2  take into account the milligrams of ephedra

3  alkaloids?

4     A.    Which sentence now?

5     Q.    Well, I can just ask generally, you have

6  the opinion that the ephedra did not cause

7  Mr. Singh's stroke; is that correct?

8     A.    That's correct.

9     Q.    Would that opinion change if he took a

10  larger dose of Herbalife?

11        MR. OETHEIMER:  Objection.

12     A.    Well, I have a speculation, but no, I

13  don't think it would change.  Because I don't know

14  of any evidence that any dose of ephedra has been

15  established to cause an important increase in blood

16  pressure.  When I say that, I mean ephedra as an

17  individual, sole agent, not in conjunction with

18  other things.

19     Q.    Have there been case reports of ephedra

20  users who have had hemorrhage strokes?

21     A.    Yes, there have.

22     Q.    Have you reviewed any of those?

23     A.    I'm sure I did in the past, yes.

24     Q.    Do you think in this specific situation