UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: EPHEDRA PRODUCTS LIABILITY : 
LITIGATION : 04 MD 1598 (JSR)
 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Pertains to: :
 : 06 CV 00014
Harbir Singh, *et al.* v. Herbalife International of :
America, Inc., *et al.* :
 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## HERBALIFE INTERNATIONAL COMMUNICATIONS, INC.'S, HERBALIFE INTERNATIONAL OF AMERICA, INC.'S, AND STEVE PETERSON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

Joanne M. Gray (JG7287)
Glenn S. Kerner (GK2482)
Frederick R. McGowen (FM1072)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
212.813.8800

Richard A. Oetheimer
GOODWIN PROCTER LLP
Exchange Place
Boston, MA
617.570.1000

Attorneys for Defendants
HERBALIFE INTERNATIONAL COMMUNICATIONS,
INC., HERBALIFE INTERNATIONAL OF AMERICA,
INC., AND STEVE PETERSON

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................. 2

ARGUMENT .............................................................................................. 4

    I.    Herbalife is entitled to summary judgment on all claims because plaintiffs have no specific causation opinion. .............................................................. 5

        A.   This Court's Daubert Order leaves plaintiffs with no adequate specific causation opinion. ........................................................ 6

        B.   Even if Dr. Shields' remaining opinions constitute specific causation, they are insufficient to withstand summary judgment. ............................. 11

    II.   In the absence of any evidence of any breach of duty, product defect, or proximate causation, Herbalife is entitled to summary judgment on all of plaintiffs' claims: negligence, product liability, breach of warranty and loss of consortium. ........................................................................... 14

        A.   Plaintiffs have shown no evidence of defective manufacture........... 15

        B.   Plaintiffs have shown no evidence of defective design. ................... 15

        C.   There is no evidence of a defect or proximate causation with respect to product warnings................................................................. 16

    III.  Plaintiffs Have Failed to Provide Evidence of Alleged Breach of Express Warranty. .................................................................................... 18

    IV.  Plaintiffs have no sufficient evidence in support of Mr. Singh's claims for past or future lost earnings, or future medical expenses, or of any other claim for future damages, or of Ms. Caragata's claim for loss of consortium. 21

        A.   There is insufficient evidence of lost past or future earnings. .......... 21

        B.   Plaintiffs have not met their burden of establishing future medical damages.................................................................................. 23

    V.   Summary judgment is mandated on claims against Steve Peterson because plaintiffs have shown no basis for personal liability against him................. 24

## TABLE OF AUTHORITIES

**CASES**

*Adesina v. Aladan Corp.*,
    438 F.Supp.2d 329 (S.D.N.Y. 2006)..........................................................................14, 18, 21

*Algarin v. New York City Dept. of Corr.*,
    2006 WL 3060081 (S.D.N.Y. Oct. 30, 2006) (Rakoff, J.)......................................................11

*Anderson v. Hedstrom Corp.*
    76 F.Supp.2d 422 (S.D.N.Y. 1999)............................................................................................17

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)........................................................................................................................5

*Arnold v. Krause*,
    232 F.R.D. 58 (W.D.N.Y. 2004)................................................................................................20

*Askey v. Occidental Chem. Corp.*,
    477 N.Y.S.2d 242 (4th Dep't. 1984).........................................................................................23

*Asset Mgmt. & Control, Inc., v. ABF Freight System, Inc.*,
    18 F.Supp.2d 187 (N.D.N.Y. 1998)............................................................................................5

*B.F. Goodrich v. Betkoski*,
    99 F.3d 505 (2d Cir. 1996).........................................................................................................11

*Baker v. Dalkon Shield Claimants Trust*,
    156 F.3d 248 (1st Cir. 1998).......................................................................................................9

*Blandin v. Marathon Equip. Co*, 780 N.Y.S.2d 190, 192 (3d Dept. 2004)  ...................................15

*Boucher v. United States Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) .....................................................................................................21, 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................................5, 24

*Davis v. New York City Housing Authority*,
    256 A.D.2d. 575 (2d Dept. 1998) ............................................................................................20

*Denny v. Ford Motor Co.*,
    662 N.E.2d 730 (N.Y. 1995).......................................................................................................15

LIBA/1815690.4

*Green v. McAllister Bros., Inc.*,
  2005 WL 742624 (S.D.N.Y. 2005)......................................................................6

*Heckstall v. Pincus*,
  797 N.Y.S.2d 445 (1st Dept. 2005) ....................................................................5

*Henry v. Rehab Plus Inc.*,
  404 F.Supp.2d 435 (E.D.N.Y. 2005) ..................................................................17

*Iacobelli Constr., Inc. v. County of Monroe*,
  32 F.3d 19 (2d Cir. 1994) .................................................................................11

*Jeffries v. 3520 Broadway Mgmt. Co.*,
  827 N.Y.S.2d 136 (1st Dept. 2007) ....................................................................21

*Lodato v. Greyhawk N. Am.*,
  834 N.Y.S.2d 239 (2d Dept. 2007) .....................................................................21

*Mancuso v. Consolidated Edison Co. of New York., Inc.*,
  967 F.Supp. 1437 (S.D.N.Y. 1997).....................................................................5

*Marks v. New York Univ.*,
  61 F.Supp.2d 81 (S.D.N.Y. 1999).......................................................................5

*Martinez v. Royal-Pak Sys.*,
  300 A.D.2d 198 (1st Dept. 2002)........................................................................22

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*,
  877 F.2d 1333 (7th Cir. 1989) ......................................................................11, 14

*Miller v. Nat. Cabinet Co., et al.*,
  168 N.E.2d 811 (N.Y. 1960)..............................................................................9

*Parker v. Mobil Oil Corp.*,
  7 N.Y.3d 434 (2006) ....................................................................................6, 10

*Sanders v. Quikstak, Inc.*,
  889 F.Supp. 128 (S.D.N.Y. 1995).................................................................18, 21

*Schimmenti v. Ply Gem Industries, Inc.*,
  156 A.D.2d 658 (2d Dept. 1989) ........................................................................18

*Siemens Solar Industries v. Atlantic Richfield Co.*,
  673 N.Y.S.2d 674 (1st Dep't 1998) .....................................................................18

*Smoot v. AST Sports Science, Inc.*,
  No. 04 M.D. 1598, No. 04 Civ. 5482, slip op. (S.D.N.Y. Feb 28, 2006) ..................6

LIBA/1815690.4

*Sosna v. Am. Home Prods.*,
    748 N.Y.S.2d 548 (1st Dept. 2002) ......................................................17

