779zsinh.txt

1

```
779zsinh                    Hearing
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    HARBIR SINGH, et al.,
3
4              Plaintiffs,
4
5         v.                        06 CV 00014 (JSR)
5
6    HERBALIFE INTERNATIONAL
6    COMMUNICATIONS, INC., et al.,
7
7              Defendants.
8
8    ------------------------------x
9
9                                   July 9, 2007
10                                  5:10 p.m.
10
11   Before:
11
12                   HON. JED S. RAKOFF,
12
13                                  District Judge
13
14                      APPEARANCES
14
15   RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & MCCARTNEY LLP
15        Attorneys for Plaintiffs
16   BY:  PAUL RHEINGOLD
16        DAVID B. RHEINGOLD
17
17   GOODWIN PROCTER LLP
18        Attorneys for Defendants
18   BY:  RICHARD A. OETHEIMER
19        FREDERICK R. McGOWEN
20
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
779zsinh                    Hearing
1         THE DEPUTY CLERK:  All rise.  Please be seated.
2         THE COURT:  All right.  This is a Daubert hearing in
3    the case of Singh versus Herbalife International of America,
4    number 06 Civ. 0014, and it's part of the In Re Ephedra MDL.
5    Will counsel identify themselves for the record.
6         MR. PAUL RHEINGOLD:  Paul Rheingold for the plaintiff,
7    your Honor.
8         MR. DAVID RHEINGOLD:  David Rheingold for the
9    plaintiff.
10        MR. OETHEIMER:  Richard Oetheimer, your Honor, for the
11   defendant Herbalife and Mr. Peterson.
12        MR. McGOWEN:  And Frederick McGowen for Herbalife.
13        THE COURT:  Very good.  I guess we should call Dr.
                         Page 1
```

779zsinh.txt
```
14   Shields.
15              MR. PAUL RHEINGOLD:  Yes.  Dr. Shields, would you come
16   up, please.
17   LAWRENCE W. SHIELDS,
18        called as a witness by the plaintiff,
19        having been duly sworn, testified as follows:
20   DIRECT EXAMINATION
21   BY MR. OETHEIMER:
22              THE COURT:  Thank you.  Since I'm familiar with Dr.
23   Shields' background and with his expert report, it probably
24   makes sense to have questioning first by counsel for Herbalife.
25              MR. OETHEIMER:  Thank you, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                   3
```
     779zsinh                     Shields - direct
1    BY MR. OETHEIMER:
2    Q.   Good afternoon, Dr. Shields.
3    A.   Good afternoon.
4    Q.   Can I assume that you have a copy of your December 4, 2006
5    report with you?
6    A.   I do.
7    Q.   Okay, thank you.
8              MR. OETHEIMER:  And the Court has it as well?
9              THE COURT:  I do.
10             MR. OETHEIMER:  Thank you, your Honor.
11   Q.   Dr. Shields, in your report you gave the opinion that with
12   a reasonable degree of medical certainty, Mr. Singh's use of
13   Herbalife on the day of and the months preceding his
14   subarachnoid hemorrhage on May 10th, 2003, more likely than not
15   substantially contributed to his stroke, correct?
16   A.   Yes.
17   Q.   Okay.  And, in fact, you assumed and stated in your report
18   that Mr. Singh had taken Herbalife, an Ephedra containing
19   compound, on May 10th, 2003, that is on the day of his stroke.
20   You stated that on page two of your report, correct?
21   A.   That's correct.
22   Q.   Okay.  You state that Mr. Singh had used Herbalife on a
23   daily basis for perhaps as long as a year prior to his stroke,
24   and stated that he also used it on the day of this subarachnoid
25   hemorrage, right?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                   4
```
     779zsinh                     Shields - direct
1    A.   Correct.
2    Q.   And actually we can agree, can we not, that Mr. Singh
3    testified under oath at his deposition that he did not take
4    Herbalife on the day of his stroke, isn't that right?
5    A.   That is what he testified to.
6    Q.   And Mr. Singh gave that testimony at deposition in November
7    2006, the month before you issued your report?
8    A.   That's correct.
9    Q.   And if Mr. Singh took the product in accordance with the
10   Herbalife label, twice daily at 10:00 a.m. and 4:00 p.m --
11             THE COURT:  Wait a minute.  I'm sorry.
12             So, were you aware of that testimony at the time you
13   did your report?
14             THE WITNESS:  I was aware of it at a certain point,
15   but nevertheless, the information that I had was given to me by
16   the patient.  So to me that's medical history.
17             What he said in his deposition, to me, doesn't have
18   the same medical value, even though I know that he was confused
                                Page 2
```

779zsinh.txt
```
19  and gets mentally fatigued as a result of his brain injury.
20          THE COURT:  Well, all right, let me just make sure I
21  understand this.  He told you that he took Herbalife on the day
22  of his stroke?
23          THE WITNESS:  Yes.
24          THE COURT:  And where did that interview occur?
25          THE WITNESS:  In my office.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    5

779zsinh                   Shields - direct
```
1           THE COURT:  Was anyone else present?
2           THE WITNESS:  His wife.
3           THE COURT:  Okay.  How long did the interview last?
4           THE WITNESS:  A long time.  The -- well, the
5   interview --
6           THE COURT:  A long time is nice, but not nice enough.
7           THE WITNESS:  I'm going to tell you.
8           THE COURT:  Well, please do by answering my question;
9   how long?
10          THE WITNESS:  Well, the interview's integrated with my
11  doing the exam.  The entire exam took about two-and-a-half
12  hours.
13          THE COURT:  Okay.  And at what point in the exam did
14  he tell you this; what point in the meeting did he tell you
15  this?
16          THE WITNESS:  Fairly early in the exam.
17          THE COURT:  Now, did you review the actual transcript
18  of his deposition before you wrote the report?
19          THE WITNESS:  Well, I don't recall reading the entire
20  deposition.  Apparently, it was done in three parts, and I only
21  got one part.  And --
22          THE COURT:  Did that part include this testimony, that
23  he had not taken Ephedra on the day of the stroke?
24          THE WITNESS:  I don't recall.
25          THE COURT:  Okay.  But at some point you became aware
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    6

779zsinh                   Shields - direct
```
1   of it?
2           THE WITNESS:  I became aware of -- yes.  I became
3   aware that was his testimony.
4           THE COURT:  And you chose to discount that?
5           THE WITNESS:  I wouldn't say I discounted it.  I would
6   say that I gave it less value than what he told me.
7           I realize that in a given situation, somebody who is
8   brain damaged, it may be that he is giving inaccurate
9   information on either occasion.
10          But between the two, that is, when he is testifying
11  under oath in a situation which he considers, I would think,
12  adversarial, it would not be the same as when he's talking to
13  me in a doctor's office and giving me a kind of a running
14  account of what had happened.
15          THE COURT:  Well --
16          THE WITNESS:  So --
17          THE COURT:  -- let me make sure I understand your
18  reasoning here.  You posit that because of his brain damage,
19  there is a possibility of inaccuracy in either context; yes?
20          THE WITNESS:  That's correct.
21          THE COURT:  But you think that when he is under oath,
22  sworn to tell the truth on the record, in what would seem to be
23  a serious proceeding, that he would be more likely to be
```
                        Page 3

