```
                        2-20-07 - Singh - Shields.TXT
00001
  1
  2            UNITED STATES DISTRICT COURT
  3           SOUTHERN DISTRICT OF NEW YORK
  4
  5    IN RE:  EPHEDRA PRODUCTS    )
       LIABILITY LITIGATION,       )
  6                                )
                                   )
  7    Pertains to:                )
                                   )
  8    Harbir Singh, et al.        )
       v. Herbalife International  )
  9    Communications, Inc. et al. )
                                   )
 10    ---------------------------)
 11
 12
 13      DEPOSITION OF LAWRENCE SHIELDS, M.D.
 14            Long Beach, New York
 15          Tuesday, February 20, 2007
 16
 17
 18
 19
 20
 21
 22    Reported by:
       JEAN VALERIE GAFA
 23    JOB NO. 10158
 24
 25
00002
  1
  2                              February 20, 2007
  3                              11:30 a.m.
  4
  5            Deposition of LAWRENCE SHIELDS, M.D.,
  6    held at the offices of Long Beach Neurology,
  7    736 East Park Avenue, Long Beach,
  8    New York, pursuant to Subpoena, before
  9    Jean Valerie Gafa, a Notary Public of the
 10    State of New York.
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
00003
  1
  2    A P P E A R A N C E S:
  3
  4       RHEINGOLD, VALET, RHEINGOLD,
```

                        2-20-07 – Singh – Shields.TXT
 5    SHKOLNIK & McCARTNEY, LLP
 6    Attorneys for Plaintiff
 7            113 East 37th Street
 8            New York , New York  10016
 9    BY:    DAVID RHEINGOLD , ESQ.
10
11    GOODWIN PROCTER, LLP
12    Attorneys for Defendants
13            Exchange Place
14            Boston , Massachusetts  02109
15    BY:    RICHARD A. OETHEIMER, ESQ.
16
17
18
19
20
21
22
23
24
25
00004
 1
 2            IT IS HEREBY STIPULATED AND AGREED by
 3    and between the attorneys for the
 4    respective parties herein, that filing and
 5    sealing be and the same are hereby waived.
 6            IT IS FURTHER STIPULATED AND AGREED
 7    that all objections, except as to the form
 8    of the question, shall be reserved to the
 9    time of the trial.
10            IT IS FURTHER STIPULATED AND AGREED
11    that the within deposition may be sworn to
12    and signed before any officer authorized
13    to administer an oath, with the same force
14    and effect as if signed and sworn to
15    before the Court.
16
17
18
19
20
21
22
23
24
25
00005
 1                    Shields
 2    L A W R E N C E    S H I E L D S ,    M . D . ,
 3            called as a witness, having been duly
 4            sworn by a Notary Public, was examined and
 5            testified as follows:
 6    EXAMINATION BY
 7    MR. OETHEIMER:
 8                (Defendants' Exhibits 1 and 2,
 9    documents, marked for identification, as of
10    this date.)
11            Q.  Thank you.  Good morning,
12    Dr. Shields.  My name is Richard Oetheimer.  I'm
13    with the law firm of Goodwin Procter, and we
14    represent the defendants in this action,
15    Herbalife International, and Herbalife

                                        Page 2

                    2-20-07 – Singh – Shields.TXT
16   International of America, also referred to as
17   Herbalife?
18           All right?
19       A.  Yes.
20       Q.  You have been identified as an expert
21   witness by the plaintiff in this matter,
22   Mr. Harbir Singh; is that right?
23       A.  Yes.
24       Q.  Retained by Mr. Rheingold's firm?
25       A.  Yes.
00006
 1                    Shields
 2           Q.  And what is the, in general terms,
 3   what did you understand to be the issue that you
 4   were asked to address in your opinions?
 5       A.  The causal relationship between the
 6   ingestion of Herbalife and the stroke,
 7   hemorrhagic stroke that this man sustained.
 8       Q.  In the parlance we use in legal
 9   terms, specific causation, upon, what caused this
10   man's stroke; is that right?
11       A.  Yes, or significantly contributed to
12   it.
13       Q.  Okay.  Thank you.
14       A.  I take it we're being recorded.
15           (Discussion held off the record.)
16           MR. OETHEIMER:  Recorded, I guess,
17   for your aid.
18       Q.  But also a written transcript will be
19   prepared that you will have a chance to review
20   and sign.
21       A.  Yes.
22       Q.  The purpose of my examination today
23   is to understand, make sure that I understand
24   your opinions and the grounds for your opinions
25   as they relate to Mr. Singh's case.  I'll try to
00007
 1                    Shields
 2   be clear in my questions, but please ask me for
 3   clarification if you need to at any point.
 4           All right?
 5       A.  I will.
 6       Q.  You've done this, I take it, many
 7   times before?
 8       A.  I've been deposed a number of times
 9   before.
10       Q.  As an expert witness?
11       A.  Yes.
12       Q.  In fact, I'm going to hand you what's
13   been premarked here as Exhibit 1 to your
14   deposition transcript, and I guess the first page
15   of Exhibit 1 is actually a cover letter,
16   transmittal letter from counsel transmitting a
17   copy of your report to my office, but behind that
18   letter dated December 12th, 2006, is a copy of
19   your December 4th, 2006 report.
20           Do you see is that?
21       A.  Yes.
22       Q.  And is that your report for this
23   case?
24       A.  It's December 4, 2006.
25       Is that what you said?
00008

2-20-07 - Singh - Shields.TXT
```
 1                   Shields
 2         Q.  Let's correct it on the record, the
 3  transmittal letter from counsel is December 12th?
 4         A.  21st.
 5         Q.  Okay, so that I got wrong?
 6         A.  Mine is December 4th, 2006.
 7         Q.  December 4th, 2006.  Thank you.
 8         Is that the only written report that you
 9  have prepared for this case?
10         A.  No, I've prepared a report several
11  months earlier, November 14th, 2000 -- wait,
12  yeah, related to the same visit, November 14th,
13  2005, and I have that report here.
14         Q.  I'm sorry, 2005 or 2006?
15         A.  2005, and I issued a report on
16  November 16th, 2005.
17         Q.  May I see your November 16th, 2005
18  report?
19         A.  (Handing.)
20         Q.  Okay, so as you state in your report,
21  you examined Mr. Singh in your office on
22  November 14th, 2005; is that correct?
23         A.  Yes.
24         Q.  And you prepared your November 16th,
25  2005 report, I take it, shortly after conducting
00009
 1                   Shields
 2  that examination?
 3         A.  Yes.
 4         Q.  And what was your reason for
 5  preparing a second report in December 2006?
 6         A.  The reason was the language that
 7  would be allowed according to a judge's ruling on
 8  the case, so I changed the language so it was in
 9  accordance with what he would allow.
10         Q.  All right.  Did you --
11         A.  And I had a couple of additional
12  documents.
13         Q.  That was going to be my next
14  question.
15         Did you have any additional information at
16  the time that you prepared your December 4th,
17  2006 report that you did not have at the time
18  that you prepared your December 16th, 2005
19  report?
20         A.  Yeah, first of all, the judge's
21  rulings.
22         Q.  I understand.
23         A.  Secondly, I had the fourth amended
24  generic expert report of Stephen Levine, which
25  seemed to give examples of the judge's rulings.
00010
 1                   Shields
 2  I had the deposition of Doiner Caragata in U.S.
 3  District Court concerning products liability
 4  litigation, and I had the deposition of Habir
 5  Singh; and I think those are the things that I
 6  didn't have prior.
 7         Q.  Ms. Caragata, that's C-A-R-A-G-A-T-A,
 8  do you understand that to be Mr. Singh's wife?
 9         A.  Yes.
10         Q.  And your December 16th report, marked
11  as Exhibit 1, indicates that you've listed her
```
Page 4

                        2-20-07 – Singh – Shields.TXT
12  deposition as one of the materials that you had
13  reviewed?
14          A.  Yes.
15          Q.  I do not see Mr. Singh's deposition
16  listed in your December 4th, 2006 report.
17          A.  Yes.
18          Q.  You said a moment ago that was one of
19  the --
20          A.  Yes, that was an oversight not to put
21  it on the front page.
22          Q.  Not to put it on the front page of
23  the report?
24          A.  Yes.
25          Q.  Is it referenced anywhere in the
00011
1                      Shields
2   report?
3           A.  Not specifically.  I don't think so.
4           Q.  But it's your testimony that Mr.
5   Singh's deposition at the time that you authored
6   your December 4th, 2006 report?
7           A.  Yes.
8           Q.  Do you know whether you had his
9   complete deposition?
10          A.  I don't recall.
11          Q.  Do you know if you had more than one
12  transcript of his deposition?
13          A.  I don't really recall.
14          Q.  I say that only because his
15  deposition, for a variety of reasons, ended up
16  being taken over three separate days.
17          A.  I seem to remember that, but I don't
18  remember the specifics.
19              MR. OETHEIMER:  Off the record.
20          (Discussion held off the record.)
21           (Time noted:  11:40 a.m.)
22           (Recess taken.)
23  MR. OETHEIMER:
24          Q.  Let me turn, in your report, which is
25  Exhibit 1 --
00012
1                      Shields
2           A.  Which report are you referring to?
3           Q.  Exhibit 1 is your December 4th, 2006
4   report?
5           A.  Yeah.
6           Q.  There is a section towards the back
7   of that behind your curriculum vitae which lists
8   court appearances by Lawrence W. Shields, M.D.
9           Do you see that?
10          A.  No.
11          Q.  Should be the last four pages of
12  Exhibit 1.
13          A.  Oh, yeah.
14          Q.  Is that a listing that you prepared?
15          A.  It's prepared by one of the people in
16  the office.
17          Q.  Okay, one of your employees?
18          A.  Yes.
19          Q.  I only noted one matter that I could
20  identify in here relating to ephedra.  That is
21  your deposition in the case of Sayonora
22  Bhattacharya, B-H-A-T-T-A-C-H-A-R-Y-A.
                                    Page 5

2-20-07 – Singh – Shields.TXT
23          Do you recall giving any other testimony,
24  either at trial or deposition, in a personal
25  injury case involving a stroke or other injury
00013
1               Shields
2   alleged to be due to ephedra or ma huong?
3          A.  Ephedra as opposed to PPA?
4          Q.  Yes.
5          A.  Not that I can recall.
6          Q.  Okay.
7          A.  There might be another one, but I
8   can't think of it.
9          Q.  On the page four of your curriculum
10  vitae, next to the heading "Amassed Court
11  Litigation Experience," you state that you have
12  reviewed and rendered opinions in 500 plus cases
13  of use of ephedra-containing compounds and their
14  potential neurologic complications.
15          Do you see that?
16          A.  Yes.
17          Q.  Again, I just ask, in 500 plus cases
18  of use of ephedra-containing compounds, you
19  believe you've only testified once?
20          A.  Well, in ephedra-containing, I
21  included the idea of PPA.
22          Q.  Well, look at your list then because
23  I do see several PPA matters.  There's and
24  indication that you gave a deposition in June
25  2003 in a PPA case by the name of Cardenas?
00014
1               Shields
2          A.  Just so I'm with you, where are you.
3          Q.  That is under court appearances by
4   Lawrence Shields, and it is the third page in.
5          And that case involved a ruptured cerebral
6   aneurism?
7          A.  Yes.
8          Q.  And your opinion was it was PPA
9   related?
10          A.  Yes.
11          Q.  PPA, for the record is
12  phenylpropanolamine?
13          A.  Yes.
14          Q.  And on that same page, there's an
15  indication that you gave a deposition in a
16  PPA-related stroke case.  The plaintiff was Todd
17  McKinley?
18          A.  Yes.
19          Q.  So those are two depositions in 2003
20  in PPA cases, correct?
21          A.  Yes.  That's how they're listed.
22          Q.  That's how they're listed.
23          Do you believe the listing is correct?
24          A.  I think it's probably correct, but I
25  don't specifically remember.
00015
1               Shields
2          Q.  I didn't see any other PPA cases
3   listed.  Feel free to, in fact, why don't I ask
4   you to review the four-page list of court
5   appearances and just confirm for me that there
6   are no PPA cases other than those two and no
7   ephedra case other than the Bhattacharya case.