*Speller ex rel. Miller v. Sears, Roebuck & Co.*,
    790 N.E.2d 252 (N.Y. 2003) ..........................................................14, 16

*Van Deusen v. Norton Co.*,
    612 N.Y.S.2d 464 (3d Dept.. 1994) ....................................................15

*Voss v. Black & Decker Mfg.*,
    450 N.E.2d 204 (N.Y. 1983) ..........................................................15-16

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) ..................................................................9

## RULES

Fed. R. Civ. P. 56(e) ..................................................................................11

Fed. R. Civ. P. 56(c) ...............................................................................1, 5

Fed. R. Civ. P. 56 ......................................................................................11

Fed. R. Evid. 702 ......................................................................................11

LIBA/1815690.4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IN RE: EPHEDRA PRODUCTS LIABILITY : 
LITIGATION : 04 MD 1598 (JSR)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Pertains to: :
: 06 CV 00014
Harbir Singh, *et al.* v. Herbalife International of :
America, Inc., *et al.* :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**HERBALIFE INTERNATIONAL COMMUNICATIONS, INC.'S,
HERBALIFE INTERNATIONAL OF AMERICA, INC.'S, AND
STEVE PETERSON'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Herbalife International Communications, Inc., Herbalife International

of America, Inc. and Steve Peterson (collectively, "Herbalife") submit this memorandum

of law in support of their motion, pursuant to Federal Rule of Civil Procedure 56(c) and

all applicable Case Management Orders in this multidistrict litigation, for summary

judgment dismissing all of plaintiffs' claims against Herbalife due to an inability to show

causation as to any alleged injury or any basis for liability.

**PRELIMINARY STATEMENT**

Plaintiffs have not met their burden of proof on any claim.  Each of plaintiffs'

claims requires expert testimony to establish specific causation, but this Court's *Daubert*

ruling has left plaintiffs with no viable specific causation expert testimony.  The ruling

precludes plaintiffs' only specific causation expert, Lawrence Shields, M.D., from

providing testimony regarding the effects of ephedra on Mr. Singh.  Such a limitation

effectively precludes Dr. Shields from "connecting the dots" between the general causation testimony and the facts of this particular case, as is required of a specific causation expert. Moreover, even if Dr. Shields' opinion constitutes specific causation testimony, it is too conclusory and unsubstantiated to withstand summary judgment.

Because plaintiffs have not established that ephedra caused Mr. Singh's stroke, all of their claims must be dismissed. However, even if they could establish causation, they have provided no evidence to support their claims. Plaintiffs have provided no evidence to support their claims for negligence, design or manufacturing or warning defect, or for breach of express or implied warranty, or for the derivative loss of consortium claim. Similarly, they have not provided any evidence at all against Steve Peterson, and have not provided any evidence supporting claims of lost past or future earnings, loss of earning capacity, or future medical expenses. Because plaintiffs have not offered a single piece of evidence on these claims, Herbalife is entitled to summary judgment.

## FACTUAL BACKGROUND

Plaintiff Harbir Singh is a 45 year old man, born on November 20, 1961. (**Ex. A**: Transcript of Deposition of Harbir Singh, dated November 8, 2006 ("Singh Dep.") at 7:23-25.) Defendant Herbalife International of America, Inc. is a health and wellness company that markets lines of personal care products and nutritional supplements. Defendant Steve Peterson is an independent distributor of Herbalife products. (**Ex. B**: December 5, 2006 Deposition of Steve Peterson at 35:12-16.)

Plaintiffs claim that from May 2002 until May 2003, Mr. Singh ingested an Herbalife dietary supplement—Original Green—that contained herbal ephedra. (**Ex. A**: Singh Dep. at 274:24-275:3, 345:9-12.) He states that he took Herbalife according to the

2

instructions on the bottle, namely three tablets in the morning and three tablets in the

evening, for a total of 42 milligrams of ephedrine alkaloids daily.  (**Ex. A**:  Singh Dep. at

346:18-19; **Ex. C**:  Label for Herbalife Original Green, Shields Deposition Exhibit No.

11 ("Original Green Label").)  The last time that Mr. Singh ingested an Herbalife

ephedra-containing product was May 9, 2003, the day before he had a stroke.  (**Ex. A**:

Singh Dep. at 345:9-12.)  Prior to his stroke, Mr. Singh had smoked one pack of

cigarettes per day and had drunk two alcoholic beverages per day for over twenty years.

(**Ex. A**:  Singh Dep. at 227:19-22, 228:24; 365:3-6.)  Mr. Singh also drank up to three

cups of Lipton caffeinated tea per day.  *Id.* at 235:6-8.

On the morning of May 10, 2003, at age 41, Mr. Singh fainted in the bathroom at

home and was taken to the hospital.  *Id.* at 372:4-5, 376:18-20.  Shortly after Mr. Singh

was admitted to the hospital, a CT scan was performed, which showed a subarachnoid

hemorrhage ("SAH"), likely caused by a ruptured aneurysm.  (**Ex. D**:  January 10, 2007

Deposition of Bruce Charles Zablow ("Zablow Dep.") at 19:20-21, 25:20-22.)  Cerebral

arteriography performed later that day confirmed the ruptured aneurysm.  (**Ex. E**:  Report

of Neuroendovascular Surgery.)  A coiling procedure was successfully performed,

stopping the flow of blood from the aneurysm.  (**Ex. D**:  Zablow Dep. at 27:25-28:11.)

During Mr. Singh's hospitalization, his treating physician, Bruce Zablow, M.D.

noted the presence of dysplasia in the cervical left internal carotid artery, which he

diagnosed as "most likely fibromuscular dysplasia."  *Id.* at 62:9-18.  Dr. Zablow also

noted that Mr. Singh showed no evidence of vasospasm prior to the stroke.  *Id.* at 27:16-

17.

3

On January 3, 2006, Mr. Singh and Ms. Caragata commenced this ephedra product liability lawsuit against two Herbalife entities (Herbalife International Communications, Inc. and Herbalife International of America, Inc.) and Steve Peterson, in the Southern District of New York.  (**Ex. F**:  Complaint.)  The complaint alleges negligence, strict liability and breach of express and implied warranties, and Ms. Caragata has asserted a loss of consortium claim.  *Id.*  The Court transferred the case to the Ephedra MDL.  (**Ex. G**:  Notice of Assignment, dated January 10, 2006.)  Plaintiffs seek damages for Mr. Singh's alleged pain and suffering, lost past and future earnings and medical expenses, and for Ms. Caragata's loss of consortium claim.  (**Ex. F**:  Complaint.)   The two Herbalife defendants' and Steve Peterson's Answers are provided herewith as **Ex. H**.