779zsinh.txt
24  erroneous than when he is in a casual conversation in your
25  office?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    7
    779zsinh                    Shields - direct
1               THE WITNESS:  Absolutely.  I consider the history I
2   take to be a medical history.
3               A legal deposition, to me, is not the same.  But I
4   freely admit that either, either version might be incorrect.
5               THE COURT:  Now, if it were correct that he didn't
6   take the last dose on the day of the stroke, would that not be
7   significant, given your testimony that Ephedra's effect on
8   systemic blood pressure wears off within five hours?
9               THE WITNESS:  Well, it's a long question.  So, number
10  one, it is my testimony that blood pressure elevation from the
11  oral use of an Ephredra containing compound would have a length
12  of time of, perhaps five hours in terms of its effect on blood
13  pressure.  Absolutely true as far as that goes.
14              But it doesn't change my overall opinion as to what
15  the proximate cause of his ruptured aneurysm was, if he had
16  taken it the day before and not the day that -- of the actual
17  clinical appearance of his subarachnoid hemorrhage.
18              THE COURT:  Well, doesn't it eliminate at least one of
19  the possibilities?
20              THE WITNESS:  You mean in terms of cause from elevated
21  systemic blood pressure?
22              THE COURT:  Yes.
23              THE WITNESS:  Yes.  I said that clearly in my
24  deposition.
25              THE COURT:  So, all right.  Go ahead.  I'm going to go
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    8
    779zsinh                    Shields - direct
1   back to counsel at this point.  Go ahead.
2               MR. OETHEIMER:  Your Honor --
3   Q.  Just with respect to the issue of when he took the product
4   that morning, you interviewed --
5   A.  I'm sorry, I didn't --
6   Q.  You interviewed the plaintiff in your office -- you
7   interviewed Mr. Singh in your office November 14th, 2005,
8   correct?
9   A.  Yeah.
10  Q.  And that's when you said he told you that he had taken the
11  product that morning?
12  A.  Yes.
13  Q.  You took notes of that interview, did you not?
14  A.  I did.
15  Q.  And they are marked -- were marked as Exhibit 6 to your
16  deposition?
17  A.  I don't remember the marking, but they were marked.
18  Q.  You took seven pages of handwritten notes?
19  A.  Yes.
20  Q.  And nowhere in those notes did you record that he had taken
21  Ephedra product that morning?
22  A.  Yes, that's true.  But you, as you remember in my
23  deposition, I said the notes are not intended to be a record of
24  what he told me.  Simply things that would remind me when I did
25  my actual formal note.  And --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    9
                               Page 4

779zsinh.txt
779zsinh                    Shields - direct
1   Q.   You did --
2   A.   -- as you might remember in the deposition, there were lots
3   of abbreviations and so on that I couldn't recall exactly what
4   it meant at the time that you asked me about it.  So it's just
5   to jog my memory.  It's not intended as a, an actual record of
6   the exact things that he said to me.
7   Q.   I did give you an opportunity at your deposition, Dr.
8   Shields, to read and to interpret the entire seven pages of
9   notes.
10          THE COURT:  You know, this is -- I don't want to hear
11  a single further reference, either from the witness or from
12  counsel, as to what he said or didn't say in his deposition.  I
13  could care less.
14          MR. OETHEIMER:  Okay.
15          THE COURT:  Let's get to the issue that's before me,
16  not the issue of how the two of you jousted in the past.
17          MR. OETHEIMER:  All right.
18  Q.   You did, and I think, your Honor, your instruction -- I
19  would like -- you did note in your notes that he had had a cup
20  of tea on the morning of the stroke?
21  A.   Correct.
22  Q.   Okay.  Now, in your report, Dr. Shields, you also stated
23  that the Herbalife product, that it was your understanding that
24  the Herbalife product contained 21 milligrams of concentrated
25  Ephedra extract and 3 milligrams of caffeine, correct?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            10
779zsinh                    Shields - direct
1   A.   Yes.
2   Q.   Okay.  And that's footnoted at page two of your report?
3   A.   That's correct.
4   Q.   Okay.  And, in fact, the Herbalife product label states
5   that three tablets of original green contained 21 milligrams of
6   Ephedrine group alkaloids and 3 milligrams of caffeine,
7   correct?
8   A.   Yes.  The label that I was shown later does say that.
9   Q.   You had that label at the time you wrote your report, did
10  you not?
11  A.   Well, you saw the label that I had at the time I wrote my
12  report, and in that it is not clear.
13  Q.   Okay.  In any event, would we -- there is no disagreement
14  that your report, in terms of the dosage, that your report is
15  in error, correct?
16  A.   That there is an inaccuracy, yes.
17  Q.   Okay.  And your report states that Mr. Singh used three
18  green pills twice a day.
19  A.   Yes.
20  Q.   Is your understanding?  So that the mistake in the per
21  tablet dosage of 21 versus 7 milligrams, that error is
22  multiplied by six times, correct?
23  A.   Well, but I never cited the total dosage in my report.  I
24  simply footnoted it, the label that I got.  So that I never
25  added up the amount.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            11
779zsinh                    Shields - direct
1   Q.   Okay.  In your deposition you added it up at
2   126 milligrams, correct?
3           THE COURT:  Sustained.
4           MR. OETHEIMER:  Okay.
                        Page 5

779zsinh.txt
5          THE COURT:  I seem to have been wasting my breath
6     three minutes ago.
7          MR. OETHEIMER:  I apologize, your Honor.  I didn't
8     know how else to do that.
9     Q.  Let me ask this.  Ultimately --
10         THE COURT:  Look, let's cut to the chase, because
11    otherwise we will be wasting time.  The witness' credibility
12    is, in my view, not at issue on this hearing.  Therefore, the
13    fact that he gave prior inconsistent statements is neither here
14    nor there.
15         Here is what seems to me to be at issue.  He made two
16    seemingly material errors in his report, at least, one, he had
17    the dosage three times what it was.  He had a fairly enormous
18    dose, as Ephedra goes.  And second, he had the timing --
19         MR. OETHEIMER:  Correct.
20         THE COURT:  -- wrong.
21         The question is whether that has so tainted his
22    report, that he should not be permitted to testify, or whether
23    the report is, either as originally given or as amended,
24    salvageable.
25         I am already struck by two things, and I hope I will
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                12
      779zsinh                    Shields - direct
1     have to worry about in the rest of the hearing this afternoon.
2     The first is defense counsel's desire to score litigator's
3     points, and the second is the witness' unusually strong defense
4     of this about his prior errors.
5          Now, the former is regrettable, but immaterial.  The
6     latter bothers me, because what I'm hearing so far -- we've
7     only gone five minutes so I may change my mind totally, but I
8     thought I better flag this for the benefit of the witness -- is
9     a seeming desire to defend his bottom line, no matter what,
10    despite what would seem to have been fairly material, on their
11    face, errors.
12         I am really, for example, quite flabbergasted that
13    this witness seems to be undertaking to arrogate to himself an
14    expertise in what occurs when someone is under oath at a
15    deposition.  I wonder if he has any scientific support for his
16    apparent conclusion that people are -- with brain damage are
17    less likely to be accurate in a deposition than in a doctor's
18    office, or whether that's just simply his casual impression
19    that has no scientific basis; it's just his personal opinion.
20    I don't know.  I'd like to find out.  But he certainly seems to
21    take a very strong position in that regard.
22         But hold on one minute.  I've just been handed a note
23    that I have to deal with on another matter.  Just bear with me.
24         (Pause)
25         THE COURT:  All right, put another question.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                13
      779zsinh                    Shields - direct
1          MR. OETHEIMER:  Your Honor, before I do, could I get a
2     clarification.  We obviously have established, the Court said,
3     that there were these two mistakes, and I obviously did inquire
4     of Dr. Shields at deposition to establish that those were
5     mistakes, and he conceded they were, and what effect they would
6     have to his opinion.
7          And, obviously, what plaintiffs says is bottom line
8     doesn't affect his opinion.  But I don't really know how to do
9     this next part without asking him about those answers.  I
                            Page 6