                        Page 6

```
                          2-20-07 - Singh - Shields.TXT
 8                (Witness perusing document.)
 9         A.  That's all I see.
10         Q.  And you don't have a recollection, as
11  you testify here today, of any others in which
12  you've given testimony on cases involving either
13  PPA, ephedra or ephedrine?
14         A.  I don't have any recollection, but
15  there might be 1 or 2 others.
16         Q.  How would you determine if, how would
17  you determine whether, in fact, there are others?
18         A.  Well, if I were of a mind to
19  determine it, I guess we'd have to go through all
20  my records for the last few years.
21         Q.  I believe the federal rules of civil
22  procedure do require you to identify matters in
23  which you've given testimony, at least for the
24  past four years.
25         The 1 or 2 others that you think are
00016
 1                        Shields
 2  possible, I understand you're not certain, would
 3  those be within the past four years?
 4         A.  I don't know.  I don't specifically
 5  recall.  If I specifically recalled, I could tell
 6  you probably even what they were.
 7         Q.  In the 500 plus cases that you
 8  referred to involving use of ephedra-containing
 9  compounds, you are including PPA cases in that
10  number, correct?
11         A.  Correct.
12         Q.  In how many of those 500 plus cases
13  were you retained to provide expert opinions
14  concerning any relationship between
15  ephedra-containing compounds and potential
16  neurologic complications?
17         A.  Well, if I understand your question
18  correctly, which I don't think I do, it would
19  probably be smarter for you to ask the question
20  in a way that I could understand it.
21         Q.  Let me ask it again, and then perhaps
22  you could tell me what it is you don't
23  understand.  I want to know of these, you say you
24  have reviewed and rendered opinions in 500 plus
25  cases of use of ephedra-containing compounds and
00017
 1                        Shields
 2  their potential neurologic complications.
 3         And I guess I'm asking you, are you saying
 4  you've been retained more than 500 times to
 5  provide opinions concerning use of
 6  ephedra-containing compounds and their potential
 7  neurologic complications?
 8              (Discussion held off the record.)
 9         THE WITNESS:  I don't remember what I
10  was going to say.  I don't remember the
11  question.
12  MR. OETHEIMER:
13         Q.  Do you want to hear the question
14  again?
15         A.  No, it's okay.  Not to put too fine a
16  split to this, it depends on what you mean by
17  retained, right?
18         Q.  I don't know, but I'm happy to have
```

                    2-20-07 - Singh - Shields.TXT
19  you sort of the explain it.
20          A.  Well, in every case I was retained to
21  give an opinion.
22          Q.  You were retained to review records
23  to form an opinion?
24          A.  Yes.
25          Q.  Okay.
00018
 1                  Shields
 2          A.  To me that's retention.
 3          You understand why I have a problem with
 4  your question?
 5          Q.  I'm not sure you do.  I think you've
 6  answered my question.
 7          Perhaps you're suggesting in some of those
 8  cases, the opinion you formed may not have led to
 9  further work?
10          A.  Exactly.
11          Q.  Can you tell me in what percentage of
12  those cases that you reviewed you were of the
13  opinion that the ephedra-containing compound had
14  played a role in causing or contributing to the
15  neurologic injury?
16          A.  I would say most of the time I did
17  not think so, but I can't give you an exact
18  percentage.  That's a speculation.
19          Q.  Have you ever testified on the
20  defense side of a case involving injury claiming
21  to be due to ephedra-containing compounds?
22          A.  No.
23          Q.  So you've reviewed various cases, and
24  in some cases you came to the conclusion that you
25  believed there was a causal relationship; and in
00019
 1                  Shields
 2  others you came to the opposite conclusion,
 3  right?
 4          A.  Yes.
 5          Q.  What criteria influenced that
 6  determination?
 7          A.  Which determination?
 8          Q.  Whether or not you think there is a
 9  causal relationship in the particular case, and
10  we'll come back to this case, but just in
11  general, what are the things that you are looking
12  for?
13          A.  Can't be generalized.  Each case has
14  a particular set of circumstances.  The deeper
15  you delve, the more you'll find how more
16  individual each case is.  So I would say there's
17  no general rule I could use.
18          Of course, if somebody didn't take the
19  drug, I wouldn't think there could be a
20  relationship.
21          Q.  Okay, so exposure, obviously, is one
22  essential criteria?
23          A.  One essential criterion.
24          Q.  Criterion, thank you.
25          A.  You're welcome.
00020
 1                  Shields
 2          Q.  Does there need to be a temporal
 3  relationship between that exposure and the

                        Page 8

2-20-07 - Singh - Shields.TXT
```
 4  injury?
 5          A.  It depends.
 6          Q.  What does it depend on?
 7          A.  Other factors that are involved.
 8          Q.  Can you give me examples of what
 9  those other factors might be in a given case?
10          A.  Examples in a given case?
11      You'd have to give me the given case.  I'm
12  not being evasive, but I don't want to mislead
13  you or say something that's going to require a
14  lot of qualification, so if you give me a
15  particular case, I'll tell you what I think.
16          Q.  Well, I'm not going to give you a
17  particular case just yet, Doctor.
18          Differential diagnosis is what we're
19  talking about here?
20          A.  I don't know.  You didn't tell me you
21  were talking about differential diagnosis.
22          Q.  Let me ask you, what is the process
23  by which you determine or come to the opinion,
24  whether or not you believe there is a causal
25  relationship in a particular?
00021
 1                  Shields
 2      I understand the factors of each case are
 3  different, but I assume your process is the same.
 4          MR. RHEINGOLD:  Objection to form.
 5          THE WITNESS:  Shall I answer?
 6          MR. RHEINGOLD:  Yes.
 7          THE WITNESS:  What process, what are
 8      you referring to?
 9  MR. OETHEIMER:
10          Q.  I don't know.  Is there a process by
11  which you determine a causal relationship exists?
12          A.  Yeah, I evaluate the case.  I analyze
13  the important factors, and I do do a differential
14  diagnosis.  That's the method of diagnosis in
15  neurology and in medicine, and I employ that; and
16  it's also very specifically stated in my report.
17          Q.  Right.  I understood that, and --
18          A.  So that's the process, if you want a
19  process.
20          Q.  And as part of that process, I
21  understand each case is different, but part of
22  that process involves understanding what are the
23  facts of this particular case, correct?
24          A.  The facts are very important.
25          Q.  And the exposure would be one of the
00022
 1                  Shields
 2  facts?
 3          A.  Yes.
 4          Q.  And the temporal relationship between
 5  the exposure and the injury, would that also be
 6  something important to understand?
 7          A.  Yes, it's relevant.
 8          Q.  And how about the presence of other
 9  risk factors for the injury?
10          A.  They have to be assessed.  They have
11  to be recognized, and then they have to be
12  assessed in terms of the events that happened.
13          Q.  And to understand the facts of this
14  case, as I understand, you reviewed some of the
```

                    2-20-07 - Singh - Shields.TXT
15    deposition testimony?
16         A.  Yes.
17         Q.  And some of the medical records?
18         A.  Yes.  I also took a history from the
19    patients, the patient and his wife.
20         Q.  Subsequent to when you saw him,
21    subsequent to the stroke, you examined the
22    patient and interviewed him in the presence of
23    his wife?
24         A.  I believe his wife was there.  Let me
25    see.  Yeah.
00023
1                    Shields
2         Q.  Let's take a moment before we go back
3    to your report and review the documents that you
4    produced.  Before I mark these, I'll show you
5    Exhibit 2.
6              Exhibit 2 is a copy of the Notice Of
7    Deposition for today's deposition and a subpoena,
8    which requested production of certain documents,
9    and I confess that this was handled by my New
10   York office; and I'm sure David has seen the
11   subpoena.  I don't honestly know if you have or
12   you have not?
13        A.  I don't recall seeing it.
14        Q.  Let me show you what's been marked as
15   Exhibit 2, and after you've had a chance to leaf
16   through it, if you could look at the schedule of
17   documents at the back and tell me whether there's
18   anything that you reviewed about the Singh case
19   that I'm not holding in my hand at this point, at
20   least in terms of paper.  I understand you
21   examined Mr. Singh and interviewed him and his
22   wife.
23        A.  Well, Number Two is ridiculous, all
24   data or other information considered by you in
25   forming your opinions.  We're talking about,
00024
1                    Shields
2    let's see, 38 years of experience, and all that
3    goes into data that I use in forming my opinions.
4         Q.  Okay.  Let me reframe my question.
5    Let's start with specific to the Singhs, if you
6    have anything specific to Mr. Singh and his
7    injury beyond what you've produced here this
8    morning?
9         A.  Same thing.  I have thousands of
10   articles, thousands of textbooks -- not thousands
11   of textbooks, hundreds of textbooks.
12        Q.  I understand, and I understand that
13   those may inform your opinion, but what I want to
14   know, and I guess I would like answered on the
15   record, do you have anything specific to his case
16   other than what I'm holding?
17        A.  Well, I prepared a list of references
18   that you're holding.
19        Q.  Correct.
20        A.  Which I'm not only talking about the
21   selective bibliography in the back of it, but in
22   there, there's a bibliography by category, but
23   that is not limiting.  I just put that down to
24   answer some questions that I thought, that I
25   anticipated you would ask.  That might be it.
                         Page 10