In December 2006, plaintiff provided a case-specific expert report for Lawrence W. Shields, M.D.  (**Ex. I**:  Expert Report of Lawrence W. Shields, M.D. ("Shields Report").)  Herbalife moved to exclude the expert opinion of Dr. Shields.  (**Ex. J:** Herbalife's Notice of Motion to Preclude Plaintiffs' Case-Specific Experts' Opinions or Portions Thereof, ("*Daubert* Motion") filed May 14, 2007.)  Following an evidentiary hearing on July 9, 2007, the Court granted Herbalife's motion in part and denied it in part in an Order issued on July 13, 2007.  (**Ex. K**:  Transcript from July 9, 2007 *Daubert* hearing ("*Daubert* Transcript"); **Ex. L**:  July 13, 2007 Memorandum Order ("Memorandum Order") at 1, 4.)  That Order gives rise to Herbalife's summary judgment motion.

## ARGUMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Anderson v. Liberty Lobby,* 477 U.S. 242, 250 (1986). Although the moving party has the initial burden of "informing the district court of the basis for its motion and identifying . . . [the matter] which it believes demonstrates the absence of a genuine issue of material fact," once it has met that burden, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), *Asset Mgmt. & Control, Inc., v. ABF Freight System, Inc.*, 18 F.Supp.2d 187, 190 (N.D.N.Y. 1998). Moreover, to withstand summary judgment, a plaintiff needs to make out a prima facie case on each element of its claims. *Marks v. New York Univ.*, 61 F.Supp.2d 81, 88 (S.D.N.Y. 1999). Summary judgment must be granted if the non-moving party fails to meet its burden. *Asset Mgmt. & Control, Inc.* 18 F.Supp.2d at 190.

I.      **Herbalife is entitled to summary judgment on all claims because plaintiffs have no specific causation opinion.**

It is black letter law that the plaintiff in a negligence or strict products liability case has the burden of proving both general and specific causation. *See Heckstall v. Pincus*, 797 N.Y.S.2d 445, 447 (1st Dept. 2005) (requiring both general and specific causation in strict liability and negligence claims).[1] To prove specific causation, a plaintiff must show that, more likely than not, the product caused the plaintiff's injury. *See Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F.Supp. 1437, 1446

---

[1]      The Singh case is governed by New York law, plaintiffs' place of residence and the locus of the injury.

(S.D.N.Y. 1997).  In this case, plaintiffs cannot meet their burden because they lack any expert testimony regarding ephedra's effects on Mr. Singh.

> **A.    This Court's Daubert Order leaves plaintiffs with no adequate specific causation opinion.**

This Court's *Daubert* opinion prohibits Dr. Shields from providing the necessary specific causation testimony.  To meet its burden with respect to specific causation, a plaintiff must show that, more likely than not, the toxin in question caused his or her specific injury.  *See Parker v. Mobil Oil Corp.*, 7 N.Y.3d 434, 448 (2006).  This Court has described the duty of specific causation experts as "connect[ing] the dots between ephedra and the particular plaintiff's injury."  (**Ex. M**:  *Smoot v. AST Sports Science, Inc.,* No. 04 M.D. 1598, No. 04 Civ. 5482, slip op. at 2 (S.D.N.Y. Feb 28, 2006) ("Smoot Order").)  In this case, that means that the plaintiffs must show that Herbalife's ephedra-containing product caused Mr. Singh's hemorrhagic stroke.  By prohibiting Dr. Shields from testifying "as to the effects of ephedra on this plaintiff," this Court's *Daubert* Order precludes exactly the testimony that plaintiffs need to survive summary judgment.  (**Ex. L**  "Memorandum Order" at 1.)

Similarly, the remaining pieces of Dr. Shields' opinion cannot provide the necessary specific causation testimony.  After the *Daubert* ruling, Dr. Shields is only permitted to testify as to "opinions concerning risk factors other than ephedra, including his opinion that they were insufficient in themselves to cause Mr. Singh's stroke."  (**Ex. L**:  Memorandum Order at 4.)  This opinion cannot supply the requisite specific causation.  In cases involving personal injury, specific causation is typically shown by differential diagnosis, "in which the expert 'rules out' other potential causes and 'rules in' a particular toxin as the cause of the plaintiff's injuries."  *Green v. McAllister Bros., Inc.,*

2005 WL 742624, at *11 (S.D.N.Y. 2005). What is left of Dr. Shields' opinion simply does not meet those requirements. While the *Daubert* Order permits Dr. Shields to testify that Mr. Singh's other known risk factors "were insufficient in themselves to cause Mr. Singh's stroke," (**Ex. L**: Memorandum Order at 4), "ruling out" alone does not constitute a differential diagnosis. "Ruling out" cannot satisfy the specific causation requirement because it does not "rule in" ephedra by "connect[ing] the dots" between the general causation testimony and the specific facts of this case. Furthermore, Dr. Shields has not "ruled out" other causes. Dr. Shields admits that both smoking and caffeine intake likely contributed to causing Mr. Singh's aneurysmal rupture. (**Ex. N**: February 20, 2007 Deposition of Lawrence Shields, M.D. ("Shields Dep.") at 161:12-14, 174:7-9; **Ex. K**: *Daubert* Transcript at 22:11-13, 23:11-14.)

Although plaintiffs may argue that their general causation expert will effectively "rule in" ephedra as a possible cause of stroke in some people and that Dr. Shields may then "rule out" all other causes for Mr. Singh's stroke, this argument cannot succeed. Dr. Shields does not rule out all other causes for Mr. Singh's stroke. He merely opines that Mr. Singh's other known risk factors do not themselves sufficiently explain the stroke. He does not, and indeed cannot possibly, rule out unknown causes. In about 85% of cases, including Mr. Singh's, subarachnoid hemorrhage is caused by the rupture of an aneurysm.[2] (**Ex. N**: Shields Dep. at 132:20-21.) There are countless potential reasons why an aneurysm might rupture. At his deposition, Dr. Shields provided an incomplete

---

[2]   There has been no suggestion that Herbalife products caused the aneurysm to form. Moreover, Dr. Shields believes that Mr. Singh's smoking habit likely spurred the growth of the aneurysm, and as an aneurysm grows, the likelihood of rupture increases. (**Ex. K**: *Daubert* Transcript at 22:14-17; **Ex. N**: Shields Dep. at 139:18-20.)

list of potential causes as including:

> binge drinking; cigarette smoking, especially on the day; use of drugs like ephedra-containing products; alterations of blood pressure; chronic blood pressure and acute blood pressure elevations; wearing down processes; jetting of flow; alteration of direction of flow; pulsatile flow; turbulence of flow; vibration of the aneurism; pregnancy; sex; disease; activity; [or] lack of activity.  I can go on for a very long time.