779zsinh.txt
10  asked, does the fact that the dose was less, 7 milligrams of,
11  not 21, does that affect your opinion; is there a minimum dose
12  here?
13          THE COURT:  So ask him now.
14          MR. OETHEIMER:  Okay.
15  Q.  Doctor, I asked you, is there a minimum dose -- does the
16  fact that you had the dose wrong in your report impact your
17  opinion?
18  A.  It doesn't impact my overall opinion since it's, the total
19  dose is 42 milligrams, assuming your facts to be in fact facts.
20  So it doesn't alter my opinion since that's above a number that
21  is accepted as being potentially contributory causally to the
22  rupture of an intracranial aneurysm.
23  Q.  And is that because, Doctor, in your opinion in this case
24  any dose except zero, you would consider significant?
25  A.  Yeah, I consider any drug that a patient takes that I'm
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              14
      779zsinh                Shields - direct
1  seeing significant, so yes.
2  Q.  Okay.  And that -- and likewise, your opinion is that it
3  doesn't matter whether he took the product -- whether Mr. Singh
4  took the product that day or he did not?
5  A.  It doesn't change my opinion.  It matters, but it doesn't
6  change my opinion.
7  Q.  And is that because your opinion is that any exposure
8  within as much as two weeks before the stroke event could be
9  attributed as causation?
10  A.  In a particular case, that might be the case.  But here
11  we're talking about, if I accept your fact as a fact, a day.
12  Q.  Okay.  You agree that the product, if it was last taken at
13  4:00 o'clock the afternoon before, could -- would not have
14  produced any increased systemic blood pressure on the day of
15  the stroke, correct?
16  A.  It wouldn't directly do that.
17  Q.  So when you say it wouldn't directly, you're implying that
18  it could, indirectly?
19  A.  Yes.  If it created an intracranial disaster, which raises
20  the blood pressure usually, then I would consider that an
21  indirect effect.
22  Q.  Okay.  And you're theory your -- absent the, the --
23          THE COURT:  What is your current theory?
24          THE WITNESS:  That the, that the use of the Ephedra
25  containing product in a dosage, accepting the, as I said, the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              15
      779zsinh                Shields - direct
1  facts that have been stated to be facts, 42 milligrams on the
2  day prior -- which is discrepant from what he told me -- would
3  be sufficient to be the proximate cause of his blowing his
4  aneurysm, even though there were other risk factors present.
5          THE COURT:  And how would that happen?
6          THE WITNESS:  By the mechanism of vaso constriction,
7  or I use the term vaso constriction and vasospasm
8  interchangeably.  But by the process of narrowing of blood
9  vessels, secondary to the stimulation of alpha one receptors on
10  the blood vessels in the brain.
11          THE COURT:  Now, do I understand it that you did not
12  review the brain images that the treating physician reviewed?
13          THE WITNESS:  I did not see the actual films.
14          THE COURT:  Did you ask for them?
                        Page 7

```
                              779zsinh.txt
15              THE WITNESS:  Yes.  I always do.
16              THE COURT:  And what were you told?
17              THE WITNESS:  I don't recall, but I never received
18    them.
19              THE COURT:  All right.  The person you would have been
20    asking was Herbalife's lawyers?
21              THE WITNESS:  I asked, actually, Mr. Rheingold.
22              THE COURT:  Okay.  I'm sorry.  Mr. Rheingold,
23    plaintiff's lawyer.  That's what I meant to say, okay.  And he
24    never got them to you?
25              THE WITNESS:  No.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
```
      779zsinh                    Shields - direct
1               THE COURT:  Okay.  By the way, just so the record is
2     clear, since there are two Mr. Rheingolds, you're talking about
3     Paul Rheingold?
4               THE WITNESS:  I spoke to David.
5               THE COURT:  Okay.  David Rheingold, okay.
6               Now, there is evidence that the treating physician
7     found no evidence of vasospasm -- I'll get it right --
8     anyway -- on the brain images; true?
9               THE WITNESS:  No, that's -- no, I don't agree with
10    that, your Honor.
11              THE COURT:  Okay.  What is your understanding of what
12    he found?
13              THE WITNESS:  Well, first of all on his actual report
14    he said vasospasm one place, and another place no vasospasm.
15    That's on his actual report.
16              But of his description of the lesion that was seen in
17    the internal carotid on the left side, he describes an
18    appearance that would be consistent with conditions other than
19    what he called; namely, fibromuscular dysplasia, including
20    spasm, vasospasm in the internal carotid artery could look just
21    like his description of what he saw in the internal carotid
22    artery.  So even though he used two different concepts as to
23    vasospasm and no vasospasm, his description itself is one of
24    the patterns that can be seen, not the only one, in a spastic
25    cerebral vessel.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
```
      779zsinh                    Shields - direct
1               THE COURT:  Have you seen -- have you, to this day,
2     now seen the brain images?
3               THE WITNESS:  No.
4               THE COURT:  Let me ask David Rheingold, why not?
5               MR. DAVID RHEINGOLD:  We didn't obtain those films.
6               THE COURT:  Is it correct, as the witness just
7     testified, that he asked you for them?
8               MR. DAVID RHEINGOLD:  I believe so, your Honor.
9               THE COURT:  And so you chose not to follow up on that
10    request?
11              MR. DAVID RHEINGOLD:  Correct.  We relied on the
12    written reports.
13              THE COURT:  Okay.  So one thing -- I flag this for
14    plaintiff's counsel, not for the witness, whether I should draw
15    an adverse inference from that failure, adverse to the adequacy
16    of this witness' testimony.  But you don't have to answer that
17    now.
18              MR. PAUL RHEINGOLD:  Okay.  In due course, your Honor.
19              THE COURT:  Well, if you want to answer it now, you
                               Page 8
```

779zsinh.txt
20   can.  I mean, I don't mean to cut you off.
21        MR. PAUL RHEINGOLD:  Well, it hasn't been brought out,
22   the doctor's credentials, your Honor.  He's a general
23   neurologist.  We're now talking about interpreting neuro
24   radiology or neuro vascular material.
25        THE COURT:  No, that's not the issue.  The issue, as I
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    18
     779zsinh                    Shields - direct
1    understand it, is he asked plaintiff's counsel for something
2    that he thought would assist him in rendering his opinion, and
3    plaintiff's counsel chose, for whatever reason, good, bad or
4    indifferent, not to obtain that and provide it to him.  And why
5    shouldn't I infer from that that you didn't do that because you
6    thought it might undercut an opinion favorable to you?
7         MR. PAUL RHEINGOLD:  Well, your Honor, we have other
8    motives besides the ones you're attributing to us, and that is
9    that it's not his field.  And he hasn't stated yet that he, in
10   looking at these radiographs or whatever they are, could
11   interpret them better than the written report by an expert that
12   he, himself, has now examined.
13        THE COURT:  So you made the determination -- let me
14   make sure I understand what you're saying -- you made the
15   determination that, in your opinion, this wasn't within his
16   purview.
17        MR. PAUL RHEINGOLD:  No, your Honor.  I can't say
18   that.  That's the way it came out rather than a judgment we
19   made up front.  But you also want to create an adverse
20   inference that we made a judgment in the reverse that we
21   wouldn't show it to him because it might somehow change his
22   opinion.  That's not the case either.
23        THE COURT:  Well, I don't -- it seems to me
24   problematic that when an expert who you want to call asks to
25   see some data that he believes would be relevant -- indeed, he
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    19
     779zsinh                    Shields - direct
1    just testified he asked for them in all cases -- that you
2    choose not to provide him with that because you make -- you
3    substitute your judgment as to what would be relevant to him or
4    not.  That seems to me to be, arguably, the basis for --
5    forgetting about whether your motive was good, bad or
6    indifferent -- a basis for possibly excluding his testimony.
7         But, all right, let's continue with the questions.
8    BY MR. OETHEIMER:
9    Q.  Dr. Shields, we've been speaking about the treating
10   physician, that's Dr. Zablow, correct?
11   A.  Yes.
12   Q.  Okay.  In Dr. Zablow's surgical report he noted:  No
13   evidence of vasospasm was seen; correct?
14   A.  In one place, yes.  And that was his comment.
15   Q.  Excuse me?
16   A.  That was his comment.
17   Q.  Correct.  And you, in your testimony in response to the
18   Court's question, referred to his finding of fibromuscular
19   dysplasia, correct?
20   A.  Yes, as a possibility.
21   Q.  Correct.  And saying that perhaps that was evidence of
22   vasospasm rather than FMD; was that your suggestion?
23   A.  That the finding was, yes.
24   Q.  Yes.  But you correct me if I'm wrong, Doctor, but you,
                        Page 9