2-20-07 - Singh - Shields.TXT
00025
1                        Shields
2          Q.  You're referring to, I'll hand it to
3     you?
4          A.  Yes.  It's marked "Bibliography."
5     The first page has alkalinization of urine, slow
6     excretion.
7          Q.  You don't have to do that now, but
8     we'll come --
9          A.  But this is not the extent of the
10    kinds of things I would consider and have
11    considered.  As you must know, there's a
12    literature of, I don't know how many tens of
13    thousands of articles, which bear on the various
14    aspects of a case like this, and I've been
15    reading them since 1968.
16         Q.  Of course, in the deposition we'll
17    come to that, and I understand that a lot of your
18    personal experience, clinical experience and
19    training is relevant to and forms your opinions
20    in this case.  I do believe that defense counsel
21    is entitled to identification of any studies,
22    papers that form, you know, the particular
23    reliance for your opinion, and I do understand
24    that you provided a bibliography in your report;
25    and I'll review this bibliography as well.
00026
1                        Shields
2          But I do, for the record, I do object to
3     basically the attempt to broaden the reliance and
4     say that, you know, anything else that's in the
5     world medical literature is fair game for the
6     doctor's opinion because I don't believe that to
7     be the case.  You and I don't have to argue about
8     it.
9          A.  I will argue it because I'm not
10    broadening it.  I'll tell you exactly how it
11    works.
12         Q.  And for the record, I'm going to
13    object to reliance on any study that is not
14    identified in Dr. Shield's bibliography, and
15    that's a determination the judge makes, not
16    myself, or Mr. Rheingold or, respectfully, you,
17    Doctor.
18         A.  Okay.
19             MR. OETHEIMER:  Let's mark what we
20         have here produced by Dr. Shields.  So
21         Exhibit 3, mark as Exhibit 3 a copy of
22         Dr. Shield's previously identified
23         November 16th, 2005 report.  We'll call
24         it, for the purpose of the deposition, if
25         I refer to your former report, this will
00027
1                        Shields
2         be the November 16th, 2005 report, and the
3         second report will be the December 4th,
4         2006 report, if I don't refer to them by
5         date.
6     MR. OETHEIMER:
7          Q.  Okay?
8          A.  Okay.
9             (Defendants' Exhibit 3, document,
10         marked for identification, as of this

                            Page 11

                         2-20-07 - Singh - Shields.TXT
11          date.)
12               MR. OETHEIMER:  Mark as Exhibit 4 the
13          bibliography that Dr. Shields just
14          identified a few moments ago in his
15          testimony.
16               (Defendants' Exhibit 4, document,
17     marked for identification, as of this date.)
18     MR. OETHEIMER:
19          Q.  And this is in addition to the
20     bibliography that's contained in your report?
21          A.  Well, some of it is repetitive.
22          Q.  Some of it is overlap?
23          A.  Probably, most of it, but it's
24     categorized to make it easy.
25               MR. OETHEIMER:  I will mark as
00028
1                    Shields
2          Exhibit 5, this is another copy of
3          Dr. Shields' December 4th, 2006 report.
4          It appears to have a few handwritten
5          corrections.
6               Let me mark this and I'll show them
7          to you and ask you a question about them.
8               I'll make that Exhibit 5.
9               (Defendants' Exhibit 5, document,
10          marked for identification, as of this
11          date.)
12     MR. OETHEIMER:
13          Q.  Dr. Shields, let me show you briefly
14     what's been marked as Exhibit 5.
15          It's another copy of your December 4th,
16     2006 report, correct?
17          A.  Yes.
18          Q.  And I note that there are a couple of
19     handwritten corrections or annotations in that.
20          Are those in your handwriting?
21          A.  Yes.
22          Q.  Do you know, are those corrections,
23     and you can compare it to Exhibit 1, are those
24     corrections that you made after your report was
25     issued, or were those corrections that were
00029
1                    Shields
2     picked up in the report, do you know?
3          A.  These are corrections that I noticed
4     when I read it in preparation for this depo, and
5     what they are is typos and misuse of one or
6     two words.  For example, on page two, I
7     substituted product for compound.
8          Q.  I think there may be one or two
9     others?
10          A.  And I substituted the word "the" for
11     "a," you know, just better English, and then we
12     have "no a," which should have been "on a." It
13     irritates me when I see this.  It's my criterion.
14          Q.  So --
15          A.  I think there's one other one.  I'm
16     not sure.  I crossed out the word "an alcohol" on
17     page one because earlier we mentioned alcohol,
18     and on page 13, the word "are" is crossed out and
19     "an" is put in, and that's it.
20          Q.  Can I ask, can you, are you able to
21     tell me when you did this, when you made these

                              Page 12

2-20-07 - Singh - Shields.TXT
```
22   corrections?
23           A.  Well, last few days.
24           Q.  So you spent a little time preparing
25   for the deposition?
00030
 1                    Shields
 2           A.  Yes.
 3           Q.  Went back and reviewed your file and
 4   made these corrections this your report?
 5           A.  Yes, I call them corrections of
 6   typos.
 7           Q.  If you had found any substantive
 8   errors in your report, would you have also
 9   corrected those?
10           A.  No, but I would have pointed them
11   out.
12           Q.  Are you aware of any to point out?
13           A.  No, I'm not aware of any, but it's
14   always possible.
15           Q.  Now, why would you have pointed them
16   out but not corrected them?
17           A.  Well, because I don't believe in
18   changing documents except for typos.  If there's
19   an inaccuracy, I bring it up.  I didn't think
20   that the corrections I made were really material,
21   but it just annoys me to read it.
22           Q.  Right, and I'm not suggesting that
23   they are, but I was trying to understand in the
24   course of that review, if you had become aware of
25   inaccuracies or errors, you would bring them to
00031
 1                    Shields
 2   my attention?
 3           A.  Absolutely, and if you know of any,
 4   I'd appreciate it.
 5           MR. OETHEIMER:  We have handwritten
 6           notes.  There are seven pages here.  Mark
 7           this as Exhibit 6.
 8           (Defendants' Exhibit 6, document,
 9           marked for identification, as of this
10           date.)
11   MR. OETHEIMER:
12           Q.  Dr. Shields, we've marked as
13   Exhibit 6, your handwritten notes, correct?
14           A.  Yes.
15           Q.  And I may ask you to take a few
16   moments, but we don't have to do it right now, to
17   read them for me, but let me just ask you right
18   now, were these all made in the course of your
19   examination and interview on November 14th, 2005?
20           A.  They were.
21           Q.  Before I mark these, let me ask you,
22   there are three typed pages.
23           My assumption is that these also relate to
24   your November 14th, 2005 examination; is that
25   right?
00032
 1                    Shields
 2           A.  Well, one of them really isn't.  It's
 3   all typed.
 4           Q.  They're typed forms?
 5           A.  Typed forms.  This is part of the
 6   examination.
```
                            Page 13

                    2-20-07 – Singh – Shields.TXT
 7          Q.  Is part of the examination?
 8          A.  Yes.  We ask the patient to do this.
 9   If you want a name for it, we call it the
10   simultagnosia card, simultagnosia card,
11   S-I-M-U-L-T-A-G-N-O-S-I-A, card.  That's a term
12   we use.
13          Q.  It reflects a neurological
14   examination that you conducted?
15          A.  Yes, audited, yes.
16          Q.  And the other page is an intake form?
17          A.  Intake, and this is general
18   identification of some vital signs.
19          MR. OETHEIMER:  I'm going to staple
20          these three pages and ask that they be
21          marked collectively as Exhibit 7.  So the
22          intake form will be the first page.  The
23          form titled vital statistics will be the
24          second page of Exhibit 7, and the
25          examination record will be the third page
00033
 1                      Shields
 2   of Exhibit 7.
 3          (Defendants' Exhibit 7, document,
 4          marked for identification, as of this
 5          date.)
 6   MR. OETHEIMER:
 7          Q.  Then there appear to be several pages
 8   of excerpts from the St. Vincent's Medical Center
 9   records, and I don't know if these are complete.
10          Let me ask you, Doctor, if you would put
11   them together?
12          A.  I don't think they're complete.
13          Q.  And I may have the complete records.
14   I'll be happy to show them to you at some point.
15          A.  I don't think these are the complete
16   records.  It's part of a angio and endovascular
17   surgery report.
18          Q.  What do you have, are they separate
19   records from the angiogram?
20          A.  Yes, and I have pages one and two of
21   each.
22          Q.  You want to hand me the angiogram,
23   we'll make the angiogram records Exhibit 8?
24          A.  They call it arteriography.
25          Q.  Is that the same thing as an
00034
 1                      Shields
 2   angiogram?
 3          A.  Yes, to me it is.
 4          MR. OETHEIMER:  Marked as Exhibit 8
 5          is the record of the angiogram, and
 6          marking as Exhibit 9, the two pages that
 7          relate to the endovascular surgery.
 8          (Defendants' Exhibits 8 and 9,
 9          document, marked for identification, as of
10          this date.)
11   MR. OETHEIMER:
12          Q.  And, Dr. Shields, let me hand you
13   what's been marked as Exhibit 9, the endovascular
14   surgery report.
15          There are some notations on Exhibit 9?
16          A.  Yes.
17          Q.  Are those yours?

                              Page 14

2-20-07 – Singh – Shields.TXT

```
18        A.  Yes.
19             (Discussion held off the record.)
20             MR. OETHEIMER:  Mark that as
21      Exhibit 10.
22             (Defendants' Exhibit 10, document,
23      marked for identification, as of this
24      date.)
25  MR. OETHEIMER:
00035
 1                    Shields
 2        Q.  Dr. Shields, I'm going to hand you
 3  what's been marked as Exhibit 10, and I stapled
 4  three pages together.  The first page appears to
 5  be a photographic copy of a bottle of Herbalife
 6  Original Green Dietary Supplement.  The second
 7  page appears to be a photostatic copy of the
 8  label, 2001 copyright, and then the third page
 9  appears to be a copy of a business card of
10  Herbalife Independent Distributor Steve Peterson.
11  I think you can identify if I've correctly
12  identified the exhibit, and then tell me who
13  furnished those two you.
14        A.  Number one, you've correctly
15  represented what it is, and, number two, I
16  believe Mr. Rheingold's office sent them to me.
17        Q.  Did they send you an actual bottle or
18  just the photograph just as we see it in the
19  exhibit?
20        A.  I don't think I have a bottle.
21        Q.  So you have the photograph of the
22  bottle, and then a photograph of the label, and
23  did you read the label?
24        A.  Yes.
25        Q.  And were you able to read it?
00036
 1                    Shields
 2        A.  I think I had some other labeling
 3  material because I don't think I could have read
 4  that.
 5        Q.  Do you know what other labeling
 6  material you had?
 7        A.  I don't recall.
 8        Q.  And do you know who Mr. Peterson is?
 9        A.  I don't.  I can tell you who I think
10  he is, but I really don't know for sure who he
11  is.
12        Q.  I take it you've never spoken with
13  him?
14        A.  No.
15        Q.  You mentioned, you obviously have
16  testified that you examined Mr. Singh on
17  November 14th, 2005 and interviewed him in the
18  presence of his wife.
19             Is there anyone else that you've spoken to
20  to obtain any of the facts about Mr. Singh's
21  stroke?
22        A.  No.
23        Q.  Did you, in preparing for your
24  deposition today, did you meet with Mr. Rheingold
25  or anyone from his office?
00037
 1                    Shields
 2        A.  Yes.
```