(**Ex. N:**  Shields Dep. at 140:3-12.)  In short, nearly anything—or nothing at all—could cause an aneurysm to rupture.  One of the references cited by Dr. Shields in support of his opinion observes that "the fact that so many cases . . . bled during sleep indicates that SAH can, and frequently does, occur independently of any unusual environmental stresses . . .."  (**Ex. O**:  H. B. Locksley, Report on the Cooperative Study of Intracranial Aneurysms and Subarachnoid Hemorrhage, Section V, Part I, Natural History of Subarachnoid Hemorrhage, Intracranial Aneurysms and Arteriovenous Malformations, ("H. B. Locksley") Neurosurgery, 219-239, 226, 1966), cited in Shields Report, at Bibliography entry 18.)   A recent review article in the prominent British medical journal, Lancet, also noted that "[f]actors that precipitate rupture of an aneurysm are complex . . .."  (**Ex. P**:  J. van Gijn, R. S. Kerr, and G. J. E. Rinkel, Subarachnoid Haemorrhage, ("Van Gijn") Lancet 369:307 (2007), cited in Shields Dep., Exhibit 12.)

Merely ruling out Mr. Singh's known risk factors, even were Dr. Shields able to do so, therefore only addresses one part of the equation.  The plaintiffs must do more to connect the dots between the general causation experts and the specific facts of the case.  They cannot leave a jury to speculate as to the cause of the stroke.  This situation is not analogous to asking a fact finder to infer that a traffic light was red based on testimony that it was not yellow and was not green.  On the contrary, there is not an exhaustive or finite group of potential causes for a stroke.  Further, determining the cause of a medical

8

ailment is beyond the scope of a layperson fact finder and must be shown through expert testimony. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (even under plaintiff's reduced burden under the Jones Act, "where an injury has multiple potential etiologies, expert testimony is necessary to establish causation.") Thus, ruling out some potential causes brings a fact finder no closer to determining what did cause the stroke and Herbalife is entitled to summary judgment. *See Miller v. Nat. Cabinet Co., et al.*, 168 N.E.2d 811, 817-818 (N.Y. 1960) (holding that plaintiff must show more than that defendant's actions *possibly* caused plaintiff's injury because to hold otherwise would impermissibly shift the burden to the defendant to prove that plaintiff's illness "resulted from something else").[3] Furthermore, although alternate causation may be probative, a defendant has no burden to show such alternate causation. *See Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252 (1st Cir. 1998).

Moreover, the testimony of a general causation expert cannot substitute for specific causation testimony. Plaintiffs' general causation expert, Steven Levine, M.D., states only that "in some people . . . ephedra supplements may likely be a contributing cause of severe adverse reactions, including stroke." (**Ex. Q**: Fourth Amended Generic Expert Report of Steven R. Levine, M.D., dated February 27, 2006 ("Levine Report") at

---

[3]      In fact, Dr. Shields concedes that Mr. Singh's smoking habit played a causal role in the stroke, but believes a "precipitant" was needed at the time of the stroke. Yet, Dr. Shields concedes that ephedra last taken the day before the stroke had no effect on Mr. Singh's blood pressure on the day of the stroke (**Ex. K**:  *Daubert* Transcript at 7:5-24; 14:12-16), whereas Mr. Singh's caffeine intake would have caused an increase in blood pressure and could have played a role in precipitating the stroke (**Ex. K**:  *Daubert* Transcript at 23:11-14). Dr. Shields' opinion that these other factors are not themselves sufficient appears to be based on nothing more than data that the majority of aneurysms do not rupture.  (*See* **Ex. K**: *Daubert* Transcript at 24.)  It is yet another example of Dr. Shields' determination to "defend his bottom line, no matter what." (**Ex. K**:  *Daubert* Transcript at 12:9.)

9

3.)  This testimony does not obviate the need for a specific causation opinion because it does not—as is required of a specific causation opinion—state that ephedra caused Mr. Singh's injury.  Indeed, it says nothing at all about Mr. Singh.  Further, "may likely be" does not meet the New York standard for causation, which requires proof that a defendant's product "more likely than not" caused a plaintiff's injury.  *See Parker,* 7 N.Y.3d at 448.

Without Dr. Shields' testimony, plaintiffs have no specific causation testimony on ephedra.  As described above, Dr. Levine does not provide such testimony.  Similarly, Mr. Singh's treating neurologist, Bruce Charles Zablow, M.D., cannot establish the required specific causation because he had no knowledge that Mr. Singh even ingested an ephedra-containing product.  (**Ex. D**:  Zablow Dep. at 22:16-20.)  He stated plainly that Mr. Singh's stroke was caused by the typical rupture of a berry aneurysm.  *Id.* at 25:11-26:9.  Nowhere has Dr. Zablow testified that ephedra caused Mr. Singh's stroke.

Dr. Zablow noted the presence of dysplasia in the left internal carotid artery, which he diagnosed as "most likely fibromuscular dysplasia" ("FMD").  (**Ex. D**:  Zablow Dep. at 62:9-18.)  FMD is associated with an increased incidence of rupture of aneurysm.  (**Ex. R**:  April 12, 2007 Deposition of John F. Dashe, M.D. ("Dashe Dep.") at 85-86; **Ex. S:** February 26, 2007 Expert Report of John F. Dashe ("Dashe Report") at 4.)  Although Dr. Shields professes to be skeptical of Dr. Zablow's finding of FMD, Dr. Shields has never reviewed Mr. Singh's arteriogram images, **Ex. K**:  *Daubert* Transcript at 17:1-3, and admits that without reviewing the films he cannot say if Mr. Singh did or did not have FMD.  (**Ex. K**:  *Daubert* Transcript at 19:24-20:3.)  If Dr. Shields cannot say that Mr. Singh did not have FMD, then logically he lacks a proper basis to rule out FMD as a

potential cause of Mr. Singh's rupture of aneurysm.  Herbalife has designated Dr. Zablow

as a non-retained trial expert (**Ex. T**:  Herbalife International Communications, Inc.'s,

Herbalife International of America, Inc.'s and Steve Peterson's Disclosure of Expert

Witnesses), and Dr. Shields is not able to controvert Dr. Zablow's testimony, based on his

treatment of Mr. Singh and review of the arteriogram images, that Mr. Singh most likely

had FMD in his carotid artery.