779zsinh.txt

25      yourself, without reviewing those films, you cannot say if that
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    20
        779zsinh                        Shields - direct
1       finding represented fibromuscular dysplasia, vasospasm or some
2       other condition, correct?
3       A.   That's correct.   But even, even looking at the films, I
4       might not be able to tell, just as this doctor wasn't able to
5       tell.
6       Q.   But you haven't looked at the films?
7       A.   I haven't looked at the films.
8               But, furthermore --
9               THE WITNESS:   If I may, your Honor?
10              THE COURT:   Go ahead.
11              THE WITNESS:   The doctors treating this patient, as
12      far as I can tell from the records that I got, did not treat
13      him as you would somebody who might have fibromuscular
14      dysplasia.   Because what you would do in that circumstance
15      would be to repeat the arteriogram to see if the
16      fibromuscular dysplasia appearance were persistent.   Because if
17      it were persistent, it would be suggestive that is in fact a
18      correct diagnosis of what was going on in his neck.
19              Further, and even perhaps more importantly, would be
20      to investigate the renal arteries, which are those which are
21      most typically involved in fibromuscular dysplasia.   And if you
22      find it, there are things that you're supposed to do about it,
23      if it's compromising kidney blood supply.   And I didn't see any
24      evidence in the records that I received that either one of
25      those steps were taken.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    21
        779zsinh                        Shields - direct
1               So it seems to me that the doctors who made that
2       diagnosis or thought it probable, might have either changed
3       their minds -- I don't know the reason they didn't do it.   But
4       normally that would be the followup that you would do if you
5       thought you had a patient who had fibromuscular dysplasia.
6       Q.   Okay.   Doctor, can we agree there is no radiographic
7       finding of vasospasm at the time of the stroke?
8       A.   No, we can't agree.
9       Q.   Is there a radiographic finding of vasospasm at the time of
10      the stroke?
11      A.   I'm just telling you that the -- what was interpreted as
12      being possibly FMD, could also have been vasospasm.
13      Q.   But you can't say that it was?
14      A.   No, not for sure.
15      Q.   Now, Mr. Singh was a long-time smoker, correct?
16      A.   That's correct.
17      Q.   He had smoked a pack a day for almost 30 years, according
18      to your --
19      A.   According to what he told me, yes.
20      Q.   And do you agree that smoking is an established risk factor
21      for rupture of aneurysm and subarachnoid hemorrhage; do you
22      not?
23      A.   I do.   It's in my report.
24      Q.   And the risk of hemorrhagic stroke remains elevated even if
25      someone quit smoking, correct?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    22
        779zsinh                        Shields - direct
                              Page 10

779zsinh.txt
```
 1    A.   Yes, over a ten-year period, that's correct.
 2    Q.   And Mr. Singh was still smoking at the time of his stroke
 3    and had not quit smoking, correct?
 4    A.   Absolutely correct.
 5    Q.   And you have no basis to exclude smoking as a risk factor
 6    in his case, do you?
 7    A.   I did not exclude it.  I said it was a risk factor.
 8    Q.   Right.  You characterized as a predisposing risk factor in
 9    your report?
10    A.   Yes.
11    Q.   And you cannot exclude smoking as a contributing causal
12    factor in your differential diagnosis?
13    A.   That's correct, and that's how I concluded my report.
14    Q.   And you accept that smoking may have contributed to the
15    formation and growth of the aneurysm?
16    A.   Form -- yeah, well not exactly formation, but growth and
17    further progress.
18    Q.   You believe that his smoking predisposed Mr. Singh to
19    rupture of the aneurysm by weakening the wall of the aneurysm?
20    A.   I do.
21    Q.   And you think the effects, or do you think the effects of
22    smoking also made the aneurysm more subject to rupture from
23    surges or increases in blood pressure?
24    A.   Yes.
25    Q.   And is it your -- and Mr. Singh did have a cup of tea on
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    23
779zsinh                     Shields - direct
```
 1    the morning of his stroke?
 2    A.   That's what he told me.
 3    Q.   And you noted that in your --
 4    A.   Yes.
 5    Q.   -- report?  And a cup of tea contains 30 to 100 milligrams
 6    of caffeine, is that right?
 7    A.   Yes.  It's usually closer to 100.
 8    Q.   Okay.  And a cup of caffeinated tea can produce a surge of
 9    systemic blood pressure, can it not?
10    A.   Yes.
11    Q.   And do you accept that the cup of tea that Mr. Singh
12    consumed that morning could have been the precipitant in the
13    rupture of the aneurysm?
14    A.   I think it could have contributed.
15    Q.   Okay.  And you do not believe that the Ephedra, if not --
16    if it was not taken that day, would have had any direct effect
17    on his systemic blood pressure on the day of the stroke?
18    A.   That's correct.
19             MR. OETHEIMER:  Your Honor, I think those are all the
20    questions that I have at this time.
21             THE COURT:  All right.
22             MR. OETHEIMER:  I'll be prepared to argue at the
23    appropriate time.
24             THE COURT:  Let me hear from -- let me hear
25    cross-examination by plaintiff's counsel.
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    24
779zsinh                     Shields - direct
```
 1             MR. PAUL RHEINGOLD:  Thank you, your Honor.
 2    CROSS EXAMINATION
 3    BY MR. PAUL RHEINGOLD:
 4    Q.   Dr. Shields, in medicine can you have more than one cause
 5    of a disease or condition that appears?
```
                           Page 11

779zsinh.txt
```
 6   A.   Yes.  In fact, I said that in my report.
 7   Q.   Okay.
 8              THE COURT:  The question, though, is why do you think,
 9   if you do, that it was more likely than not that Ephedra
10   contributed to this stroke?
11              THE WITNESS:  One big reason is that the natural
12   history of cerebral aneurysms of this type is to never rupture.
13   If we take the most basic statistics that are given, aneurysm
14   prevalence in this country, cerebral aneurysm prevalence in the
15   United States is three -- somewhere between three to
16   17 percent.  But I would simply take a low number, 5 percent of
17   the population.  That means we have 15 million aneurysms
18   walking around.  28,000, perhaps, rupture every year.  Some of
19   them are reruptures.  So even if we were to accept all 28,000
20   of them, they would be 14,972,000 that didn't rupture.  So you
21   need a precipitant.
22              Now, smoking is a precipitant, and it's also a risk
23   factor.  This patient -- but we're still talking about a
24   population of people, a large percentage of which were smoking,
25   and they still don't rupture their aneurysms.  So I say that it
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    25
```
     779zsinh              Shields - cross
 1   is a contributing factor, that is smoking.  And Ephedra, also
 2   by dint of its design initially or one of its designed uses,
 3   which was to constrict alpha one latent blood vessels, which
 4   are in your brain, also, alpha one receptors, there is you
 5   might say connecting the dot, the dots.  You have a potential
 6   problem where you add up enough factors, and then the aneurysm
 7   blows.
 8              So I think that:  A, having the aneurysm; B, smoking;
 9   C, taking caffeine with Ephedra, Ephedra, they all add up to
10   blowing the aneurysm.  And the dose that he took was sufficient
11   to do it.  And the period of time, even the day -- even if we
12   accept what he said in his testimony, sworn testimony, is still
13   within the timeframe that is recognized as being adequate for
14   producing this effect.
15   Q.   Doctor --
16              THE WITNESS:  Those are my reasons.
17   Q.   Excuse me.
18              THE COURT:  Okay.
19   Q.   Do you have an opinion whether, but for the Ephedra,
20   Mr. Singh would've had the rupture of the aneurysm which he had
21   on the date that we know had occurred?
22   A.   Yes, I have an opinion, that but for the Ephedra use, he
23   would not have ruptured on that day.
24   Q.   And the amount that he took, when we corrected your report
25   where it comes down to 42 milligrams, rather than some larger
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    26
```
     779zsinh              Shields - cross
 1   sum, is that opinion changed any way by consideration it was
 2   only 42 milligrams?
 3   A.   No.  42 is sufficient.
 4   Q.   And what's your basis for saying that --
 5   A.   Well --
 6   Q.   -- that dosage in that range is capable of being the factor
 7   that you've assigned to it?
 8   A.   Well, first of all, I would say what's reported in the
 9   Morgan Stern rehash of the hemorrhagic stroke project would be
10   a piece of literature that's out there.
                              Page 12
```