Page 15

2-20-07 – Singh – Shields.TXT
```
 3          Q.  And when was that?
 4          A.  I think, let's see, Friday, this past
 5   Friday.
 6          Q.  Who did you meet with?
 7          A.  Mr. David Rheingold.
 8          Q.  Where was that meeting?
 9          A.  In his office.
10          Q.  In Manhattan?
11          A.  Yes.
12          Q.  Was anyone present, other than
13   yourself and Mr. David Rheingold?
14          A.  No.
15          Q.  How long did the meeting last?
16          A.  I would say an hour and 20 or
17   30 minutes.
18          Q.  Did you review your December 4th,
19   2006 report with Mr. Rheingold at that meeting?
20          A.  No, not particularly, I don't think I
21   did.
22          Q.  Did you discuss any of the deposition
23   testimony in the case?
24          A.  Yes, one aspect of the deposition
25   testimony.
```
00038
```
 1                  Shields
 2          Q.  What was that?
 3          A.  When it applied to the written note
 4   that you mentioned on top of the angio and
 5   neurovascular business, something that I'd
 6   forgotten that had been said because, you didn't
 7   ask me, but I read the deposition of the
 8   neurovascular expert.
 9          Q.  Dr. Zablow?
10          A.  Yeah.
11          Q.  I promise you I was going to get to
12   it.  I haven't asked you yet.
13          A.  I had read that after I had written
14   these reports, but I wrote there was an
15   inconsistency between the two reports.  One said
16   there was vasospasm, no, one concluded there was
17   vasospasm, and the other said there was no
18   vasospasm.  So that's what that written business
19   referred to and I mentioned it to Mr. Rheingold,
20   and he reminded me that the deposition, the
21   deposed clarified that and he said that there
22   wasn't vasospasm, it was some sort of typo or
23   misrepresentation.
24          Q.  So it may have left a word out.  In
25   the body of the report it says, "no evidence of
```
00039
```
 1                  Shields
 2   vasospasm," but in the impression?
 3          A.  It says, "vasospasm."
 4          Q.  And you read Dr. Zablow's deposition
 5   yourself?
 6          A.  Yes.
 7          Q.  So you're aware he testified that was
 8   a typographical error?
 9          A.  Yes.
10          Q.  And in fact they saw no evidence of
11   vasospasm?
12          A.  Yes.
13          Q.  Do you have any reason to dispute
```
                                    Page 16

2-20-07 - Singh - Shields.TXT

14  that?
15         A.  No, well, not that particular
16  statement.
17         Q.  I'm only asking about that particular
18  statement.
19         A.  I believe it was a typo.
20         Q.  Can I ask you to read your
21  handwritten note on Exhibit 9?
22         A.  It says, "Early vasospasm on angio,
23  angio says no evidence and conclusion says
24  evidence," and the date of the angio, see that?
25         Q.  The date there is given as 5/12?
00040
1                     Shields
2          A.  '03.
3          Q.  And do you understand that date also
4   to be in error?
5          A.  Procedure date listed above is
6   5/12/03.  If that's an error, I didn't know that.
7          Q.  I believe, if you read Dr. Zablow's
8   deposition, I think you'll see that he indicates
9   that, in fact, both the angiogram and the
10  vascular surgery were done on May 10th, the date
11  of the stroke.  That's just, that 5/12 date is an
12  error.
13         A.  I didn't recall that.
14         Q.  We can move on from that.  I will
15  show you, this is the deposition transcript of
16  Bruce Charles Zablow, taken on January 10th,
17  2007, and I'll direct you to page 19 of the
18  minuscript.  Actually, if you want you can start
19  reading at the bottom of page 18 which is in the
20  bottom right-hand corner.
21         A.  You want me to read it out loud?
22         Q.  No, to yourself.  Just calling your
23  attention to the question at the bottom of page
24  18.
25         See it?
00041
1                     Shields
2          A.  Yes.
3          Q.  And do you understand that, in fact,
4   the endovascular surgery, what was done that same
5   day?
6          A.  Yes, they're typically done together.
7          Q.  And before the surgery was done, they
8   had the angiogram, of course?
9          A.  That's how it's done.
10         Q.  And prior to that, there had been a
11  CAT scan earlier in the day, correct?
12         A.  Yes.
13         Q.  Do you happen to know Dr. Zablow?
14         A.  No.
15         Q.  Do you know Dr. Hirschfeld?
16         A.  No.
17         Q.  And you mentioned earlier that since
18  that deposition of the treating doctor, the
19  surgeon, was taken on January 10th, 2007, it, of
20  course, was not available to you at the time that
21  you prepared either your first report or your
22  second report, correct?
23         A.  That's correct.
24         Q.  But since authoring your second

Page 17

2-20-07 - Singh - Shields.TXT
25   report in December, you've had an opportunity to
00042
1                    Shields
2    review Dr. Zablow's deposition?
3         A.   Yes.
4         Q.   Is there anything in your report that
5    you would change or alter in any way based on
6    review of that deposition testimony?
7         A.   No.
8         Q.   Before when I asked you do you have
9    any reason to dispute the conclusion made by the
10   treating physicians that no evidence of vasospasm
11   was seen, you said that you do not dispute that
12   specific finding suggesting to me that there are
13   other things that you may wish to dispute.
14        Let me ask you, is there anything that you
15   recollect from reading in Dr. Zablow's deposition
16   that you do challenge or disagree with?
17        A.   I don't remember specifically now,
18   but he quoted a few things that were wrong about
19   subarachnoid hemorrhage, and I think it's towards
20   the end, about the incidence or something like
21   that; and I wasn't convinced that what was being
22   called "fibromuscular dysplasia" was
23   fibromuscular dysplasia or could have been, but
24   if I went through it, I could probably pick it
25   apart in a more specific way.  But those are the
00043
1                    Shields
2    two major things.
3         Q.   So one is just incidence levels?
4         A.   Yes, just a general statement about
5    how, certainly does not bear on his observations.
6         Q.   I understand the distinction you're
7    drawing.
8         And the fibromuscular dysplasia?
9         A.   Yes, and also I don't remember the
10   specifics, although I'd be happy to look at it.
11   The issue of teats will come up, and I don't
12   remember exactly what he said about that, but I
13   remember not agreeing with it.
14        Q.   I'm certain that that will come up,
15   and we'll have some discussion about that.  Let
16   me ask you --
17        A.   And there may be more, because with
18   all the materials that generally relate to a
19   subject of this type, I don't think to remember
20   everything.
21        Q.   But those are the only issues that
22   stand out?
23        A.   That come to my mind.
24        Q.   Do you still have Exhibit 1 in front
25   of you?
00044
1                    Shields
2         A.   Which is Exhibit 1?
3         Q.   Exhibit 1 is your report?
4         A.   The December --
5         Q.   December 4th, 2006.
6         A.   Yeah, I have it.
7         Q.   We're still on the first paragraph of
8    it.
9         A.   The first paragraph.

                         Page 18

2-20-07 – Singh – Shields.TXT
10          Q.  First paragraph, we talked about your
11    examination.
12          You then say that you've also reviewed the
13    following available medical records concerning
14    Mr. Singh?
15          A.  Yes.
16          Q.  You identified St. Vincent's Medical
17    Center 5/10/03 admission record?
18          A.  Yeah.
19          Q.  And I guess I just would like to
20    clarify.
21          Are you referring to literally an
22    admission report, or are you referring to the
23    entire hospital record of that admission, which
24    may have spanned a month or two?
25          A.  Yes.  I had the entire
00045
1                    Shields
2     hospitalization, as far as I know.  I only know
3     the pages that I got, and I abstracted them in my
4     report.
5           Q.  Okay.
6           A.  And the abstraction comes out to just
7     a few pages, but what I abstracted were the
8     things that appeared to me worth abstracting.
9           Q.  But you do believe you had the entire
10    hospital admission, at least everything through,
11    certainly everything from May 10th, 2003?
12          A.  Yes, I believe so, but what you don't
13    get, you don't know that you got, didn't get.
14          Q.  Right.
15          In fact, let me ask, do you know if you
16    had the CAT scan, do you understand that when he
17    was admitted that day that there was a CAT scan
18    taken that afternoon?
19          A.  Yes, I believe I refer to it;
20    5/10/03, report of CT scan, incomplete report.
21          Q.  What did you have about that report,
22    because, frankly, I haven't been able to locate
23    it in our copy of the same thing?
24          A.  All I have is "Internal placement of
25    coil in suprasellar cistern to the left midline,
00046
1                    Shields
2     internal placement of shunt catheter."  So this
3     is post surgery, post intervention.
4           Q.  Do you actually have a report, you
5     know, as opposed to a second-hand report?
6           A.  Well, that could only be from some
7     kind of document in the chart, and, obviously,
8     that's all we had from that piece.  There are
9     other things that I look for in the chart that I
10    thought would have been done that I didn't see.
11          Q.  Before I ask you about that, I just
12    want to understand whether you actually have the
13    radiology report from a CAT scan?
14          A.  I have this part of it, what I refer
15    to on the top of page five.
16          Q.  That is 8:34 p.m., correct?
17          A.  No. Here is a paraphrase of the
18    original CT scan report.  The neurosurgery
19    attending admitting note, which is the first note
20    in my report, a paraphrase of the original CT

Page 19

2-20-07 - Singh - Shields.TXT

```
21  scan.
22        And I don't know, normally, if we quote it
23  this way, I don't remember it, we did this so
24  long ago.  Normally, if we quote it this way,
25  it's because we didn't find the CT scan report.
00047
1                Shields
2  So we're paraphrasing, we're not paraphrasing,
3  we're repeating what the neurosurgery attending
4  said about the CT scan.
5        Q.  Could you tell me, is this the
6  document that I put in front of you a CT scan
7  report from, looks like 8:30.
8        A.  This is the second one.
9        Q.  This is the second one?
10       A.  Yeah, the second one that I have in
11  my chart, in my report.
12       Q.  Okay, and where is the first one?
13       A.  What do you mean?
14       Q.  Do you have your chart here, do you
15  have records from Mr. Singh?
16       A.  I don't have them here.
17       Q.  Where would they be?
18       A.  In storage.  So I don't, you know, I
19  don't recall the specific documents, but what
20  you're showing me here is the beginning of what I
21  have as an impression, and we noted incomplete
22  report, which means that for some reason or
23  another --
24       Q.  And I understand you have a second
25  report.  I was trying to understand whether you
00048
1                Shields
2  actually had a report like this at all, a final
3  report for the --
4        A.  I don't recall, but I have to tell
5  you that on the basis of how this is transcribed,
6  where we say, "incomplete report," it means we're
7  missing something, it didn't duplicate it or
8  something.
9        Q.  Right, but we know from this report
10  later that there was comparison made with the
11  patient's prior CAT scan of the head at 5/10/03,
12  performed at 1 p.m. The present examination is
13  performed at 8 p.m.
14        So there was a CAT scan done at 1 o'clock
15  that afternoon?
16       A.  That's what I'm referencing in the
17  initial note of my review of selected medical
18  records on page four.  You see about the fourth
19  line or fifth line, let's see, yeah, fifth line,
20  CT, diffuse local cistern subarachnoid hemorrhage
21  greatest in left sylvian fissure, possibly,
22  illegible, defect in, illegible, fissure."
23       So that was from a handwritten note.
24       Q.  All right.
25       A.  And then the rest of it is mentioned,
00049
1                Shields
2  "Mild to moderate hydrocephalus, no intracerebral
3  clot, some blood in ventricular system."
4        Q.  And by the time of this second CAT
5  scan report, the surgery had already been done?
```