> **B.**    **Even if Dr. Shields' remaining opinions constitute specific causation, they are insufficient to withstand summary judgment.**

Even if Dr. Shields' remaining opinions constitute specific causation, they are

nonetheless insufficient under Fed. R. Civ. P. 56(e) to prevent summary judgment for

Herbalife.  Rule 56(e) requires that affidavits or testimony in support of and in opposition

to summary judgment "shall set forth such facts as would be admissible in evidence."

The Rule 56 requirement has led courts to require experts to provide, in their affidavits in

opposition to motions for summary judgment, the facts on which they rely and the

reasoning process that leads to their opinions.  *See Mid-State Fertilizer Co. v. Exch. Nat'l

Bank of Chicago*, 877 F.2d 1333, 1338-40 (7th Cir. 1989) (expert's affidavit consisting

solely of seven conclusory sentences insufficient to defeat summary judgment).  The

Second Circuit has cited the Seventh Circuit's decision in *Mid-State* as an example of an

inadequate affidavit.  *See B.F. Goodrich v. Betkoski*, 99 F.3d 505, 526 (2d Cir. 1996);

*Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994).[4]

---

[4]    In the recent case of *Algarin v. New York City Dept. of Corr.*, 2006 WL 3060081, at *6 (S.D.N.Y. Oct. 30, 2006) (Rakoff, J.), the Court ruled that the affidavit of plaintiff's expert was inadmissible under *Daubert* and Rule 702, but "even if it were admissible, it would not carry plaintiff's burden" to establish the medical community's standards of care governing involuntary commitment.  Thus, summary judgment for defendants was mandated.  *Algarin, supra*, at *7.

As in the cases above, Dr. Shields' expert testimony is wholly inadequate to withstand summary judgment.  Dr. Shields conclusorily asserts that an aneurysm will not rupture in the absence of "a precipitant," stating that this must be the case because so many people have aneurysms that do not rupture.  (**Ex. K**:  *Daubert* Transcript at 24:20-21.)  This statement is illogical and is contrary to Dr. Shields' own testimony.  Although many people's aneurysms never rupture, other people's aneurysms do rupture, and many of these ruptures have no apparent cause.  Dr. Shields himself states that "alterations of blood pressure" or "activity; [or] lack of activity" could cause an aneurysm to rupture.  (**Ex. N**:  Shields Dep. at 140:3-11.)  "Activity; [or] lack of activity" covers basically every possible human condition.  Such normal activity can hardly be called "a precipitant."  Dr. Shields further notes that blood pressure naturally varies during the course of the day, **Ex. N**:  Shields Dep. at 153:17-20, and blood pressure is typically higher in the morning, at the time that Mr. Singh had his stroke, due to normal diurnal variations (**Ex. R**:  Dashe Dep. at 85-86; Dashe Report at 4).  Thus, Dr. Shields' reasoning is wholly specious.

Dr. Shields acknowledges that one physical characteristic that makes aneurysms more prone to rupture is size.  (**Ex. N**:  Shields Dep. at 139:18-20.)  Mr. Singh's aneurysm was 7.0 x 5.4 mm.  (**Ex. N**:  Shields Dep., Exhibit 8 at 1; **Ex. E:** Report of Neuroendovascular Surgery.)  Dr. Shields, defendant's expert neurologist Dr. Dashe, and Mr. Singh's treating physician Dr. Zablow are all in agreement that at 7 mm. Mr. Singh's aneurysm had reached the size where rupture was more likely.  (**Ex. N**:  Shields Dep. at 142:14-15; **Ex. R**:  Dashe Dep. at 91:13-17; **Ex. D**:  Zablow Dep. at 65:22-66:4.)   Dr.

Shields' reliance on data that most aneurysms, *the great majority of which are very small*, never rupture is entirely disingenuous for that reason.

Moreover, even if Dr. Shields' precipitant requirement is correct, plaintiffs are no closer to establishing specific causation.  Although on the one hand Dr. Shields states "a population of people, a large percentage of them which were smoking, and they still don't rupture their aneurysms," seeming to imply that smoking cannot be a precipitant,  **Ex. K**: *Daubert* Transcript at 24:23-25, on the other hand Dr. Shields says specifically that "smoking is a precipitant".  *Id.* at 24:22.  Dr. Shields discounts the effects of Mr. Singh's smoking habit because Mr. Singh reportedly did not smoke on the day of the stroke, but he has not provided any scientific literature to support his assertion.[5]

Moreover, Dr. Shields concedes that even without smoking on the day of the stroke, Mr. Singh's long term smoking habit placed him at a three to four times increased risk for rupture of aneurysm and subarachnoid hemorrhage.  (**Ex. N**:  Shields Dep. at 173:19-23; **Ex. K**:  *Daubert* Transcript 30:24-31:2.)  The scientific literature linking smoking to rupture of aneurysm and hemorrhagic stroke is consistent and overwhelming. (**Ex. N**:  Shields Dep. at 172:18-173:2; **Ex. R**:  Dashe Dep. at 58:7-18.)  The epidemiologic literature establishes that smoking is an *independent* risk factor for hemorrhagic stroke and does not support Dr. Shields' opinion that an additional "precipitant" beyond normal activities of daily life and usual variations in blood pressure is necessary.

---

[5]     Although Dr. Shields committed at his deposition to provide such literature at the request of defense counsel, he did not do so.  (*See* **Ex. N**:  Shields Dep. at 173:12-14; **Ex. V**:  Letter from Frederick McGowen to David B. Rheingold, dated March 7, 2007 ("March 7, 2007 Letter").)

13

Dr. Shields also agrees that the tea that Mr. Singh drank on the morning of his stroke could have been a precipitant.  *Id.* at 23:11-14.  Despite these statements, Dr. Shields summarily states that Mr. Singh's other risk factors were not themselves sufficient to cause the stroke.  Dr. Shields provides absolutely no reasoning for "ruling out" these other risk factors as potential precipitants of Mr. Singh's stroke.  As in *Mid-State*, Dr. Shields' report presents only naked conclusions, and, as in *Mid-State*, they cannot shield plaintiffs from summary judgment because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  877 F.2d at 1339.

In sum, the portions of Dr. Shields' report remaining after this Court's *Daubert* Order provide a fact finder with no guidance as to what caused Mr. Singh's stroke and therefore do not fulfill plaintiffs' specific causation requirement.  However, even if these incomplete opinions could constitute specific causation, they are wholly unsupported and are thus insufficient to create a genuine issue of material fact to defeat summary judgment.