779zsinh.txt

11          But on the basis of the way in which Ephedra works,
12     also adds to -- weight to my thinking.
13          THE COURT:  Well, didn't the Morgan Stern study --
14     which you correctly characterize as a reinterpretation of data
15     that was originally obtained for other purposes -- but didn't
16     the Morgan Stern study conclude, as a statistically significant
17     finding, that doses of Ephedra below 32 milligrams per day are
18     not associated with hemorrhagic stroke?
19          THE WITNESS:  I agree with what you said, except for
20     two things.  Number one, the Morgan Stern study, they actually
21     only found seven patients, so it was statistically
22     underpowered.  That was what was derived as, on the basis of
23     the study at hand, but not sufficient to come to a conclusion.
24     That's number one.
25          THE COURT:  So, of course, on that basis, we should
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    27
       779zsinh                    Shields - cross
1     disregard it altogether, correct?
2          THE WITNESS:  Well, you never --
3          THE COURT:  Can't take it for some purposes and not
4     for others.
5          THE WITNESS:  Well, I'm taking it for the theory
6     2 milligrams and above.  And I'm not saying it's definite.  I'm
7     saying it's the trend in the Morgan Stern study.  But it's also
8     consistent with the what we understand about how these drugs or
9     these compounds work, and also it's consistent with what's
10     suggested in the hemorrhagic stroke project itself, where doses
11     as low as 7 milligrams were sufficient because it was PPA.
12          THE COURT:  I'm having a little trouble following what
13     you just said.  The Morgan Stern study, one of its few
14     statistically significant findings, assuming you accept the
15     limited population involved, was that doses below 32 milligrams
16     a day are not associated with hemorrhagic stroke.  You say,
17     don't give that any particular weight because the number of the
18     population was much too small.
19          THE WITNESS:  Yes.  And also --
20          THE COURT:  Okay, okay.  Why doesn't that go in both
21     directions?
22          THE WITNESS:  It does.  It really does go in both
23     directions.
24          THE COURT:  So the Morgan Stern study is not
25     consistent with the other data that you're just referring to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    28
       779zsinh                    Shields - cross
1     about 7 milligrams and so forth.  It's partly consistent and
2     partly inconsistent?
3          THE WITNESS:  That's right.  It's suggestive.  The
4     study's suggestive.
5          THE COURT:  Or, or non-suggestive.  I mean, it doesn't
6     seem to me you can have it both ways.
7          THE WITNESS:  It's suggestive of the -- no, I -- in
8     all due respect, your Honor, I don't agree.
9          First of all, the entire study, starting from the HSP,
10     is flawed by their exclusion of patients who died or who had
11     serious neurologic deficit.  That excluded a certain number of
12     patients, so the whole very very picture is considered to be
13     statistically very very shaky.
14          THE COURT:  Right.
15          THE WITNESS:  Nevertheless --
                           Page 13

779zsinh.txt
```
16          THE COURT:  So I'm -- accepting that for present
17   purposes, doesn't it follow, then, that you should forget about
18   the Morgan Stern study; it shouldn't be a factor in evaluating
19   your testimony one way or the other?
20          THE WITNESS:  It's the best we have, and --
21          THE COURT:  All right.
22          THE WITNESS:  -- it substantiates --
23          THE COURT:  Well, then do you want -- yeah, go ahead.
24   I'm sorry.
25          THE WITNESS:  Well --
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                                    29
```
     779zsinh              Shields - cross
1          THE COURT:  I agree with you, it's the best we have,
2    which is why the Court referred to it in its Daubert opinion.
3    But I just don't understand that the -- and I'll shut up and
4    let you explain to me -- but I don't understand how you can
5    accept it for certain purposes and disregard it for other
6    purposes.
7          THE WITNESS:  I'm not -- I don't disregard it, your
8    Honor.  It demonstrates trends which are consistent with the
9    understanding of the pharmacology of all these substances that
10   we've been talking about.  So you have to correlate what
11   happens clinically with your understanding of how this works
12   pharmacologically, physiologically, and you're stuck with these
13   anecdotal type limited studies.
14         THE COURT:  Well --
15         THE WITNESS:  But they hang together.
16         THE COURT:  Well, do they?  I mean, in other words,
17   one could conceive of a possibility where -- let's forget about
18   Ephedra for a moment -- let's hypothesize substance X, one
19   could conceive of possibilities where substance X, in even very
20   very small doses could, by its pharmacological operation, bring
21   on strokes or help contribute to their occurrence.
22         One could also conceive of situation where only when
23   the amount of this hypothetical substance X reached over a
24   certain level, that it was likely to have any effect.  One can
25   think of examples in common experience of both those
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                                    30
```
     779zsinh              Shields - cross
1    possibilities.  So how do we distinguish which one is true in
2    the case of Ephedra?
3          THE WITNESS:  You have to weigh the individual case.
4    I totally agree with what you've posited.  That's why you have
5    to look at each case individually and tease out the
6    particularities of it.
7          So I didn't get a chance, for example, to discuss the
8    fact that cigarette smoking has its greatest effect on the day
9    that you smoke.  Why is that?  It's because the pharmacology of
10   the drug, because it induces elastase activity and raises the
11   blood pressure for a short period of time.  So you have a nine
12   times greater chance when you smoke that day.  You have --
13         THE COURT:  Did he smoke that day or not?
14         THE WITNESS:  He denies smoking to me that day.
15         THE COURT:  Do we know whether he smoked the day
16   before?
17         THE WITNESS:  The assumption is that he did.
18         MR. PAUL RHEINGOLD:  In fact, we're accepting he
19   smoked the day before, but not the day of.
20         THE COURT:  So maybe why wasn't -- why do you think
```
                            Page 14