Page 20

2-20-07 – Singh – Shields.TXT

```
 6        A.  Yes.
 7            THE WITNESS:  I'm going to have to
 8        take a break.  I just want to get a cup of
 9        coffee.
10            MR. OETHEIMER:  No problem.  We can
11        go off the record.
12            (Time noted:  12:36 p.m.)
13            (Recess taken.)
14            (Time noted:  1:07 p.m.)
15   MR. OETHEIMER:
16        Q.  One thing I wanted to, as the
17   reporter mentioned off the record at the break,
18   Doctor, I was going to ask you to read your
19   November 14th, 2005 examination and interview
20   notes into the record, since those are
21   handwritten and otherwise we may not be able to
22   read all of your handwriting.
23            Before I ask you to do that, I
24   understand that you, and, again, was this here or
25   in your office in New York, I think I asked you
00050
 1                    Shields
 2   and I apologize?
 3        A.  I think it was here, but normally the
 4   report would say.  It doesn't say.
 5        Q.  Just says, "My office"?
 6        A.  Probably here.
 7        Q.  Do you maintain more than one office?
 8        A.  Yes.
 9        Q.  Where is your other office?
10        A.  42 Broadway, Manhattan.
11        Q.  And we're today in Long Beach?
12        A.  Yes.
13        Q.  So you think it was here, but not
14   certain?
15        A.  It usually, my office means here.
16   It's where I am most of the time these days.
17        Q.  And Mr. Singh's wife, Ms. Caragata,
18   was present for your interview?
19        A.  Yes.
20        Q.  Was she present during, as you
21   conducted the examination?
22        A.  Yes.
23        Q.  And to the extent that you made notes
24   in the course of your examination and interview,
25   the examination notes, obviously, are based on
00051
 1                    Shields
 2   your examination.
 3            The interview notes, the history you took,
 4   did you do anything in your notes to indicate who
 5   the source of the information was, whether it was
 6   Mr. Singh or his wife?
 7        A.  No.
 8        Q.  Did his wife contribute to providing
 9   the history that you took?
10        A.  Yes.
11        Q.  Did Mr. Singh contribute to providing
12   the history that you took?
13        A.  Yes.
14        Q.  So the information and the history
15   you recorded, you would only be able to identify
16   whether the source of that information was
```

Page 21

2-20-07 - Singh - Shields.TXT
17  Mr. Singh or Ms. Caragata if you have a memory?
18       A.  Correct.
19       Q.  I will now ask you to read your
20  notes, and there are seven pages of notes, which
21  I think you testified earlier were all, all
22  relate to your November 14th, 2005 examination
23  and interview?
24       A.  Yes.
25       Q.  Let me say this, Dr. Shields.  I'd
00052
1                    Shields
2   like you to read your entries.  To the extent
3   your made shorthand, you obviously can testify to
4   the long hand version that you've indicated by
5   your abbreviation.
6            If you want to comment or expand on
7   anything you wrote here, I'll certainly give you
8   the opportunity to do that, but I would like it
9   for the record it to be clear that you're now
10  expanding on what is here.
11       A.  Well, I'd like to say something
12  before we start.
13       Q.  Okay.
14       A.  These notes are made to jog my
15  memory, so they might make no sense whatsoever,
16  and I make no claim that they're complete.
17           They're just so that I can dictate a real
18  note afterwards, okay.
19       Q.  Okay.  All right.  Understood, and as
20  I said, read the notes, and if you feel anything
21  needs to be put in context or whatever, I'm happy
22  to do that, but just say, this is not written,
23  but I'd like to add, all right?
24       A.  I'll read it off the written, and I'd
25  also like to say one other thing, just to make it
00053
1                    Shields
2   clear.  I skip around when I do this, so I'm
3   going to go in the order that I do it, that I
4   took it.
5        Q.  You're going to proceed in the order
6   that it's written?
7        A.  I write it as I go along, but I like
8   to make it more interesting.
9            Shall I start?
10       Q.  Yes, please do, and let's, as we
11  finish each page, we'll just announce it?
12       A.  This is page one, and it's dated
13  11/14/05, and on top it says, "Doina Caragata,
14  wife."
15           Shall I spell Caragata?
16       Q.  No, we have it in the transcript.
17       A.  Okay, and some of this is
18  abbreviations.  "43-year-old right-handed man,
19  St. Vincent's -- St. Vincent's clinic Manhattan,
20  1 to 2 times every month --  Dr. S-A-T-H-Y,
21  neurologist -- multivitamins E -- stiff joints
22  Tylenol -- for HAS headaches six times Sundays --
23  acupuncture one time a month back and neck pain
24  various stimuli plus minus help.  Dr. Martin
25  Manhattan -- chiropractor one time a month back
00054
1                    Shields

Page 22

2-20-07 - Singh - Shields.TXT
```
 2  and leg pain," and I can't read what the next
 3  word is, "manipulation."  Back pain, leg and neck
 4  is what it is?
 5          Q.  Before you go to page two, I just ask
 6  you only one question on page one.
 7          When you say plus or minus help, can you
 8  explain that?
 9          A.  Sometimes it helps.
10          Q.  Okay.  Page two.
11          A.  Page two, on top it says, "Singh,
12  two.  Six months ago stopped one pack a day --
13  times 30 years Allergic to penicillin 10 to
14  15 years -- U.S.A. India -- college literate in
15  English, Hindi, Punjabi sales in jewelry and
16  repair silver -- apartment second floor room,
17  room in apartment -- elevator."
18          Q.  Question on page 2; one pack a day
19  smoker times 30 years.
20          The entry above that is stopped six months
21  ago; does that relate to smoking as well?
22          A.  I believe so. You have to look at
23  what I actually said in my report.
24          Q.  Okay, we'll do that.
25          A.  That's what I think it probably
00055
 1                  Shields
 2  means.
 3          Q.  Page three?
 4          A.  Page three, "Household ADL wife, wife
 5  in Manhattan personally helps wife at work, walks
 6  all day naps during -- watches TV -- read with an
 7  arrow going down can't concentrate -- computer
 8  for fun.  No longer drives a car afraid to
 9  drive -- can't work no gym 2 to 3 times a week --
10  socialize use of public transportation no cards."
11  That's the end of that page.
12          Q.  Just quickly, ADL, activities of
13  daily living?
14          A.  Yeah.
15          Q.  Page four?
16          A.  Let's see.  "3 to 5/10/03, Herbalife
17  to lose times two years three green tabs took
18  three times a day Tea in a.m. on day of stroke
19  ambulance to St. Vincent times four."  I don't
20  know what follows that.  "-- surgery tracheostomy
21  one and a half months in," and the next word is
22  illegible to me.  "St. Vincent's times four
23  months rehabilitation Home."
24          Q.  Before you turn to page 5, 5/10/03,
25  May 10th, 2003, was the day of Mr. Singh's
00056
 1                  Shields
 2  stroke, right?
 3          A.  Yes.
 4          Q.  Do you know what the three before the
 5  five relates to?
 6          A.  No. Remember I said this is just to
 7  jog my memory at the time.
 8          Q.  I know, but it's fair for me to ask
 9  you.
10          A.  No, sometimes I can't even read it
11  after a few weeks.
12          Q.  You don't think that relates to some
```
Page 23

2-20-07 – Singh – Shields.TXT
```
13    time period from March to May or, and I do not
14    want to put words in your mouth?
15             A.  I don't remember.  There's usually an
16    annotation that means something very particular
17    to me at the moment.
18             Q.  "Herbalife to lose," and do you have
19    an understanding as to lose what?
20             A.  Weight.
21             Q.  And the notation times two years,
22    Herbalife to lose weight, do you know if that was
23    information that was provided by Mr. Singh,
24    himself, or by his wife?
25             A.  Actually, one of them said that.
00057
1                     Shields
2             Q.  And you can't say which?
3             A.  No.
4             Q.  Is that also true with respect to the
5    next entry, the reference to three green, that
6    was provided by one or the other, and you
7    couldn't be sure which?
8             A.  Yes.
9             Q.  And tea in a.m. on day of stroke?
10             A.  Yes.
11             Q.  That's an indication that Mr. Singh
12    had drank a cup of tea that morning before his
13    stroke event?
14             A.  Yes, that's what I believe.
15             Q.  Do you know what kind of tea?
16             A.  No.
17             Q.  And do you know who provided that
18    information?
19             A.  I don't recall.
20             Q.  One or the other?
21             A.  Yes.
22             Q.  Do you know if it was caffeinated
23    tea?
24             A.  I don't know.
25             Q.  Do you assume that it was caffeinated
00058
1                     Shields
2    tea?
3             A.  I do.
4             Q.  You can turn to page five, thank you.
5             A.  Shall I go on?
6             Q.  Yes, please.
7             A.  "CC," which stands for current
8    complaints:  "Headaches QD DEN," which means de
9    novo, which means he didn't have them before.
10    "Tylenol right frontal lasts X two hours 6 to 8
11    or 9 out of 10 Explode --" I don't know what the
12    next thing is.  "No," I don't know what the next
13    thing is.  "Waken from sleep" -- oh, no, that's
14    "no warning, wakens from sleep and phonophobia."
15             Q.  After wakens from sleep, is that
16    p.m.?
17             A.  P.m.
18             Q.  Yeah.
19             A.  Next is "OMS," which means organic
20    mental syndrome, an old fashioned term.
21             Q.  Organic what?
22             A.  Organic mental syndrome.  "Memory, --
23    expression, whines and cry hypochondriacal in
```
Page 24