## II.  In the absence of any evidence of any breach of duty, product defect, or proximate causation, Herbalife is entitled to summary judgment on all of plaintiffs' claims: negligence, product liability, breach of warranty and loss of consortium.

Under New York law, for claims of strict liability, negligence or breach of an implied warranty, plaintiffs most prove that Original Green was defective as a result of either a manufacturing flaw, improper design or a failure to provide adequate warnings. *Adesina v. Aladan Corp.*, 438 F.Supp.2d 329, 345 (S.D.N.Y. 2006); *Speller ex rel. Miller v. Sears, Roebuck & Co.*, 790 N.E.2d 252, 254 (N.Y. 2003).  In addition, the plaintiff must prove that the defect was a substantial factor in causing the plaintiff's injury. *Voss*

*v. Black & Decker Mfg.*, 450 N.E.2d 204, 207 (N.Y. 1983).  Even if plaintiffs could prove specific causation, they cannot prove any of the remaining elements of their negligence, product liability and breach of implied warranty claims.  Thus, all of these claims, and the derivative loss of consortium claim, should be dismissed.

> **A.**     **Plaintiffs have shown no evidence of defective manufacture.**

A claim for manufacturing defect requires proof that the product "was not built to specifications" or "did not conform to the manufacturer's intended design."  *Van Deusen v. Norton Co.*, 612 N.Y.S.2d 464, 466 (3d Dept.. 1994).  Plaintiffs have shown no evidence that the Original Green that Mr. Singh allegedly ingested was not manufactured to specifications or did not conform to the intended design.  Thus, plaintiffs' claims for negligent or defective manufacture should be dismissed.

> **B.**     **Plaintiffs have shown no evidence of defective design.**

On a defective design claim in either negligence or strict liability, plaintiffs must identify some defect in the product.  *Blandin v. Marathon Equip. Co*, 780 N.Y.S.2d 190, 192 (3d Dept. 2004) ("in design defect cases very little difference exists between prima facie cases in negligence and in strict liability").  New York courts have held that " a defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use."  *Voss*, 450 N.E.2d. at 207.  A plaintiff, therefore, "is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner."  *Id.* at 208.  Alternately, if the plaintiff cannot identify a defect, the "plaintiff must prove that the product did not perform as intended and [must]

15

exclude all other causes for the product's failure that are not attributable to defendants." *Speller*, 100 N.E.2d at 254-55.

Plaintiffs have shown no evidence of a flaw in design, nor have they claimed that the product did not perform as intended.  In fact, Mr. Singh testified at his deposition that he used Original Green to lose weight, and that he believes that he lost weight while taking the product.  (**Ex. A**:  Singh Dep. at 273:24 – 274:4; 351:6 – 352:16.)  Thus, the evidence indicates that the product did work as intended.

Moreover, plaintiffs have not excluded all other causes for the alleged product failure that are not attributable to the product.  As described above, there are several possible causes for Mr. Singh's injury, which have not been ruled out.  Similarly, plaintiffs have not proffered any feasible alternative, safer design.  Finally, plaintiffs have not designated any expert who can testify as to a defect in the design of Original Green and the time for designation of such experts has long since passed.  Therefore, plaintiffs' negligent and defective design claims must be dismissed.

> **C.   There is no evidence of a defect or proximate causation with respect to product warnings.**

Under New York law, a prima facie showing of liability for failure to warn requires plaintiffs to show both 1) that the warning was deficient, and 2) that any alleged failure to warn was the proximate cause of the alleged injuries.  Plaintiffs have made no showing that the Original Green warning was deficient.  Even if the warning is considered inadequate, plaintiffs still must show that the inadequate warning proximately caused Mr. Singh's injury.  In other words, plaintiffs must show that Mr. Singh would have behaved differently had the warning been different.  *Sosna v. Am. Home Prods.*, 748 N.Y.S.2d 548, 549 (1st Dept. 2002).

New York law inconsistently recognizes a rebuttable presumption that a plaintiff would have read and heeded an adequate warning.  *Compare Sosna*, 748 N.Y.S.2d at 549 (plaintiff's burden "includes adducing proof that the user of a product would have read and heeded a warning had one been given") *with Henry v. Rehab Plus Inc.*, 404 F.Supp.2d 435, 442 (E.D.N.Y. 2005) ("[i]n New York there is a presumption that a user would have heeded warnings if they had been provided and that the injury would not have occurred").  If a heeding presumption is applied, then a defendant may rebut that presumption "by proof that an adequate warning would have been futile since plaintiff would not have read it."  *Anderson v. Hedstrom Corp.* 76 F.Supp.2d 422, 441 (S.D.N.Y. 1999).

Regardless of whether this Court applies a heeding presumption, plaintiffs cannot make a prima facie showing of failure to warn.  If the Court applies a heeding presumption, the evidence rebuts it.  The evidence shows that Mr. Singh did not read the warning of the label of Original Green.  Mr. Singh testified at his deposition in this case that he could not recall reading the warning on the Herbalife label, nor could he recall ever having read a warning label.  (**Ex. A**:  Singh Dep. at 355:16-22, 355:24-356:5.) Thus, in this case, a warning, regardless of its content or adequacy, would have been futile, and the heeding presumption is rebutted.  *See Sosna*, 748 N.Y.S.2d at 549 (finding no proximate causation in failure to warn case where plaintiff admitted that he had not read product warnings).

Because the presumption has been rebutted, the burden returns to the plaintiffs to prove that had Mr. Singh received a different warning, he would have avoided the injuries he allegedly received as a result of ingesting Herbalife Original Green.  However,

as stated above, plaintiffs have provided no evidence that a different warning would have altered Mr. Singh's behavior.  Hence, the adequacy of the warning is immaterial (although Herbalife maintains that its warning was adequate) because Mr. Singh would not have changed his behavior in response to a different "adequate" warning.  By his own admission, he would not have read it.  Therefore, there is no proximate causation between any alleged defect in the warning on the label of Herbalife's Original Green product and Mr. Singh's alleged injuries.  Plaintiffs' failure to warn claim should, therefore, be dismissed.

As plaintiffs cannot prove that Original Green was defective as a result of either a manufacturing flaw, improper design or a failure to provide adequate warnings, plaintiffs' negligence, product liability and breach of implied warranty claims, and the derivative loss of consortium claim, should all be dismissed.