779zsinh.txt
21  that, by itself, wasn't sufficient to trigger the stroke?
22          THE WITNESS:  I think any time he smoked he was adding
23  to the burden on his vessels.
24          However, as I just tried to explain, it's been well
25  demonstrated that if you smoke on the day, you increase your
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    31
    779zsinh              Shields - cross
1   risk very considerably from two-and-a-half to four times normal
2   risk, to about nine times normal risk.  Some people would say
3   seven.  I accept nine.
4           Those episodes on the same day are usually confined to
5   within three hours of having smoked, and that is consistent
6   with the understood mechanism of acute damage to the blood
7   vessels caused by smoking.  The elastase piece, very important.
8   What does elastase do?  It digests connective tissue, including
9   the internal elastic membrane or internal elastic lamina, which
10  is the last bastion of protection against blowing your
11  aneurysm.  But that's an acute effect, the same as the
12  elevation of the blood pressure.
13          THE COURT:  Okay.  So along those same lines, Ephedra,
14  at least as I understand your own testimony, Ephedra's effect
15  on -- the direct effect on systemic blood pressure wears off
16  after five hours, right?
17          THE WITNESS:  Of oral use, yes.
18          THE COURT:  Okay.  Similar situation to what you've
19  just been describing in terms of smoking, right?
20          THE WITNESS:  Yes.
21          THE COURT:  But there is an indirect way in which
22  Ephedra might, over a longer period of time, cause or
23  contribute to hemorrhagic stroke, and that is what I keep
24  mispronouncing as vasospasm; yes?
25          THE WITNESS:  I would say vasospasm.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    32
    779zsinh              Shields - cross
1           THE COURT:  Vasospasm.  Thank you.  That's -- you see,
2   my father is a doctor, but he never taught me the proper
3   pronunciation.
4           THE WITNESS:  Depends where you come from.
5           THE COURT:  On the other hand, he was a gynecologist
6   so it was a different area that he was interested in.
7           THE WITNESS:  I'm interested in that area.
8           THE COURT:  But to ascertain whether in this
9   particular case that there was that indirect vasospasm effect,
10  it would have been helpful, would it not, under your own
11  approach, to have to review those brain images?
12          THE WITNESS:  It would be helpful.  But vasospasm is
13  not necessarily demonstrable on an arteriogram.
14          THE COURT:  It wouldn't have been dispositive, but it
15  would have been helpful?
16          THE WITNESS:  It would have been helpful.
17          THE COURT:  Okay.  Now, you didn't have that, for
18  whatever reason -- we'll now put that aside for the moment.
19  What was it that you did have that convinced you there was this
20  vasospasm effect?
21          THE WITNESS:  The timing of events, and also the
22  appearance that was described on the reports that I got, and
23  the -- to go back to what I said before, the timing of events,
24  because I don't believe aneurysms rupture for no reason.
25  There's always a reason.  And in this case we had several
                          Page 15

779zsinh.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
779zsinh                    Shields - cross
1   reasons.  One of them was Ephedra.
2           THE COURT:  Well, but at the time you made your
3   original analysis, that was a slam dunk, so to speak, because
4   at that time you were operating under the assumption -- which
5   in your heart I think you still believe was the real reality --
6   that he took Ephedra on the same day; yes?
7           THE WITNESS:  Yes.
8           THE COURT:  Okay.  But, but if -- so you didn't have
9   to reach, at the time you wrote your original report, you
10  didn't have to reach this alternative problem of an indirect
11  effect because you were at least under the assumption that on
12  the day of he took Ephedra, he hadn't smoked; simple case,
13  right?
14          THE WITNESS:  Well, that makes it simpler.  But I said
15  many times before that the effect of Ephedra is prolonged, and
16  as long as two weeks in some cases, but three days is well
17  within the range of what is generally accepted, and he was one
18  day.
19          THE COURT:  The indirect effect, the vasospasm?
20          THE WITNESS:  Yes.
21          THE COURT:  Yes.
22          THE WITNESS:  I'm not arguing that it was a blood
23  pressure effect.
24          THE COURT:  Okay.  Counsel?
25          MR. PAUL RHEINGOLD:  Thank you, your Honor.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
779zsinh                    Shields - cross
1   BY MR. PAUL RHEINGOLD:
2   Q.  Dr. Shields, although did you not see the actual films of
3   the work that was done when they were diagnosing the aneurysm
4   and then treating it, you did read the report of the neuro endo
5   vascular surgeon, is that correct?
6   A.  I did.
7   Q.  Was that, was that and is that still sufficient to you as a
8   basis to give the opinions which you're rendering today?
9   A.  Yes.
10  Q.  In addition to referring to the Morgan Stern article, are
11  there other sources that you've relied upon to know that
12  42 milligrams of Ephedra taken, let's say, within 24 hours or
13  slightly shorter period of time, can be a cause of the vaso
14  constriction which you've described eventuating in a
15  subarachnoid hemorrage?
16  A.  Well, the main other report that really goes to this is the
17  HSP where low doses, which involved PPA, could produce
18  subarachnoid hemorrhage within three days.  They use the
19  three-day time period also, which makes sense.  One was
20  derivative from the other, but three days also in that
21  situation.  Low dose is seven milligrams, although I freely
22  admit the average dose was much higher.
23  Q.  Okay.  In your testimony you're making some analysis or
24  comparison between PPA and Ephedra.
25  A.  I did.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
779zsinh                    Shields - cross
1   Q.  Would you explain why --
Page 16

779zsinh.txt
2  A.  They're similar in structure -- pardon me?
3  Q.  Why is it scientifically justified?
4  A.  The molecules look alike.  They have similar effects on
5  alpha receptors.  Ephedrine has a little bit more effect or
6  more effect on beta receptors.  But, basically, the difference
7  between the two molecules really is a methyl group on a
8  nitrogen atom so it's reasonable to analogize from one to the
9  other.
10 Q.  Dr. Shields, if we had not asked you to examine or speak to
11 our client, but instead we had hypothetically told you that we
12 want you to assume that this person had taken 42 milligrams of
13 Ephedra alkaloids the day for a long period of time and last
14 taken at 4:00 p.m. on the day before he had a sudden faint 9:00
15 a.m. the next morning, would that in any way have changed the
16 opinion which you wrote about in your original report?
17 A.  Well, assuming all the other factors, the cigarette smoking
18 and so on, it would not have changed my opinion.
19 Q.  Thank you, sir.
20         MR. PAUL RHEINGOLD:  That's all the questions we have.
21         THE COURT:  All right.  Anything else?
22         MR. OETHEIMER:  I think, your Honor, I'd like to be
23 heard.  I don't know that I need to pose any additional
24 questions to Dr. Shields.
25         THE COURT:  All right, Dr. Shields, thank you so much.
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                          36
   779zsinh              Shields - cross
1  You may step down.
2         THE WITNESS:  Thank you, your Honor.
3         (Witness excused)
4         MR. PAUL RHEINGOLD:  If we're through with the
5  witness, your Honor, may we discharge him?
6         THE COURT:  Sure.  Not only may you discharge him, you
7  may even let him leave.
8         THE WITNESS:  Thank you.
9         (Witness excused)
10        MR. OETHEIMER:  Your Honor, we have -- this is
11 comparable to Curtis Delta, this Ephedra MDL with other
12 comparable cases, and I think having read the transcripts of
13 some of those, I think they are sort of apropos of this.
14        At the time Dr. Shields wrote his report, he believed
15 that the dosage was three times what it actually was, and he
16 believed that the product had been taken that morning.  And
17 that's the basis on which he wrote the report that is before
18 the Court.
19        We now all understand that those were not the facts,
20 and the facts, the true facts are --
21        THE COURT:  Well, I'm not sure -- actually, on the
22 dosage I think the matter is reasonably clear.  On the when he
23 took, you have competing, as I understand it, statements from
24 the witness; one that he made to the doctor and one that he
25 made at his deposition.  So I'm not sure that that is so
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

                                                          37
   779zsinh
1  clearly established one way or the other.
2         MR. OETHEIMER:  I will say, your Honor, that's a
3  little -- in plaintiff's opposition to our motion, and I'll ask
4  Mr. McGowen to pull it -- plaintiff conceded that he did not --
5  that Mr. Singh did not take the product on the day of the
6  stroke.
                      Page 17

```
                        779zsinh.txt
 7              THE COURT:  Okay.
 8              MR. OETHEIMER:  I did hear the testimony.
 9              THE COURT:  I see your adversary nodding his head
10     affirmatively, so that's fine.
11              MR. PAUL RHEINGOLD:  For legal purposes, we conceded
12     it.  However, the expert explained why it was significant to
13     him to take a history, your Honor.
14              THE COURT:  Okay.
15              MR. OETHEIMER:  And I understand the Court really
16     doesn't want to argue credibility.  But I would note -- I don't
17     recall Dr. Shields testifying at deposition to that.  And the
18     notes of his interview do not reflect that he was --
19              THE COURT:  Well, it's -- anyway, it's now been
20     conceded so it's --
21              MR. OETHEIMER:  Right, so --
22              THE COURT:  Let me make clear why I don't think
23     credibility is an issue.  I don't say that there's never a case
24     where a Daubert determination can't be affected by credibility
25     concerns.  But I think in this particular situation -- and I
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

38