2-20-07 - Singh - Shields.TXT
24  patient."  Next is "tinnitus -- hissing AU."
25  That means both ears.  Something on, I don't know
00059
 1               Shields
 2  what the first word there is, "CMF -- 8 out of
 3  ten constant 3 or 4 months -- chiro."
 4          Q.  The subarachnoid hemorrhage that
 5  Mr. Singh sustained was on the left side,
 6  correct?
 7          A.  Well, he had, the aneurism was on the
 8  left side.  Subarachnoid hemorrhage is a general
 9  thing.  The blood gets distributed in the
10  subarachnoid space.  He also had interventricular
11  blood, and he had an effect of the subarachnoid
12  hemorrhage on the right side of his brain.
13              So, basically, the whole picture
14  involved both sides of his brain, and the exam is
15  consistent with that.
16          Q.  That's my question, whether the right
17  frontal location of the headaches he experiences,
18  whether you attribute that to the sequelae of the
19  stroke?
20          A.  As you phrase the question, I can't
21  give you the simple yes/no answer, but I will
22  tell you what I think.
23          Is that okay?
24          Q.  Yes.
25          A.  Localization of headaches by their
00060
 1               Shields
 2  position on your head is notoriously misleading,
 3  so I do attribute the headaches to the
 4  subarachnoid hemorrhage and the events
 5  thereafter.  The right-sided aspect of it is
 6  nonspecific to me.
 7          Okay, to make myself clear?
 8          Q.  Yes.  You can turn to the next page.
 9  Crossed out, it's tough to read the number six
10  here, but since there were seven pages.
11          A.  No, it's number six.  Okay, on top,
12  "Hands numb ulnar fingers C-8 -- Q a.m. sleep --
13  synostosis, LMF times one year."  I don't know
14  what that word on the next line is, but
15  "bilateral below knee left hip Weak legs since
16  stroke Upstairs, up steps worse.  No interest de
17  novo depressed suicidal."
18          Q.  Now, you're going up to the
19  right-hand, top right-hand?
20          A.  Yes.  "Right arm 10 to 12 years
21  deformity operated playing with friends."  That
22  refers to how he hurt his arm.
23          Q.  Okay.  Page seven?
24          A.  Seven, "Gait poor, headaches six,
25  motor per separation truncal tilt to the left,
00061
 1               Shields
 2  right foot splayed out toe tapping two hours
 3  bilateral right and left Radial deviation left,"
 4  something or other.  And on top, "BCBRC."
 5          Q.  What does that stand for?
 6          A.  Bush, Clinton, Bush, Reagan, Carter.
 7  That's part of the testing to see if he can name
 8  the names of presidents.

                    Page 25

2-20-07 - Singh - Shields.TXT
```
 9            Q.  Okay, is that right?
10            A.  And I write that down because I often
11    forget to ask them, not that I forget the order
12    of the presidents myself.
13            Q.  Do any of the things on Exhibit 6
14    relate to the test that's reflected on the third
15    page of Exhibit 7?
16            A.  No. That's part of the general
17    neurologic exam, but it's alluded to in my report
18    but is not in these notes.
19            Q.  Tell me briefly what this test
20    involves.
21            A.  This we call the "simultagnosia card"
22    because it's not a card anymore, but it has to do
23    with testing visual/spatial orientation, which
24    you might call visual agnosia, and we call it the
25    simultagnosia card because of this figure here,
00062
 1                    Shields
 2    which as you might be able to see, hopefully you
 3    do, it's a four made of threes.  So we typically
 4    will ask the patient what numbers do you see and
 5    we record the response.
 6            This patient only saw threes.  That's my
 7    notes, threes only, and if the patient doesn't
 8    see the four right away, sometimes they'll see
 9    33, 333,000, etc., but if they don't see the
10    four, I prompt them, which is, and I say, you
11    don't see the number four there, then they might
12    see it up here, but I point to it.  Wait, there's
13    more.
14            And, by the way, most of this reflects
15    right brain function, but not only.  This is
16    visual/spatial orientation.  The patient is asked
17    the name of what this is, which isn't so
18    important for this, and then to draw it.  He can
19    copy it or he can do it his own way.
20            You see what he did.  I gave him two
21    shots.  It took a long time to get this out and
22    this is imperfect.  Then, close your eyes, I ask
23    them to read that and then do it.  Whatever his
24    response was, I don't remember what it is
25    offhand, and here's the clock, they have to tell
00063
 1                    Shields
 2    the time that is right.
 3            So we have a sample of how he can write,
 4    this is a sample of his handwriting.  This is a
 5    sample of my handwriting and signed and dated.
 6    It's part of the -- the fact that he made
 7    spelling errors is part of this.
 8            Q.  Doctor, let me ask you, well, first
 9    let me ask, what was your purpose in examining
10    Mr. Singh?
11            A.  It's always the same purpose doing
12    neurologic exam, to discover what his neurologic
13    findings are to enable me to understand what
14    happened to his nervous system.  So you might say
15    it's to make a diagnosis, but it's more than
16    that.
17            Q.  But let me understand this.
18            Put aside the history, which I'll ask you
19    about separately, but the examination itself,
```
Page 26

2-20-07 - Singh - Shields.TXT

```
20   does that, do you rely for, to any degree, for
21   your opinion on what caused the stroke on
22   May 10th, 2003, on the examination that you
23   conducted on November 14th, 2005?
24           A.  I don't think you realize how complex
25   a question that is.  So the answer is, yes, no,
00064
1                    Shields
2    and it depends.
3           Q.  Well, what part, and, again, I'm
4    separating the history because I'll separately
5    ask you whether any of the history that you took
6    from Mr. Singh and his wife formed any part of
7    the basis for your opinion.
8           A.  I understand that you'll do that.
9           Q.  I'll do that now.
10          Does any of the history that you took from
11   Mr. Singh and his wife on November 14th, 2005,
12   form a part of the basis of your causation
13   opinion?
14          A.  Well, let's put it this way.  The
15   history of determining the cause, which you can
16   learn, you want all of the information of history
17   that you can get, which is not to say the history
18   is a just a recounting of everybody says is
19   written down, but what you extract from that,
20   what's available, what people have said, what the
21   patients tell you, the patient's family tells you
22   and also what's available in medical records.
23   And you extract from that information, which
24   often helps you tell what is going on, and it's
25   usually most useful in determining cause, but
00065
1                    Shields
2    usually you can figure out the whole story from
3    history, but as neurologists, we're the coma
4    doctors, and we often don't get any history at
5    all, and we have to rely on the exam and other
6    clues.
7           Q.  Now, this exam, your examination of
8    the patient obviously occurred two and a half
9    years after the stroke?
10          A.  Yes.
11          Q.  So tell me, if you would, how, what
12   role your own examination of Mr. Singh, your own
13   physical examination and whatever tests you
14   administered when you saw him, and I take it you
15   only saw him the one time?
16          A.  Once.
17          Q.  What role does your examination play
18   in assisting you to arrive at your opinions in
19   the case?
20          A.  I'd like to answer that question, but
21   it's so broad or vague that I don't really think
22   that I can help you.
23          Q.  Well, I think --
24          A.  I think maybe I could just talk.
25          Q.  Well, I think you have to respond to
00066
1                    Shields
2    the questions.  Let me ask you, we've looked at
3    your notes, Exhibit 6, and I'll put them back in
4    front of you.
```

                        2-20-07 - Singh - Shields.TXT
 5          A.  You don't have to put them back.
 6          Q.  And I understand you base your
 7  opinion on your clinical experience and the
 8  literature and review of the medical records, but
 9  I just want to understand, what in your
10  examination of Mr. Singh, what in your
11  examination do you rely on to any degree for your
12  opinions?
13          A.  You mean the straight neurologic
14  examination?
15          Q.  Well, start with that and I'll ask
16  you if there's more.
17          A.  Because I consider the examination to
18  include the history.
19          Q.  And that's why I'm separating them,
20  so let's stick with the straight --
21          A.  We're talking about straight
22  neurologic examination.
23          Q.  For purposes --
24          A.  The neurologic examination in some
25  cases, and in this case enables you to tell what
00067
 1                      Shields
 2  deficits the patient has which are reasonably
 3  related to the injury he sustained.  It also
 4  enables you to rule out certain other conditions
 5  which may be an alternative explanation for what
 6  happened to him.  So I think that is a broad
 7  answer to your question.
 8          Q.  Let's be more specific then.
 9          Are there any, are there any potential
10  causes that you were able to rule out in
11  Mr. Singh's case, based on your neurological
12  examination?
13          MR. RHEINGOLD:  Objection.
14              Causes of what?
15  MR. OETHEIMER:
16          Q.  Causes of his May 10th, 2003
17  hemorrhagic stroke.
18          A.  Yes, but there are a number of
19  negative things that I didn't observe that rule
20  out conditions that produce strokes, and this
21  kind of stroke.
22          Q.  Okay.
23          A.  So that would be really involved,
24  understanding what the differential diagnosis of
25  aneurisms and what ruptured aneurisms are.  So to
00068
 1                      Shields
 2  cut to the chase, to make it a little bit
 3  simpler, I didn't see any sign that he had
 4  long-term effects of hypertension, and I judged
 5  that on neurologic exam, on the main, by having
 6  normal fundi, but there's also an infinite number
 7  of other things that might be contributory that I
 8  didn't observe.
 9          For example, he didn't have any of the
10  signs of the connective tissue diseases that can
11  cause a stroke like Marfan's syndrome.
12          Q.  Okay.
13          A.  You want me to go through the entire
14  list?
15          Q.  No.

                              Page 28

2-20-07 - Singh - Shields.TXT
```
16         A.  I also observed he was not a woman,
17 as pregnancy can predispose to rupturing an
18 aneurism.
19         Q.  Let me turn and ask it the other way.
20         A.  So I can go on for a very long time.
21         Q.  Identifying things that you did not
22 find?
23         A.  Right, but that's what differential
24 diagnosis is all about, eliminating things.  So I
25 didn't find any, of course, the biggest thing in
00069
1                    Shields
2 a case like this is not finding signs of
3 hypertension.  It is a frequent associative
4 condition, but can be quite miniscule with other
5 conditions.
6         Q.  And you looked for signs of chronic
7 hypertension and did not find them on
8 examination; is that right?
9         A.  Yes, that's correct.
10         Q.  Did you have any history from
11 Mr. Singh or his wife concerning hypertension?
12         A.  On the history that I received was he
13 never knew of hypertension nor was he a guy that
14 went to doctors.
15         Q.  I was going to say, we don't really
16 have any historical blood pressure readings, do
17 we?
18         A.  That's why I made the point about his
19 eyebrows because I consider that to be a sign of,
20 the appearance of vessels in the eyes are a sign
21 of vessels in the brain are going to look like
22 because the vessels in the eyes are extensions
23 and very similar to the vessels in the brain.
24     So the way you recognize the presence of
25 chronic hypertension is whether the patient has
00070
1                    Shields
2 an enlarged heart, whether the patient has renal
3 problems, whether the patient, renal meaning
4 kidney, or the patient has changes in the
5 eyebrows.  Of those three, the best is changes in
6 the eyebrows as being the effects of blood
7 vessels in the brain.  Of course, taking the
8 patient's blood pressure is useful, the patient's
9 blood pressure, in an exam of this type is, we
10 always have patients with elevated blood
11 pressures when they come to see me.  Neurology
12 exam is scary to them.
13         Q.  So white coat syndrome?
14         A.  Well, it's worse because we test them
15 and we test them until, for example, on status
16 testing, we test them until they make mistakes to
17 find what they can do, so it makes people
18 anxious.
19         Q.  Do you take their blood pressure
20 before you test them or after?
21         A.  I usually take it after because I
22 consider a lot of neurologic testing to be
23 provocative.  It is provocative.
24     I mean, that's the way you're supposed to
25 do it.  So even having an edge when you do the
00071
```