III.     **Plaintiffs Have Failed to Provide Evidence of Alleged Breach of Express Warranty.**

It is well settled under New York law that, in order to recover on a breach of express warranty claim, plaintiff must demonstrate that there was an "affirmation of fact or promise by the seller, the natural tendency of which [was] to induce the buyer to purchase and that the warranty was relied upon …."  *Schimmenti v. Ply Gem Industries, Inc.*, 156 A.D.2d 658, 659 (2d Dept. 1989) (internal quotations omitted), *citing Friedman v. Medtronic, Inc.*, 42 A.D.2d 185, 190, 345 N.Y.S.2d 637, 643 (2nd Dep't. 1973).  Plaintiffs must also prove that Original Green did not perform as it should have, and that the express warranty relates to the failure alleged.  *Adesina*, 438 F.Supp.2d, at 347; *Sanders v. Quikstak, Inc.*, 889 F.Supp. 128, 133 (S.D.N.Y. 1995); *Siemens Solar Industries v. Atlantic Richfield Co.*, 673 N.Y.S.2d 674, (1st Dep't 1998).  As plaintiffs

have provided no evidence in support of their claim for breach of express warranty, that claim should be dismissed.

Plaintiffs have failed to set forth any evidence that Herbalife made any representations to Mr. Singh regarding the product, no less that he relied on any statements by Herbalife, or was induced to purchase the Herbalife product based upon any such statements.  Instead, Mr. Singh testified that he purchased Original Green because his friend, Vasile Panait, recommended Herbalife products.  (**Ex. A**:  Singh Dep. at 291:4-24; 296:17-25; 298:11-19; 362:10-363:9.)  Mr. Panait is not associated with Herbalife.  (**Ex. V**:  September 5, 2006 Deposition of Vasile Panait at 7:8-17, 14:9-22; **Ex. A**:  Singh Dep. at 298:8-10.)  Mr. Singh testified at his deposition that Mr. Panait had purchased Herbalife products for his daughter, and that Mr. Panait gave Mr. Peterson's contact information to Mr. Singh.  (**Ex. A**:  Singh Dep. at 291:4-24; 296:17-25; 298:11-19; 362:10-363:9.)  Mr. Singh then contacted Mr. Peterson and purchased Original Green.  (**Ex. A**:  Singh Dep. at 297:15-300:17.)  Thus, the evidence in this case suggests that plaintiffs relied on representations from Mr. Panait, and not from Herbalife (or Mr. Peterson), in purchasing Original Green.

Plaintiffs do not offer any promotional material in support of their breach of express warranty claim.  In their Fact Sheet, plaintiffs provided no information in response to the following questions regarding the Herbalife product Mr. Singh allegedly ingested:

> "Did you ever see any magazine, newspaper or other advertisements relating to the Ephedra product you allegedly took …?"

> "Did you ever see or hear any television or radio program, television or radio news program, or television or radio advertisement or infomercial relating to the Ephedra product you allegedly took …?"

(**Ex. W**:  Plaintiffs' Fact Sheet § VII.B.)  Plaintiffs also stated that Mr. Singh had not seen or reviewed any Internet websites that discussed the Herbalife product he allegedly took.  In addition, he stated that he had not seen any store displays or posters for the Herbalife product that he allegedly ingested.  *Id.*  Thus, plaintiffs can not possibly intend to rely on any representation in any advertisement, television or radio program, Internet website or other promotional material as support for their breach of express warranty claim.  In the absence of any express oral or written fact or promise attributable to Herbalife that allegedly induced Mr. Singh to purchase Original Green or that he relied upon in purchasing Original Green, plaintiffs' breach of express warranty claim must be dismissed.  *Arnold v. Krause*, 232 F.R.D. 58, 74 (W.D.N.Y. 2004) (granting defendant summary judgment on breach of warranty claim because plaintiffs failed to present any evidence of any specific statement of fact or promise which either induced them or that they relied upon to purchase a ladder that allegedly collapsed)(internal citations omitted); *see also Davis v. New York City Housing Authority*, 256 A.D.2d. 575, 576 (2d Dept. 1998) ("The cause of action … sounding in breach of express warranty [was] properly dismissed since the plaintiffs failed to set forth the terms of the warranty on which they relied ….").

Furthermore, as discussed above, plaintiffs have not proven that the product did not perform as intended.  As noted above, Mr. Singh testified at his deposition that he used Original Green to lose weight, and that he believes that he lost weight while taking the product.  (**Ex. A**:   Singh Dep. at 273:24-274:4; 351:6-352:16.)  Thus, the evidence indicates that the product did work as intended.  As plaintiffs cannot prove that the

product did not work as intended, their breach of express warranty claim should be dismissed.  *E.g., Adesina*, 438 F.Supp.2d at 347; *Sanders*, 889 F.Supp., at 133.

**IV.      Plaintiffs have no sufficient evidence in support of Mr. Singh's claims for past or future lost earnings, or future medical expenses, or of any other claim for future damages, or of Ms. Caragata's claim for loss of consortium.**

   **A.      There is insufficient evidence of lost past or future earnings.**

To recover for lost earnings, plaintiffs are required to establish Mr. Singh's future earnings "with reasonable certainty."  *Jeffries v. 3520 Broadway Mgmt. Co.*, 827 N.Y.S.2d 136, 138 (1st Dept.. 2007).  A plaintiff cannot meet this burden through "[u]nsubstantiated testimony, without documentation."  *Lodato v. Greyhawk N. Am.*, 834 N.Y.S.2d 239, 242 (2d Dept. 2007).  Additionally, expert testimony is often required to make out a prima facie case of speculative future economic losses.  *See, e.g., Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996).

Plaintiffs have not provided documentation to make a determination of lost past or future earnings.[6]  Plaintiffs produced nothing except an authorization with which defendants obtained joint personal tax returns for 1999, 2000, 2004 and 2005, which do not distinguish Mr. Singh's earnings in those years from Ms. Caragata's earnings.  (**Ex. X**: Internal Revenue Service records.)  IRS records indicate that no tax returns were filed for 2001, 2002 and 2003.  (**Ex. X**:  Internal Revenue Service records.)  Thus, plaintiffs have produced no financial documents for the two years prior to, and the year of, Mr. Singh's stroke.  Without additional documentation, it would be impossible for a jury or an expert to determine what Mr. Singh earned in the years leading up to his stroke or

---

[6]      From recent communications with counsel, Herbalife is led to believe that plaintiffs are no longer seeking past lost earnings.  However, even if plaintiffs still seek past lost earnings, they are not so entitled.

thereafter.