```
       779zsinh
 1     was motivated, in part, by wanting to move this along -- it
 2     seems to me that we have three different opinions here.  One is
 3     his findings on physical examination of the patient.  That has
 4     really not been an issue today, and that sounds like he,
 5     otherwise relevant, he could testify to that.
 6              Second is his testimony that Mr. Singh's smoking
 7     history would predispose him to stroke that could be
 8     contributed to by other causes.  I want to think about that,
 9     but I -- the first part, of course, you don't disagree at all;
10     that is to say, that smoking would predispose one towards a
11     stroke.
12              I think the nice question here is whether this witness
13     could testify with respect to Mr. Singh -- which is all he's
14     being asked to testify -- is that his background, history, so
15     forth is such that to state it more clearly than the witness
16     did, that by his smoking, he put himself in the position of
17     someone who would be more susceptible than the every day person
18     to the potential effects of Ephedra in possibly causing a
19     stroke.  I think that that may be admissible testimony, but
20     that's the second issue.
21              The third issue, the one that really has been chiefly
22     the point of this hearing is that his opinion that Ephedra more
23     likely than not caused the stroke.  I'm very skeptical of that,
24     given the points you just were just alluding to, but I wanted
25     to flag all three areas so we can have them in front of us.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

39

```
       779zsinh
 1              MR. OETHEIMER:  Right.  I think I can address them.
 2     So I think the -- because it's been conceded he didn't take it
 3     that day, and because the witness has conceded it could not --
 4     would not have increased his blood pressure that day, he didn't
 5     take it that day, an increase in blood pressure as a direct
 6     precipitant of the stroke is out.  It was in his report, but
 7     that's out.
 8              The witness' theory now is this indirect affect,
 9     causation through vasospasm.  Before I come back to that, on
10     the smoking itself, people -- smoking is the single strongest
11     known risk factor for ruptured aneurysm and hemorrhagic stroke.
                              Page 18
```

779zsinh.txt
12    It may be true that there are lots of people walking around
13    with aneurysms who don't have strokes, but it is likewise true
14    that lots of people have strokes, and the single strongest
15    association or the two strongest are with hypertension, history
16    of hypertension and a smoking history.
17               THE COURT:  Well, I'm not disagreeing with any of
18    that.
19               MR. OETHEIMER:  Right.
20               THE COURT:  But what I'm saying is it seems to me it
21    might be useful to the jury -- and I, in effect, saw it within
22    this witness' report -- though his report was somewhat
23    conclusory -- that smoking is, in effect, a factor that can cut
24    both ways in this lawsuit.
25               On the one hand it could, itself, be a cause of
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    40
      779zsinh
1     strokes.  On the other hand, it could put someone at risk where
2     something else could push you over the line and cause a stroke,
3     and I think that fairly neutral statement is one that the jury
4     maybe needs to know about.
5               MR. OETHEIMER:  Fine.  And I'll move to the next,
6     which is, but he's here to give a specific causation opinion.
7               THE COURT:  Right.  That doesn't get us to the bottom
8     line.
9               MR. OETHEIMER:  Right.  And the question is, one, I
10    guess I want to be clear, I don't accept that there had to be a
11    precipitant that morning.  Blood pressure obviously fluctuates
12    up and down.  It tends to be highest in the morning.  30 years
13    of smoking does damage to the blood vessels, just with the --
14    and our expert says the normal sort of ups and downs, you know,
15    of daily life, getting up in the morning, going taking a
16    shower, you could have an aneurysm rupture.
17               He does -- the one thing we do know is that the
18    plaintiff had a cup of tea that morning.  He drinks Lipton tea.
19    It's got caffeine in it.  If there had to be a precipitant, and
20    we -- I don't accept there had to be, but why is, Dr. Shields
21    agrees --
22               THE COURT:  Well, there has to be, in the trivial
23    sense, that you can't have an effect without a cause.  I guess
24    you can in quantum mechanics, but short of that, no.  So --
25               MR. OETHEIMER:  Sure.  But the cause can be an
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    41
      779zsinh
1     increase in blood pressure.
2               THE COURT:  What you're saying is every day common
3     changes, you know, the fact that --
4               MR. OETHEIMER:  Right.
5               THE COURT:  -- blood pressure changes over the course
6     of a day that, you know, 100 things happen that can affect
7     blood pressure in a normal day.
8               MR. OETHEIMER:  Right.
9               THE COURT:  Someone who is weakened by smoking could
10    be the precipitant effect.
11               MR. OETHEIMER:  Right.  So there may not have need to
12    be an exogenous precipitant, but, but the tea could have been,
13    because that clearly does contain caffeine and has an affect on
14    blood pressure.
15               THE COURT:  Well, you're giving plaintiff good ideas
16    for their next --
                          Page 19

779zsinh.txt

17          MR. OETHEIMER:  In any event, his opinion clearly is
18  dependent on this theory of the indirect causation through
19  vasospasm.  However, what we heard I think a lot, just in the
20  colloquy with the Court, was a lot of what really matters is
21  the general causation, the witness' belief that because of how
22  Ephedrine sort of acts and its biological properties, that it
23  could result in hemorrhagic --
24          THE COURT:  See, the difference is, you know -- and
25  it's interesting what he said about the Morgan Stern study, and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    42

779zsinh

1   I do think I want to hear from plaintiff's counsel on this, but
2   did seem to me that he was trying to have it both ways with
3   Morgan Stern study.  But the Morgan Stern study, I think he
4   correctly said, is far from a perfect study, but it's the best
5   we have.  I think that is a fair statement of the reality of
6   that particular study.  And that study concluded that
7   32 milligrams a day or more greatly increases the risk of
8   hemorrhagic stroke.  So, the point would be -- and does for a
9   period of several days.  So the point would be that, well,
10  okay, ladies and gentlemen of the jury, we'll never know for
11  sure what caused the stroke.  Ladies and gentlemen of the jury,
12  we are also reasonably sure that the smoking made him much more
13  susceptible to a stroke at a minimum than he otherwise would
14  have been.  Maybe it was tea that morning that set it off.
15  Maybe it was getting out of bed that morning.  But as opposed
16  to that possibility, consider the more likely possibility, says
17  plaintiff's counsel, that Ephedra -- which is known to greatly
18  increase the risk of hemorrhagic stroke for a period of several
19  days -- was the precipitant cause; why isn't that a reasonable
20  argument to make to the jury?
21          MR. OETHEIMER:  Let me respond in a couple of levels.
22  I mean, the one thing I see off the bat is I don't think this
23  is Dr. Shields' area of expertise.  That's --
24          THE COURT:  And it also varies considerably from where
25  he was originally coming out.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    43

779zsinh

1           MR. OETHEIMER:  Yes, that too.  But just to turn
2   back --
3           THE COURT:  Let me just flag for plaintiff's counsel,
4   so he can address it, one -- surely, one of the things that
5   most bothers me about this witness, as I flagged already, is
6   the little bit of rewriting it that, you know, gee, I reached
7   what was an easy conclusion on the data I had.  The data is now
8   wrong.  I'm reluctant to even give up the data and -- but, by
9   gosh, I'm going to find a way to justify the result even though
10  the data was wrong, because I'll now formulate a possibility
11  even under the new data where it could have come out the same
12  way.  That doesn't sound like science.  That sounds like human
13  nature in the form of bias.
14          MR. OETHEIMER:  Well, in fact, your Honor, and I know
15  deposition, but when I heard at deposition --
16          THE COURT:  You can refer to the deposition now.  I
17  just didn't want to waste time confronting him with prior
18  inconsistencies.
19          MR. OETHEIMER:  When I asked at deposition I said,
20  well, what about the fact that the dose is different than you
21  thought?  Is there a threshold dose that we need to have here?
                            Page 20