2-20-07 - Singh - Shields.TXT
```
 1                   Shields
 2  neurologic exam is useful because anxiety brings
 3  out neurological deficits.  For example, if we
 4  ask a patient to do something and he's doing it
 5  all right, I ask him to do it faster.  I say
 6  can't you do it faster, et cetera.
 7          Q.   What examination do you do to
 8  determine the condition of his retinal vessels?
 9          A.   Endoscopy, I look at it through an
10  endoscope.
11          Q.   Your testimony is that you believe
12  the retinal vessels are predictive of the
13  intercerebral vessels?
14          A.   To a large extent.  I don't say
15  there's a one to one correlation.
16          Q.   I'm just trying to find out if that
17  is generally accepted in the neurological
18  community?
19          A.   It's generally accepted among the
20  more sophisticated, and I can give you a
21  reference if you like.
22          Q.   I'd will take that reference.
23          A.   I don't have it on hand, but I can
24  give it to you tonight.
25          Q.   That would be fine.  You can, I
00072
 1                   Shields
 2  assume you would like that to go through David.
 3          A.   In my opinion.
 4          Q.   If you are able to give it before we
 5  leave today, that's fine.
 6          A.   I know exactly where the paper is.
 7          Q.   If not tonight, tomorrow is fine too,
 8  okay.
 9          A.   By the way, I'm giving you a very,
10  very specific reference, however, you could find
11  it in any, in any standard textbook of medicine
12  of hypertension and a place you could look is
13  "The American Heart Association Primer of
14  Hypertension," and you look under the section, I
15  think it's called "The Eye In Hypertension," but
16  I'll give you a much more specific reference.
17          Q.   I didn't ask you, but you are board
18  certified in neurology?
19          A.   I am.
20          Q.   And for how long have you been board
21  certified?
22          A.   I think it's about, I believe I
23  became board certified in '73, '60 -- '73, '74,
24  in the seventies.  I don't recall, but it's
25  sometime in the seventies.
00073
 1                   Shields
 2          Q.   Do you have any other certifications
 3  other than in general neurology?
 4          A.   Certification, I'm a member of the, I
 5  think I'm a fellow of the American Academy of
 6  Disability Evaluating Physicians.  I think that's
 7  it in terms of certificates.
 8          Q.   Do they have separate board
 9  certification in neurology?
10          A.   I don't think they do yet, but you
11  can take a fellowship in it, and I think, I'm not
```
Page 30

2-20-07 - Singh - Shields.TXT
```
12  sure.  There was no board up until fairly
13  recently.  I think you can become certificated in
14  it now.  I am not certificated.
15          Q.  Actually, when I asked you about
16  medical records, I don't think I asked you about
17  films, the films themselves.
18          Have you reviewed any of Mr. Singh's
19  radiographic films?
20          A.  Personally, no.
21          Q.  Is that something that you feel
22  qualified to review and interpret x-ray films?
23          A.  Angiography of the brain, yes.
24          Q.  How about CAT scan?
25          A.  Yes.
00074
 1                 Shields
 2          Q.  But you've not seen his CAT scan
 3  films or his angiograms?
 4          A.  I've seen no original imaging.
 5          Q.  You just relied on reading the
 6  reports?
 7          A.  Yes.
 8          Q.  Do you want to turn, if you still
 9  have your December 4th, 2006 report in front of
10  you?
11          A.  I have it.
12          Q.  If you want to turn to your case
13  summary beginning partway down on the second
14  page?
15          A.  (Witness complying.)
16          Q.  You give the history there in the
17  first couple of lines of the case summary, that
18  Mr. Singh, then 41-year-old right-handed man was
19  admitted to St. Vincent's having suffered severe
20  headache with nausea that morning.
21          A.  Excuse me, you're leaving out some
22  words.  It's okay with me.
23          Q.  Okay.
24          A.  I don't care, but that's not an exact
25  reading.
00075
 1                 Shields
 2          Q.  Let's read it exactly.  On
 3  May 10th --
 4          A.  If you want to do it that way, it's
 5  fine.
 6          Q.  "On May 10th, 2003, Mr. Singh, then a
 7  41-year-old right-handed man was admitted to St.
 8  Vincent's Catholic Medical having suffered a
 9  severe headache with nausea that morning."
10          Did I read that correctly?
11          A.  Yes.
12          Q.  Is that based on your interview or
13  the medical records?
14          A.  I don't remember where I got that
15  particular from.
16          Q.  How about the next statement, the
17  report that he had passed out and hit his head?
18          A.  I believe, I'm not sure where I got
19  that information.  I don't see it in the hospital
20  record that I've paraphrased, extracted,
21  abstracted, so, presumably, I got it from the
22  Singhs.
```
Page 31

2-20-07 - Singh - Shields.TXT
```
23          Q.  Is the head trauma significant at all
24   in terms of your opinion concerning the cause of
25   the stroke?
00076
 1                 Shields
 2          A.  That's interesting.  It's quite
 3   likely that the stroke caused -- we're calling
 4   this a stroke.  Sometimes that's confusing
 5   because some people only mean an occlusion as a
 6   stroke, but if you mean a stroke can include
 7   subarachnoid hemorrhage, that's fine.  Just so
 8   we're clear that we're both referring to the same
 9   thing.
10          Q.  Yes.  I had been intending to use it
11   that way.  Let's back up.
12          By occlusion, you're referring to ischemic
13   stroke?
14          A.  Blockage.
15          Q.  So I had been using the term "stroke"
16   to include what happened to Mr. Singh, which was
17   a hemorrhagic --
18          A.  Subarachnoid.
19          Q.  Subarachnoid hemorrhage.
20          A.  Right.  So here's my answer.  With
21   high medical probability, if he fell, he fell
22   because of the subarachnoid hemorrhage, and it
23   was not the cause of the subarachnoid hemorrhage,
24   although it's not impossible in reverse, it's
25   just highly unlikely, given the circumstances.
00077
 1                 Shields
 2          Q.  And his particular subarachnoid
 3   hemorrhage involved the rupture of an aneurism,
 4   correct?
 5          A.  Yes.
 6          Q.  Could a fall, could trauma to the
 7   head rupture an existing aneurism?
 8          A.  Yes.
 9          Q.  But you don't believe that's what
10   occurred in this case?
11          A.  No.
12          Q.  What is that based on?
13          A.  General experience, and why would a
14   man like this fall in the first place?
15          He's a 40-something-year-old guy, 41 at
16   the time, healthy, plus the appearance of the
17   aneurism is consistent with him having bled.
18          Q.  I'm going to skip over to the next
19   sentence about, we've discussed the head scan
20   already.
21          The head scan done at the hospital
22   revealed a subarachnoid hemorrhage, correct?
23          A.  Yes.
24          Q.  The neurological consultation --
25          A.  Neurosurgical.
00078
 1                 Shields
 2          Q.  Neurosurgical, I'm sorry.  They later
 3   recorded a blood pressure of 175/118.
 4          That's obviously an elevated reading, but
 5   what do you attribute that to?
 6          A.  The subarachnoid hemorrhage.  The
 7   nature, sometimes the patient could have normal
```

                    2-20-07 – Singh – Shields.TXT
 8  or low blood pressure associated with a
 9  catastrophic cerebral event like a subarachnoid
10  hemorrhage, but they normally don't, especially
11  the subarachnoids where the blood pressure tends
12  to be elevated.
13          Q.  So the fact that his blood pressure
14  was elevated on admission to the hospital, in
15  your view, was not informative with respect to
16  his blood pressure prior to the occurrence, the
17  onset of stroke?
18          A.  I wouldn't say it's not of interest,
19  but it doesn't tell you anything, per se, in
20  terms of whether he was hypertensive before.
21          Q.  The next sentence states that
22  Mr. Singh had taken Herbalife, there's an
23  asterisk, an ephedra-containing compound on
24  May 10th, 2003, the date of his subarachnoid
25  hemorrhage and had been ingesting this product
00079
 1                      Shields
 2  daily for the previous year.
 3          What do you recall is the basis of that
 4  statement?
 5          A.  I believe that's what they told me.
 6          Q.  And they, for the record?
 7          A.  The Singhs.
 8          Q.  Referring to Mr. Singh and his wife?
 9          A.  Yes.
10          Q.  When you interviewed them on
11  November 14th, 2005, in your office?
12          A.  Right.
13          Q.  And the next sentence is that "Mr.
14  Singh used three green pills per twice day per
15  the instructions of the distributor to promote
16  weight loss."
17          A.  Yes.
18          Q.  Is that also information that was
19  communicated to you during that interview by
20  Mr. Singh and/or his wife?
21          A.  No, originally, it appears I
22  misunderstood them, and I thought he was taking
23  three green pills three times a day, and that's
24  what I said in my original report.
25          Q.  In your notes or your original
00080
 1                      Shields
 2  report?
 3          A.  I believe in both.
 4          Q.  I'm handing you what's been marked as
 5  Exhibit 3, and I do see, I see that reference.
 6          What did you say in Exhibit 3, your first
 7  report?
 8          A.  Isn't this page two?
 9          Q.  Right.
10          A.  What I said was, "He states he had
11  been using three green pills three times a day,
12  per the instructions of the distributor to
13  promote weight loss.
14          Q.  And you've now corrected that in your
15  December 4th, 2005 report to make it three green
16  pills twice a day?
17          A.  Yes.
18          Q.  How did you determine that the