Because Mr. Singh ran his own business, calculation of future earnings is more complicated than calculating the earnings of a salaried employee.  Yet, in response to Herbalife's Request for Production of financial records relating to plaintiffs' business, plaintiffs served objections and no documents.  (**Ex. Y:** Herbalife's November 25, 2006 Case-Specific Request for Production of Documents and Things; Plaintiffs' December 21, 2006 Response to Defendant Herbalife International Communication, Inc.'s Production of Documents Demand, ¶¶ 3-10.)   Thus, there is no evidence as to the financial health of his business, nor is there any forecast of future health of the business.  Plaintiffs also did not provide transcripts of Mr. Singh's high school or college grades, which are typically used by experts in determining the value of a lost future earnings claim.  *Id.* at  ¶¶ 11 and 12.  The end date for discovery and the deadline for plaintiffs' expert reports in this case was December 26, 2006.  (**Ex. Z**:  August 9, 2006 E-mail Ruling by Special Master Niss.)

There is no evidence, expert or otherwise, outlining how much Mr. Singh's ability to earn has been impaired, or even whether his ability to earn has been impaired at all.  In the absence of documentation from which to project future lost earnings, plaintiffs' claim for lost past or future earnings is insufficient as a matter of law and should be dismissed.  *See Martinez v. Royal-Pak Sys.*, 300 A.D.2d 198 (1st Dept. 2002).  Moreover, plaintiffs have not disclosed or provided a report from an accountant or economist, or other financial expert, to support a claim for lost future earnings.  In this case, without expert opinion, and without documentation upon which an expert opinion could be based, plaintiffs have failed to make out a prima facie showing as to lost earnings, and that claim

22

should be dismissed.  *See, e.g., Boucher*, 73 F.3d 18.

### B. Plaintiffs have not met their burden of establishing future medical damages.

Plaintiffs have not met their burden of establishing future medical damages.  In New York, "[i]f a plaintiff seeks future medical expenses, . . . he must establish with a degree of reasonable medical certainty *through expert testimony* that such expenses will be incurred."  *Askey v. Occidental Chem. Corp.*, 477 N.Y.S.2d 242, (4th Dep't. 1984) (emphasis added).  Plaintiffs have provided no such evidence and, as noted above, the time for plaintiffs to designate case-specific expert witnesses is long past.  Without expert opinion, plaintiffs cannot establish future medical damages with a reasonable degree of medical certainty, and Herbalife is entitled to summary judgment on plaintiffs' claim for future medical expenses.

Ms. Caragata has asserted a loss of consortium claim, alleging that as a result of Mr. Singh's injuries she has been "deprived of the services and society of the injured plaintiff and liable for any and all expenses incurred on the injured plaintiff's behalf." (**Ex. F**:  Complaint ¶¶ 34-37.)  Plaintiffs' loss of consortium claim is a derivative claim and should be dismissed for the same reasons as set forth above.  In addition, this claim should be dismissed because other than the bare assertions in their Complaint, plaintiffs have produced no evidence in support of this claim.  There has been no evidence adduced in discovery that Mr. Singh has been medically diagnosed with any sexual dysfunction or that he ever sought treatment for the same.  Further, there has been no evidence demonstrating that Mr. Singh is unable to function in his household as he did prior to his alleged injuries.  Hence, plaintiffs' claim for loss of consortium should be also be dismissed based upon a lack of evidence.

**V.      Summary judgment is mandated on claims against Steve Peterson because plaintiffs have shown no basis for personal liability against him.**

It is well-established that a plaintiff can survive summary judgment only if he or she presents evidence sufficient to create a genuine issue of material fact.  *Celotex*, 477 U.S., at 323.  Here, plaintiffs have presented no evidence against Steve Peterson, and he is therefore entitled to summary judgment.

At his deposition, Mr. Peterson testified that he does not recall any of the substance of any oral communication with Mr. Singh, and Mr. Singh does not recall the substance of any oral communication with Mr. Peterson. (**Ex. B**:  Peterson Dep. at 44:24-45:16; 45:22-46:1; 48:15-49:14; **Ex. A**:  Singh Dep. at 311:25-312:20.)  The two witnesses can only speculate as to what they may have said to each other when Mr. Singh ordered from Mr. Peterson.  Ms. Caragata never spoke with Mr. Peterson. (**Ex. AA**: November 15, 2006 Deposition of Doina Caragata ("Caragata Dep.") at 120:11-13.) Plaintiffs have produced no documentary evidence of any representation by Mr. Peterson.

In speculating as to what they may have said to each other, Mr. Singh believes that Mr. Peterson may have told him to take the dosage recommended on the label.  (**Ex. A**:  Singh Dep. at 311:25-312:20.)  Mr. Peterson believes that he may have told Mr. Singh that the product may not be suitable for someone who has heart problems, high blood pressure or high cholesterol, which is similar to the information on the Original Green label, which states that before using the product, persons with a history of heart disease should consult their doctors about whether they should use it.  (**Ex. B**:  Peterson Dep. at 44:21-23, 51:22-52:2.)  Thus, both Mr. Singh's and Mr. Peterson's speculations, if they actually were communicated, are consistent with the label for Original Green. (**Ex. C**:  Herbalife Original Green label.)  It follows that for the reasons stated in this

24

section and throughout this memorandum, Mr. Peterson is entitled to summary judgment on all claims against him.

WHEREFORE, defendants respectfully request an order granting summary judgment on all claims and causes of action alleged by plaintiffs, and such other and further relief as the Court deems just and proper.

Dated:  July 27, 2007

Respectfully submitted,

/s/ Joanne M. Gray
Joanne M. Gray (JG7287)
Glenn S. Kerner (GK2482)
Frederick R. McGowen (FM1072)
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
212.813.8800

Richard A. Oetheimer
GOODWIN PROCTER LLP
Exchange Place
Boston, MA
617.570.1000

Attorneys for Defendants
HERBALIFE INTERNATIONAL COMMUNICATIONS, INC., HERBALIFE INTERNATIONAL OF AMERICA, INC., AND STEVE PETERSON

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2007, I caused a true and correct copy of the

foregoing HERBALIFE INTERNATIONAL COMMUNICATIONS, INC.'S.

HERBALIFE INTERNATIONAL OF AMERICA, INC.'S, AND STEVE PETERSON'S

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

to be served via E-Mail, Federal Express overnight mail, and via the Electronic Case

Filing system, upon:

David B. Rheingold, Esq.<br/>
Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP<br/>
113 East 37th Street<br/>
New York, NY 10016

s/ Joanne M. Gray

Joanne M. Gray (JG-7287)

26

LIBA/1815690.4