779zsinh.txt
22    The witness' answer was, any dose except zero.  And when I
23    asked about the fact that he didn't take it that day, the
24    witness said, I'm on record as any exposure within two weeks.
25    So I think --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

44

779zsinh
1                    THE COURT:  No, he repeated that here today, in
2     effect.
3                    MR. OETHEIMER:  Right, had infected his opinion.  And
4     those are not consistent with the testimony that this Court has
5     allowed from the generic experts, and it's nothing short of the
6     witness in the guise giving a specific causation opinion
7     substituting his own general causation views.  And he's a
8     qualified doctor.  He's entitled to opinions, but he's not
9     entitled to invade the province of the generic experts, and
10    he's got to have a basis in the facts of this case for a
11    specific causation opinion.
12                   Stripped of everything else, what we have here is a
13    speculative naked opinion, bottom line that the witness is
14    going to adhere to saying it's my opinion that Ephedra caused
15    the stroke, and change the facts and no problem, because if you
16    got Ephedra within two weeks at any dose, that's good enough
17    for me.  And I don't think that cuts it.
18                   Morgan Stern, I don't think it's his province to
19    address Morgan Stern.  But Morgan Stern, obviously, as the
20    Court correctly said, found no association below 32 milligrams;
21    found a trend not amounting to a statistically significant
22    association above 32.  Obviously there the study was
23    underpowered.  It wasn't a study that was designed to study
24    Ephedra.  So there are issues with the study.
25                   But Dr. Shields is giving an opinion here that's based
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

45

779zsinh
1     on the theory vaso spasm, that he has no evidence of in the
2     medical records, and he didn't review -- putting aside who's at
3     fault for that -- we got the films to our expert.  We didn't
4     have any trouble doing that, and both our expert and the as
5     your Honor both said no evidence of vasospasm.
6                    THE COURT:  Well, the plaintiff's counsel hasn't said
7     they had any trouble.  They say they chose, for whatever
8     reason, not to show it to him.
9                    All right, let me hear from plaintiff's counsel.
10    Thank you.
11                   MR. PAUL RHEINGOLD:  Thank you very much.
12                   This is not a case, your Honor, although it's made to
13    sound that way, of an expert tailoring his opinion once his
14    basis is shifted under, whereas in another case your Honor
15    found exactly that.
16                   In this case Dr. Shields was not careless in obtaining
17    the facts.  He may have been a little defensive about how he
18    made his errors.  But as a matter of fact, he arrived at them
19    through conversation or through reading a bad label.  Maybe I
20    should have given him a better label.  But he's not tailoring
21    anything, because in his original report he spoke about vaso
22    constriction or vasospasm as the mechanism in this case, and he
23    did not claim that there was high blood pressure as a cause.
24                   THE COURT:  Right.  But here's part of the problem.
25    Even if he had read the label, right, he could now be saying
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          Page 21

779zsinh.txt
(212) 805-0300

46

779zsinh
1  fairly enough, consistent with Morgan Stern, and the generic
2  testimony that we heard at the earlier Daubert hearing, that
3  this was enough to trigger a vasospasm effect.
4          MR. PAUL RHEINGOLD:  Right.
5          THE COURT:  But as defense counsel points out, that's
6  really not his position.  His position is even any amount more
7  than zero, and for any period up to two weeks.
8          Now, he -- I don't -- he's getting that from wherever,
9  but it's certainly not consistent with what this Court found at
10 the time of the first -- of the overall hearing.
11         MR. PAUL RHEINGOLD:  Nor me, your Honor.  And the man
12 made a statement that would be beautiful fun to cross-examine
13 him at trial, because 1 milligram -- obviously, no one accepts
14 as causative.  He didn't say it was causative anyway.  He said
15 it was significant.
16         THE COURT:  No, but Daubert says it's not just a
17 matter of leaving it to cross-examination at trial.
18         MR. PAUL RHEINGOLD:  For sure.  But what he --
19 although he made a few statements that I wouldn't have made.
20 And as I said, I would enjoy, if I was on the other side of
21 this case, to cross-examine him when this case comes to trial.
22         Still on the facts of this case, it was 42 milligrams
23 about 18 hours before consumed.  So while he said about
24 possibly two weeks, possibly any amount more than zero, that's
25 not the facts of his opinion as he gave it here today.  And it
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

47

779zsinh
1  is the facts, as your Honor pointed out, of Dr. Levine who is
2  the platform that he must work on.  Dr. Levine said that it
3  could be anything over 20 milligrams, and he said anywhere from
4  48 to 72 hours.  So this particular case is well within the
5  generic expert's statement, as well as Dr. Heller, and well
6  within what this expert has now been asked to assume as the
7  facts of the case.
8          THE COURT:  It would be a great experiment -- I think
9  some day we should try it -- of having plaintiff's counsel
10 become defense counsel for purpose of cross-examining the
11 expert and vice versa.  You know in England, as you may well
12 know, the very same lawyer can be the Prosecutor in one case
13 and the defense counsel in the very next criminal case.
14         MR. PAUL RHEINGOLD:  Yeah.
15         THE COURT:  And it leads to a remarkable balance of
16 view.  But, in any event, not to be in our system.
17         Well, I understand the point you're making.
18         What about the point, though, that you see that
19 they're making is a little bit different.  They're saying it's
20 one thing to say, based on the platform that Dr. Levine
21 gives -- I like that way of putting it -- this patient's
22 history was such that you would expect that, more likely than
23 not, Ephedra would have been the most likely cause or something
24 like that, of tipping him over the -- but he really doesn't say
25 that.  He says, I'm going to base this on my own view of what
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

48

779zsinh
1  the science is here.  And my original view, which was perfectly
2  consistent with Dr. Levine and everyone else, was wrong because
Page 22

779zsinh.txt
3  of the facts were wrong, but now I'll give a different view
4  based on my erroneous view of the science.  How can I allow,
5  under Daubert, someone like that?  I have no problem with the
6  other two aspect of his testimony that --
7          MR. PAUL RHEINGOLD:  Yeah.
8          THE COURT:  But on the causality, isn't that a
9  problem?
10          MR. PAUL RHEINGOLD:  My answer, your Honor, is I
11  didn't hear the testimony that way, nor was this correct proper
12  direct or cross-examine the witness.  I heard him say that but
13  for adding the Ephedra, it would not have occurred when it did.
14  And his explanation of vaso constriction is not a construct
15  that he made up.  It's in Dr. Levine's report and it's in his
16  original report.  I think if his testimony were presented
17  systematically, the concern you had would have disappeared.
18          THE COURT:  All right.
19          MR. PAUL RHEINGOLD:  One last point, your Honor?
20          THE COURT:  Please.
21          MR. PAUL RHEINGOLD:  And I said before, I used to be a
22  trial lawyer, I don't do much now.  I would love to
23  cross-examine Dr. Shields.  But the reason I say that is these
24  things about inconsistency or errors, or if you look at
25  something, are juicy material, but it goes to weight.  It goes
          SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

49

779zsinh
1  to this jury eventually, because the case will be tried here.
2          THE COURT:  I hear you.  I used to be a trial lawyer,
3  but I don't do it much now either, so.
4          Okay.  This is very helpful and I'm very glad we had
5  this hearing.  It's given me a much more specific feel for this
6  particular witness' testimony and the issues.
7          I will reserve judgment.  I do want to go over the
8  whole thing, including my notes of today's hearing, but I will
9  get you a decision certainly in the next, you know, couple of
10  weeks.  So, thanks very much.
11          MR. PAUL RHEINGOLD:  Thank you, your Honor.
12          MR. OETHEIMER:  Thank you, your Honor.
13          (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25
          SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

50

1              INDEX OF EXAMINATION
2  Examination of:                          Page
3  LAWRENCE W. SHIELDS
4  Direct By Mr. Oetheimer  . . . . . . . . .    2
5  Cross By Mr. Paul Rheingold  . . . . . . .   24
6
7
8

779zsinh.txt
```
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300