                          Page 33

                          2-20-07 - Singh - Shields.TXT
19   statement in your original report was incorrect?
20           A.   On the basis of his sworn testimony.
21           Q.   So after you reviewed Mr. Singh's
22   deposition testimony?
23           A.   Yes.
24           Q.   And based on that testimony you
25   corrected your report to change it from three
00081
 1                       Shields
 2   pills three times a day to three pills two times
 3   a day?
 4           A.   Yes.
 5           Q.   Do you know whether Mr. Singh
 6   testified, do you know if he was asked at his
 7   deposition that on the day of his stroke he took
 8   Herbalife?
 9           A.   I don't recall that testimony, but I
10   recall being under the impression that he took it
11   on the day of his stroke.  I don't recall the
12   testimony per se.
13           Q.   To what extent does your opinion on
14   causation depend on Mr. Singh having taken the
15   product that day?
16           A.   Well, I think that if he took it that
17   day, it's a clearer situation, but if he took it
18   the day before, I still would attribute the
19   stroke to be significantly contributed to by the
20   use of the medication, the product.
21           Q.   What is the half life of ephedra or
22   ephedrine, do you know?
23           A.   I know.  The half life of ephedrine,
24   or let's say ephedra is a range, but the half
25   life is up to 5, 4 to 6 hours, I would say; and
00082
 1                       Shields
 2   that's different for different people.  It also
 3   depends upon how alkaline your urine is and other
 4   conditions, but the general rule that I follow is
 5   two and a half is the peak, generally, hours, and
 6   five is generally the half life, and
 7   understanding that there's variation, standard
 8   deviations on either side.
 9           Q.   Okay.
10           A.   That's how I remember all medical
11   statistics.
12           Q.   If he had not taken the product that
13   day on May 10th, and I think you said that you
14   believed he was taking three pills two times a
15   day?
16           A.   Yes.
17           Q.   Morning and afternoon?
18           A.   I don't know when he was taking them.
19           Q.   Would the product that he took the
20   day before be eliminated from his system by the
21   time he woke up the following morning?
22           A.   No, no, because, sorry.  The rule of
23   thumb, aside from the peculiar effects that a
24   product like ephedrine, compound like ephedrine
25   has, can have on blood vessels, which can outlast
00083
 1                       Shields
 2   its bioavailability in the body, aside from that,
 3   the rule of thumb that's used in medicine is the

                              Page 34

```
                       2-20-07 - Singh - Shields.TXT
 4     effect of a drug is basically gone after five
 5     half lives.  There, again, there's variation.
 6     Could be 4 or 6.
 7          So a day doesn't make that much difference
 8     in terms of having some drug around.  Of course,
 9     it's a lot simpler situation to understand if, in
10     fact, he took it on the day.  Easy to, you know.
11          Q.  Do you believe that ephedra, do you
12     believe that ephedra increases blood pressure?
13          A.  It can.  You do realize that one of
14     the original uses of ephedra was to increase
15     blood pressure.  One of the original uses was to
16     control Stokes Adams attacks.
17          Q.  Ephedra or ephedrine?
18          A.  Ephedrine, but ephedra.  We should
19     define these terms because it can lead to
20     confusion and unnecessary jousting later on.
21          Q.  I don't think I'm confused, but I
22     think it does make sense to on the record.
23          You are using, when you talk about ephedra
24     being used to increase blood pressure, you're
25     talking about the ephedrine pharmaceutical, not
00084
 1                    Shields
 2     ma huong, but ephedrine contains alkaloids;
 3     correct?
 4          A.  It's 90 percent ephedrine present in
 5     most cases.
 6          Q.  What are the other alkaloids that are
 7     present?
 8          A.  Pseudoephedrine, PPA, pseudo PPA,
 9     meth ephedrine, and Meth PPA and pseudo of each
10     of those.
11          Q.  It's predominantly ephedrine?
12          A.  It's 90 percent ephedrine.
13          Q.  And I do understand, and we'll come
14     back because I do want to understand your
15     thoughts about mechanism and how ephedra works
16     and what effect it has and over what period of
17     time, but at least as to blood pressure, in terms
18     of it creating a --
19          A.  You mean systemic blood pressure?
20          Q.  Correct.
21          If Mr. Singh did not take ephedra that
22     morning, then it did not increase his blood
23     pressure that morning, correct?
24          A.  It probably would not have.  The rule
25     for ephedrine causing sustained increase in blood
00085
 1                    Shields
 2     pressure, assuming there's nothing that
 3     complicates the situation, is basically 5 to
 4     6 hours is the outside limit, in terms of
 5     systemic blood pressure, and you know what I mean
 6     by systemic.
 7          Q.  I do.
 8          You're distinguishing systemic blood
 9     pressure from intercerebral?
10          A.  Well, I wouldn't phrase it that way.
11          Q.  How would you phrase it?
12          A.  I would phrase systemic blood
13     pressure, which is basically a generalized
14     condition affecting blood pressure in your body
```

2-20-07 - Singh - Shields.TXT
```
15   in the main versus the pressure in cerebral
16   vessels because that's not the same as cerebral
17   blood pressure, if you know what I mean.
18           Q.  I do.  Let me follow.
19           What you said a moment ago is that the
20   effect on systemic blood pressure would be on the
21   outside of 5 to 6 hours?
22           A.  Yes.
23           Q.  So if he did not take the product
24   that day, you would not have expected it to have
25   any effect on increasing the systemic blood
00086
 1                   Shields
 2   pressure on the day of his hemorrhage?
 3           A.  Yes, in a simple situation.
 4           Q.  Now, let's talk about the pressure in
 5   the intracerebral vessels that you referred to in
 6   your answer a moment ago.
 7           If he did not take the product that day,
 8   would you have expected the product to have any
 9   effect on the blood pressure in his intracerebral
10   vessels that day?
11           A.  In this particular situation, yes.
12           Q.  And how would that effect occur
13   without ingestion of the product on the day of
14   the event?
15           A.  Because once you start the process in
16   the brain of vasoconstriction, it may potentiate
17   and continue without there being any additional
18   pharmacological effect.  So vasospasm or
19   vasoconstriction, if you like, I'll define the
20   difference that's considered to be.
21           Would you like me to do that.
22           Q.  I would like you to do that.
23           A.  Well, first of all, I use them
24   interchangeably, but vasospasm is thought to be a
25   functional constriction, which is a functional
00087
 1                   Shields
 2   change, and vasoconstriction is a long-term
 3   change, but it doesn't take a long time to
 4   develop after vasospasm has injured a blood
 5   vessel.  So if you keep in mind the difference in
 6   the two terms, you realize that the medical
 7   literature, the medical understanding recognizes
 8   the fact that vasospasm can lead to
 9   vasoconstriction, get it, that there can be a
10   functional change that will injure the blood
11   vessel wall to sustain the change, and exactly
12   how that happens varies from case to case, but it
13   can happen, it does happen with ephedrine and
14   products like it.
15           Of course, the most notorious is those
16   that were related to amphetamine, which is very
17   clearly understood.  I have to take a two-minute
18   break.
19                   (Time noted:  1:58 p.m.)
20                   (Recess taken.)
21                   (Time noted:  2:02 p.m.)
22   MR. OETHEIMER:
23           Q.  I think you said before, Doctor, that
24   your understanding was that he took the product
25   twice a day, three tablets twice a day?
```
                              Page 36

2-20-07 - Singh - Shields.TXT
00088
                         Shields
 1
 2          A.  Yes.
 3          Q.  But you weren't certain at what times
 4     he took it?
 5          A.  That's correct.
 6          Q.  I think you indicated that he took
 7     it, or some reference that he took it per the
 8     distributor's directions?
 9          A.  Yes.
10          Q.  Do you know what time the onset of
11     the stroke was?
12          A.  I don't know for sure, but actually
13     it's something that I have given some thought.  I
14     know that he was seen by 2:15 on 5/10/03, and how
15     many hours before that this all began, I am not
16     totally clear on.
17          Q.  Well, the Cat scan was at 1 o'clock,
18     correct?
19          A.  Yeah.
20          Q.  So he was in the hospital by late
21     morning or before noon?
22          A.  Yes.  Exactly when it started, as I
23     said, I'm not really positive.
24          Q.  Well, at Mr. Singh's deposition on
25     November 15th, 2006, he testified that "it
00089
                         Shields
 1
 2     happened to me like 8 or 9 o'clock, like when I'm
 3     talking my shower."
 4          Do you recall reading that testimony.
 5          A.  If you show it to me.  I haven't
 6     memorized the --
 7               MR. RHEINGOLD:  Could you read it for
 8          the record?
 9               MR. OETHEIMER:  I'm reading at the
10          bottom of page 344, top of page 345, and
11          it's the testimony of November 16th, 2006.
12               THE WITNESS:  Where is it?
13               MR. OETHEIMER:  Question is up here.
14               THE WITNESS:  And on the next page?
15               Okay, I see it.
16     MR. OETHEIMER:
17          Q.  Do you accept that testimony that the
18     stroke happened that morning?
19          A.  Yes.
20          Q.  8, 9 o'clock that morning?
21          A.  Well, I accept that as being
22     consistent.
23          Q.  The onset, consistent?
24          A.  Not that it will change anything very
25     much, but that kind of reporting by somebody
00090
                         Shields
 1
 2     who's had a stroke is not that reliable, could be
 3     a range, and it's certainly clear that by
 4     1 o'clock, he had big time signs on the CT scan
 5     of having blown his aneurism.
 6          Q.  And Mr. Singh testifies that the last
 7     time he took the product, the Herbalife product,
 8     was the day before his stroke?
 9          A.  Well, that's what he seems to have
10     said there, but from the nature, the same
                                        Page 37

2-20-07 - Singh - Shields.TXT
```
11  restriction, I would say, applies to that kind of
12  history, and also my sense of what he said there
13  was he was sort of confused in that part of the
14  testimony in the sense that being harried and
15  really not knowing precisely.
16      Q.  If his habit was to take the product
17  twice a day at 10 a.m. and 3 p.m., do you believe
18  he would have, in all likelihood, have had the
19  onset of his hemorrhage before 10 a.m. that
20  morning?
21          MR. RHEINGOLD:  Objection to form.
22          THE WITNESS:  And also, the question,
23      as I understand it, doesn't really make
24      sense.
25  MR. OETHEIMER:
00091
 1              Shields
 2      Q.  Let me ask a new question.
 3      Do you believe he had the onset of the
 4  hemorrhage before 10 a.m. on May 10th?
 5      A.  He may well have.
 6      Q.  Do you believe he would have taken
 7  the Herbalife product if he was already
 8  experiencing a brain hemorrhage?
 9          MR. RHEINGOLD:  Objection to form.
10          THE WITNESS:  He may or may not.
11      Don't forget that when you have a brain
12      hemorrhage, there's several different
13      aspects to this; number one, is
14      recognizing that something's happened.
15          That doesn't mean that that's when it
16      happened, which sort of works in favor of
17      your argument because he could have had it
18      much earlier.
19  MR. OETHEIMER:
20      Q.  I'm not making arguments, Doctor.
21      A.  I'm thinking out loud for you.
22  You're asking what the process is.
23      On the other hand, patients who have
24  subarachnoid hemorrhage are very often confused,
25  so he may well have taken it despite the fact
00092
 1              Shields
 2  that he was ailing.  So the bottom line answer to
 3  that is I don't know.  He may or may not have
 4  taken it if he didn't feel good.
 5      Q.  Let me ask this.
 6      We can agree that his testimony was under
 7  oath that he did not take it that day?
 8      A.  Yes.
 9      Q.  Does your opinion depend to any
10  degree on his testimony being mistaken on what he
11  himself did?
12      A.  Well, I said before that it wouldn't
13  matter to me in terms of my opinion with regard
14  to the causality, sorry, the causal importance of
15  the use of this medication, this compound,
16  whether he'd taken it the same day or the day
17  before.  I think I said that very clearly before.
18      Q.  You did, and I want it clear on the
19  record.
20      So your opinion does not depend in any
21  way, shape or form on whether or not he took the
```